**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DIANE BOND, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 04 C 2617 |
| CHICAGO POLICE OFFICERS | ) | |
| EDWIN UTRERAS (Star No. 19901), | ) | |
| ANDREW SCHOEFF (Star No. 4436), | ) | |
| CHRIST SAVICKAS (Star No. 5991), | ) | JUDGE LEFKOW |
| ROBERT STEGMILLER (Star No. 18764), | ) | |
| JOSEPH SEINITZ (Star No. 4947), | ) | |
| LORI LIGHTFOOT, Former Chief | ) | MAGISTRATE JUDGE KEYS |
| Administrator of the Office of Professional | ) | |
| Standards; PHILIP CL1NE, Superintendent | ) | |
| of the Chicago Police Department, | ) | **JURY TRIAL DEMANDED** |
| TERRY HILLARD, Former Superintendent | ) | |
| of the Chicago Police Department, in their | ) | |
| individual capacities; and the CITY | ) | |
| OF CHICAGO. | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT</u>**

Defendants, Edwin Utreras, Christ Savickas, Robert Stegmiller, Joseph Seinitz, and Andrew Schoeff (hereafter, "Defendants," unless otherwise indicated), by their attorneys, Thomas J. Platt, Geri Lynn Yanow and Mary McDonald, Assistants Corporation Counsels for the City of Chicago, and for their Answer, Defenses and Jury Demand to Plaintiff's Complaint, on behalf of themselves and no other named, dismissed or unnamed defendants, states as follows:

**INTRODUCTION**

1.      This is a civil rights action for damages and injunctive relief brought pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201 et seq., the Illinois Hate Crimes Act, and Illinois common law for the torts of assault and battery, false arrest and imprisonment, and intentional infliction of emotional distress.

**ANSWER:** Defendants admit plaintiff purports to bring claims under 42 U.S.C. § 1983 for and under Illinois common law for purported violations of her constitutional rights and state common law and statutory claims, but deny the substance and basis of these allegations and deny the remaining allegations in this paragraph.

2. Plaintiff Diane Bond, a fifty-year-old African-American woman, sues the Individual Defendants for their sexual, physical and psychological abuse and intimidation of Ms, Bond in and around her own home, perpetrated under their color of authority as Chicago police officers, and motivated by Defendants' gender and racial anima against Ms. Bond. From April 2003 to March 2004, Defendants, a small crew of Chicago police officers who had engaged in a pattern of abuse in Chicago public housing communities on the South Side of Chicago, committed multiple acts of abuse and preyed upon Ms, Bond. The Defendants invaded the sanctity, safety, and comfort of her home. They violated her body in multiple acts of sexual abuse. They threatened to plant drugs on her and to arrest her on false charges. They desecrated religious items sacred to her. They verbally assaulted her with racial and gender-based epithets. They used instruments such as a loaded gun, needle-nosed pliers, and a screwdriver to threaten her, leaving her convinced they were planning to kill or rape her. They beat and choked her. They beat her teenage son. They forced her to watch as they coerced her son to beat another member of her community. The defendants committed each and every one of these acts with the knowledge that they would be treated with impunity and with absolute confidence that Ms. Bond would be powerless to stop their abuse. The effect of the Defendants' repeated abuses was to destroy the sense of safety and security that Ms. Bond had worked her whole life to build.

**ANSWER:** Defendants admit plaintiff Diane Bond has brought this lawsuit. Further answering, defendants lack sufficient knowledge to form a belief as to the truth or falsity of the allegations that plaintiff is a fifty-year-old African American woman, but deny each and every remaining allegation in this paragraph.

3. Plaintiff sues the City and Supervisory Defendants for their policies, practices, and customs that caused and encouraged the Individual Defendants to repeatedly abuse Ms. Bond.

**ANSWER:** Defendants admit that plaintiff Diane Bond has sued the City and Supervisory Defendants but deny the substance and basis of these allegations and deny the remaining allegations in this paragraph.

2

## JURISDICTION AND VENUE

4.     The jurisdiction of the Court is conferred by 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction is conferred by 28 U.S.C. § 1367.

**ANSWER:**     Defendants admit this court has jurisdiction to hear the claims brought

under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§1331 and 1343 and the state law supplemental

claims pursuant to 28 U.S.C. §1367, but deny the substance and basis of all the plaintiff's purported

claims.

5.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because all defendants reside in the district.

**ANSWER:**     Defendants admit that venue of this case is proper.

## PARTIES

6.     Plaintiff Diane Bond is a fifty-year-old African-American woman, a resident of Cook County, Illinois, and a United States citizen.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

7.     Defendants Edwin Utreras, Andrew Schoeff, Christ Savickas, Robert Stegmiller, and Joseph Seinitz are sworn officers of the Chicago Police Department who are sued in their individual capacities for actions they took by virtue of their authority as police officers.

**ANSWER:**     Defendants admit that they are sworn officers of the Chicago Police

Department and admit they are sued in their individual capacities.  Defendants further deny the

remaining allegations of this paragraph.

8.     Defendant Edwin Utreras, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** Defendants admit that Edwin Utreras, during the times relevant to the complaint as more fully set forth below, acted within the course and scope of his employment as a police officer for the City of Chicago. Defendants deny the remaining allegations of this paragraph.

9. Defendant Andrew Schoeff, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** Defendants admit that Andrew Schoeff, during the times relevant to the complaint as more fully set forth below, acted within the course and scope of his employment as a police officer for the City of Chicago. Defendants deny the remaining allegations of this paragraph.

10. Defendant Christ Savickas, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** Defendants admit that Christ Savickas, during the times relevant to the complaint as more fully set forth below, acted within the course and scope of his employment as a police officer for the City of Chicago. Defendants deny the remaining allegations of this paragraph.

11. Defendant Robert Stegmiller, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** Defendants admit that Robert Stegmiller, during the times relevant to the complaint as more fully set forth below, acted within the course and scope of his employment as a police officer for the City of Chicago. Defendants deny the remaining allegations of this paragraph.

12. Defendant Joseph Seinitz, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** Defendants admit that Joseph Seinitz, during the times relevant to the complaint as more fully set forth below, acted within the course and scope of his employment as a police officer for the City of Chicago. Defendants deny the remaining allegations of this paragraph.

13.     Defendant Lori Lightfoot was the Chief Administrator of the Chicago Police Department's Office of Professional Standards (OPS) from August 2002 to July 2004, and at all times material to this complaint, acted in the course and within the scope of her employment. Lightfoot is sued in her individual capacity for her actions and omissions, by virtue of her authority as Chief Administrator for the Office of Professional Standards.

**ANSWER:**     Defendants, upon information and belief admit that Lori Lightfoot was an administrator for OPS for a period of time. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph.

14.     Defendant Philip Cline is the Superintendent of the Chicago Police Department, and has been the Superintendent since August 2003. As Superintendent, Cline is responsible for the overall management of the Chicago Police Department.  At all times material to this complaint, Cline acted in the course and within the scope of his employment, Cline is sued in his individual capacity.

**ANSWER:**     Defendants, upon information and belief admit that Philip Cline is and has been a Superintendent of the Chicago Police Department for a period of time. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph.

15.     Defendant Terry Hillard was the Superintendent of the Chicago Police Department and served in that capacity until August 15, 2003, during some of the time period relevant to this Complaint.  At all times material to this complaint, Hillard acted in the course and within the scope of his employment, Hillard is sued in his individual capacity.

**ANSWER:**     Defendants, upon information and belief admit that Terry Hillard was the Superintendent of the Chicago Police Department for a period of time. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations of this paragraph

16.     Defendant City of Chicago ("City") is an Illinois municipal corporation that operates the Chicago Police Department, The City was, at all times material to this Complaint, the employer and principal of the Individual and Supervisory Defendants.

5

**ANSWER:** Defendants admit that the City of Chicago is an Illinois municipal corporation and admit that the City of Chicago was their employer and principal at all times material to the Complaint. Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of the remaining allegations in this paragraph.

## FACTS
### April 13, 2003 Incident

17.  At approximately 5:00 p.m. on April 13, 2003, Plaintiff Diane Bond encountered Defendants Savickas, Utreras, Stegmiller, and Schoeff outside her home in Stateway Gardens, a Chicago Housing Authority residence, located at 3651 South Federal in Chicago, Illinois.

**ANSWER:** Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

18.  Defendant Savickas, without any provocation or lawful justification, pressed his loaded gun against Ms. Bond's temple and demanded to know where she lived. Keeping his gun pressed against Ms. Bond's head, he tore her house keys from her hand, opened the door to her home, and forced Ms. Bond inside the apartment.

**ANSWER:** Defendants deny the allegations of this paragraph.

19.  After Savickas opened the door to Ms. Bond's home, three or more additional Chicago Police Officers entered Ms. Bond's apartment.

**ANSWER:** Defendants deny the allegations of this paragraph.

20.  The Individual Defendants imprisoned Ms. Bond in her own home, handcuffing her behind her back, while they searched her home.

**ANSWER:** Defendants deny the allegations of this paragraph.

21.  The Individual Defendants threw Ms. Bond's personal belongings throughout the apartment and damaged her personal property. Among other things, they broke her drinking glasses and certain objects that held religious meaning to Ms. Bond.

**ANSWER:** Defendants deny the allegations of this paragraph.

22.  Ms. Bond's then teen-age son and his friend were also present inside her home. Ms, Bond was forced to watch in handcuffs as members of the Individual Defendants entered her son's bedroom, handcuffed her son and his friend, and beat them.

6

**ANSWER:** Defendants deny the allegations of this paragraph.

23.     In response to Ms. Bond's verbal protest to Defendants' search of her home and beating of her son, Defendant Savickas yelled, "Shut up, Cunt!" as he struck her in the face and kicked her in the side.

**ANSWER:** Defendants deny the allegations of this paragraph.

24.     He then knocked down a painting of a brown-skinned Jesus Christ that was hanging above Ms. Bond's head. When she asked him to pick up her picture of Christ, he cursed, "Fuck Jesus and you too, Bitch," mocking her deeply held religious beliefs.

**ANSWER:** Defendants deny the allegations of this paragraph.

25.     Defendant Stegmiller forced Ms. Bond up, as she sat crying on the floor. He took Ms. Bond inside her bedroom, closed the bedroom door, removed his police vest from his body, and laid the vest down near Ms. Bond's bed. He then removed Ms. Bond's handcuffs, and threatened to plant drugs on her and to falsely charge her with a crime if she did not do what he demanded.

**ANSWER:** Defendants deny the allegations of this paragraph.

26.     Defendant Utreras entered Ms. Bond's bedroom, seized her by her arm, and ordered her to accompany him inside her closet-sized bathroom. He closed the door to the bathroom and stood within a foot or two of her body. Utreras ordered Ms. Bond to unfasten her bra and shake it out. He commanded that she open her pants and pull them down. He then ordered her to place her full hand inside the front of her panties. Defendant Utreras then forced her to push the front of her panties away from her body and toward him, exposing the most private areas of her body, as he stared and smirked. He then compelled Ms. Bond to bring her panties back in contact with her pubic area, keeping her hand inside the front side of her underwear near her vagina. He ordered Ms. Bond to do it again and again. Defendant Utreras threatened to incarcerate Ms. Bond, if she did not submit to his commands.

**ANSWER:** Defendants deny the allegations of this paragraph.

27.     In the hope of ending her abuse, Ms. Bond held out her hands in front of her body so that Utreras could handcuff her again and take her to jail. Instead, he opened the door to the bathroom and ordered Ms Bond to sit on the floor, while Defendant Schoeff beat a middle-aged African-American man, whom Defendants had brought inside Ms. Bond's home without her permission or consent. Defendant Schoeff punched him in the face causing him to fall into Ms. Bond's framed painting of the Last Supper and breaking the glass inside the frame.

**ANSWER:** Defendants deny the allegations of this paragraph.

7

28.     The Individual Defendants uncuffed Ms. Bond's son and his friend and ordered them to punch and beat up the middle-aged African-American man whom Defendants brought uninvited inside Ms. Bond's home.  They compelled Ms. Bond to watch, while they forced her son to perform a sadistic, racist, and demeaning show for the amusement of the Defendants, at the threat of incarceration.  The Individual Defendants left Ms. Bond's home laughing, after they had degraded Ms. Bond and her son.

**ANSWER:**     Defendants deny the allegations of this paragraph.

29.     At no time on April 13, 2003, did Ms. Bond give her permission or consent to any of the Individual Defendants to enter or search her home.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on April 13, 2003, and did not enter or search her home and therefore deny the allegations of this paragraph.

30.     At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to search or seize her person, her home, or her personal belongings.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on April 13, 2003, did not conduct a search or seizure of her person and did not enter or search her home or personal belongings and, therefore, deny the allegations of this paragraph.

31.     The Individual Defendants did not possess any search warrant to search Ms. Bond's home nor an arrest warrant to arrest anyone in Ms. Bond's household.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on April 13, 2003,  did not conduct a search or seizure of her person and did not enter or search her home or personal belongings. Defendants admit they did not possess any search warrant for plaintiff's home and did not possess an arrest warrant for anyone in plaintiff's household, but deny the remaining allegations of this paragraph.

32.     The Individual Defendants' physical and mental abuse and humiliating search of Ms. Bond were excessive, unreasonable, and unsupported by any legal justification.

**ANSWER:**      Defendants state that they had no contact with plaintiff at any time on April 13, 2003, did not conduct a search or seizure of her person and did not enter or search her home and, therefore, deny the allegations of this paragraph.

33.     On April 14, 2003, Ms. Bond reported the Individual Defendants' abuse of their police powers to the City of Chicago's Office of Professional Standards.

**ANSWER:**      Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

### April 28, 2003

34.     Two weeks later, at approximately 7:30 p.m., on April 28, 2003, Defendant Seinitz, along with Defendant Savickas, seized Ms. Bond in the stairway leading to her apartment, without any probable cause or other lawful justification.

**ANSWER:**      Defendants state that they had no contact with plaintiff at any time on April 28, 2003, and, therefore, deny the allegations of this paragraph.

35.     They dragged her up the stairs by her coat.

**ANSWER:**      Defendants state that they had no contact with plaintiff at any time on April 28, 2003, and, therefore, deny the allegations of this paragraph.

36.     The Defendants shouted and cursed at Ms, Bond, "Give me your fucking keys!" As Defendant Seinitz held Ms. Bond by her coat, Defendant Savickas demanded Ms. Bond's house keys and struck Ms. Bond in her face, causing her to urinate on herself out of fear.

**ANSWER:**      Defendants state that they had no contact with plaintiff at any time on April 28, 2003, and, therefore, deny the allegations of this paragraph.

37.     Defendants seized Ms. Bond's keys from her person against her will and used the keys to unlock the front door to her home.

**ANSWER:**      Defendants state that they had no contact with plaintiff at any time on April 28, 2003, and, therefore, deny the allegations of this paragraph.

38.     The five Individual Defendants entered Ms. Bond's home without her permission or consent.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

39.     The Defendants also seized two young African-American men and brought them inside Ms. Bond's home without her permission or consent.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

40.     The Individual Defendants searched through Ms, Bond's home and possessions. When Ms. Bond begged them not to destroy certain items of religious significance, one of the Individual Defendants intentionally knocked Ms. Bond's icon of the Virgin Mary to the floor, broke the statue, and mocked Ms, Bond and her beliefs.  "Fuck the Virgin Mary," he said.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

41.     Three male Chicago police officers demanded that Ms. Bond join them inside her bedroom.  They ordered her to undress.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

42.     The Defendants forced Ms, Bond to pull down her pants and underwear.  They ordered her to turn her back to them and bend over, exposing her genitalia to the male Defendants.  The Individual Defendants further commanded that Ms. Bond reach inside her vagina as they looked on.  Defendant Seinitz thrust a pair of needle-nosed pliers in Ms. Bond's face and threatened to pull out her teeth, unless she complied with their demands.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

43.     The Individual Defendants threatened to plant drugs on her and incarcerate her, and otherwise verbally abused, intimidated, and humiliated her.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

44.     At no time on April 28, 2003 did Ms. Bond give her permission or consent to any of the individual Defendants or any other Chicago police officer to enter or search her home or to search her body.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

45.     The Individual Defendants did not possess any search warrant to search Ms. Bond's home nor an arrest warrant to arrest anyone in Ms. Bond's household.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

46.     At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to search or seize her person, her home, or her personal belongings.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 28, 2003, and, therefore, deny the allegations of this paragraph.

47.     The Individual Defendants' physical abuse and humiliating search of Ms. Bond were excessive, unreasonable, and unsupported by any legal justification.

**ANSWER:**     Defendants deny the allegations of this paragraph.

48.     Ms. Bond filed a second official misconduct complaint with the City of Chicago's Office of Professional Standards against the Individual Defendants for their abuse on April 28, 2003.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as

to the truth or falsity of the allegations of this paragraph.

**April 30, 2003**

49.     Two days later, on April 30, 2003, at approximately 11:30 p.m., Defendants Stegmiller and Savickas confronted Ms. Bond in the lobby of her apartment building at 3651 South Federal in Chicago.

11

**ANSWER:**     Defendants deny the allegations of this paragraph.

50.     Defendant Stegmiller seized Ms. Bond by her arm, and demanded the keys to her home.

**ANSWER:**     Defendants deny the allegations of this paragraph.

51.     As Ms. Bond stood in fear of another assault, Defendant Stegmiller grabbed Ms. Bond around her throat, pushed her up against the elevator door to her apartment building, and threatened, "I'll beat your mother fucking ass."

**ANSWER:**     Defendants deny the allegations of this paragraph.

52.     Ms. Bond cried for help, as Stegmiller choked and cursed her.

**ANSWER:**     Defendants deny the allegations of this paragraph.

53.     Despite Ms. Bond's pleas, Defendant Savickas stood by and kept a look out for his partner, while he choked Ms. Bond. He facilitated and assisted Stegmiller's choking of Ms. Bond, and refused to intercede despite a reasonable opportunity to do so. When a private citizen pleaded with him to aid Ms. Bond, Defendant Savickas thumped his hand against the man's chest and refused to intervene.

**ANSWER:**     Defendants deny the allegations of this paragraph.

54.     Other residents from the building responded to Ms. Bond's cries for help.

**ANSWER:**     Defendants deny the allegations of this paragraph.

55.     Due to their intervention, the Defendants ultimately released Ms. Bond's throat and told her to "get the fuck out of here."

**ANSWER:**     Defendants deny the allegations of this paragraph.

56.     At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to seize her person.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 30, 2003, and, therefore, deny the allegations of this paragraph.

57.     The Individual Defendants' seizure and physical abuse of Ms. Bond were unreasonable, excessive, and unsupported by any legal justification.

**ANSWER:**     Defendants state that they had no contact with plaintiff at any time on

April 30, 2003, and, therefore, deny the allegations of this paragraph.

### March 29 and 30, 2004

58.     Almost a year later, at approximately 11:40 p.m., on March 29, 2004, Ms. Bond was walking down the stairs of her apartment building at 3651 South Federal.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

59.     Defendant Stegmiller accosted her again, this time in the stairwell with a screwdriver in his hand.  Stegmiller ordered Ms. Bond to come to him and threatened to stick her in the neck with the screwdriver.

**ANSWER:**     Defendants deny the allegations of this paragraph.

60.     Defendant Stegmiller and his partner seized Ms. Bond and wrestled her to the ground. They pulled and twisted Ms. Bond's arm behind her back, causing her extreme pain, and forced handcuffs around her wrists.  Ms. Bond screamed and cried for help, in fear for her life and of further sexual abuse.

**ANSWER:**     Defendants deny the allegations of this paragraph.

61.     As Ms. Bond continued to scream for help, Defendant Stegmiller and his partner pulled her off of the ground and removed her handcuffs. Stegmiller placed his finger over his lips, and warned her not to say anything about what happened.

**ANSWER:**     Defendants deny the allegations of this paragraph.

62.     The next night, March 30, 2003, after 8:00 p.m., Defendant Stegmiller stood outside Ms. Bond's home.

**ANSWER:**     Defendants deny the allegations of this paragraph.

63.     Ms. Bond emerged wearing a sling on her right arm that the Defendant had pulled and twisted the night before.  Defendant Stegmiller called to Ms. Bond and nodded at her arm, "What happened to you?" he mocked in feigned ignorance.

**ANSWER:**     Defendants deny the allegations of this paragraph.

13

64.    At no time did Ms. Bond provide Defendant Stegmiller or his partner with probable cause or any legal justification to seize her person.

**ANSWER:**    Defendants state that they had no contact with plaintiff at any time on March 29 or 30, 2003, or March 29 or 30, 2004, and, therefore, deny the allegations of this paragraph.

65.    The Defendants' seizure and physical abuse of Ms. Bond were unreasonable, excessive, and unsupported by any legal justification.

**ANSWER:**    Defendants deny the allegations of this paragraph.

### ALLEGATIONS OF INTENTIONAL CONDUCT AND CAUSATION RELATED TO THE INDIVIDUAL DEFENDANTS

66.    Each of the Individual Defendants acted or failed to act knowingly and intentionally, maliciously, wantonly or with reckless or callous disregard of, or indifference to, the rights of Ms. Bond.

**ANSWER:**    Defendants deny the allegations of this paragraph.

67.    The Individual Defendants' seizures of Ms. Bond, the searches of her body, home, and belongings, physical beatings, physical abuse, choking, assaults, intimidation, and humiliation of Ms. Bond, destruction of her property, and vilification of Ms. Bond's religious beliefs and certain icons were undertaken with the intent to discriminate against Ms. Bond on account of her gender, race, and the color of her skin.

**ANSWER:**    Defendants deny the allegations of this paragraph.

68.    By their actions and omissions, the Individual Defendants violated and abused Ms. Bond's body and home, desecrated her most treasured icons and religious beliefs, violated her Constitutional rights, and robbed Ms, Bond of any feeling of security, leaving Ms. Bond traumatized and violated, in a constant state of fear in and around her own home.

**ANSWER:**    Defendants deny the allegations of this paragraph.

69.    As a direct and proximate result of the conduct of the Individual Defendants described above, Ms. Bond suffered and continues to suffer from severe post traumatic stress disorder and major depression, and other mental and emotional distress, including but not limited to extreme fear, anxiety, mental pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to her self esteem, and the loss of the sense of personal safety in and around her home.  In addition, Ms. Bond suffered physical pain to her head, neck, face, and eye; she

suffered intense pain in her right arm, which was required to be immobilized in a sling; and she was deprived of personal property inside her home.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## CITY OF CHICAGO POLICY, PRACTICE AND CUSTOM

70.     The City maintains a *de facto* policy, practice and custom of failing to properly supervise, monitor, discipline, counsel, and otherwise control its police officers. The City's policy, practice, and custom caused the Individual Defendants to repeatedly violate Ms. Bond's Constitutional rights.

**ANSWER:**     Defendants deny the allegations of this paragraph as it relates to

Defendants' alleged conduct. As the remainder of this paragraph is not directed toward Defendant

Police Officers, they make no answer to it.

71.     In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council, submitted an official resolution recognizing that. "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

72.     The Individual Defendants knew that the City, because of its deficient disciplinary, supervisory, and monitoring practices, rarely imposed meaningful discipline on police officers charged with abuse of civilians.

**ANSWER:**     Defendants deny the allegations of this paragraph.

73.     The Individual Defendants knew that the chance of criminal prosecution for their abuse was virtually nonexistent. On information and belief, in the five years preceding the incidents alleged here, the City has received approximately 8,000 to 10,000 official misconduct complaints a year against Chicago police officers. Approximately 2,500 to 3,000 of those complaints each year charged Chicago police officers with brutality. However, over the fifteen years leading up to the Defendants' abuse of Ms. Bond, there was only one instance of an Illinois stale criminal prosecution of a Chicago police officer for brutality committed while on duty, as a result of the Chicago Police Department's referral of a complaint to the Cook County State's Attorney's Office.

**ANSWER:**     Defendants deny the allegations of this paragraph.

15

74.     From 2001 through 2003, the City received at least 7,610 brutality complaints against Chicago police officers.  The City imposed meaningful discipline in only 13 of those 7,610 complaints, 6 officers were fired and 7 suspended for 30 days or more.  In other words, between 2001 and 2003, a Chicago police officer charged with criminal brutality had only a 0.08% (significantly less than a one in a thousand) chance of being fired, and a 0.17% (less than one-fifth of 1 percent) chance of having any meaningful discipline being imposed.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

75.     During this time period, Judge Holderman, after a full trial in Garcia v. City of Chicago, 2003 U.S. Dist. LEXIS 16565 (N.D.Ill. Sep, 19, 2003), found that the City's police abuse "investigations were incomplete, inconsistent, delayed, and slanted in favor of the officers," *Id*. At *5.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

76.     On information and belief, less than 5 percent of sworn Chicago police officers account for the majority of official complaints of civilian abuse.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

77.     The City, however, lacks any effective early warning system to identify, track and monitor problematic police behavior, much less patterns of abuse of individuals or groups of officers.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

78.     The Individual Defendants knew that the aforementioned City policies allowed officers who have engaged in patterns of abuse to continue to abuse with impunity.  Time and again, the Defendants have seen in their own experience and even in widely reported, high profile cases that obvious patterns of abuse are not punished or stopped.  For example,

- Officer Raymond Piwnicki, who also policed public housing developments on Chicago's South Side, amassed 56 (fifty-six) official abuse complaints within the seven years preceding the Defendants' abuse of Ms. Bond. Despite Piwnicki 's pattern of complaints, the City has never imposed any meaningful discipline or even identified Piwnicki as in need of behavioral intervention. For example, after abusing a middle-aged African-American

16

man in Stateway Gardens (the site of Defendants' abuse of Ms. Bond), a Cook County Circuit Court judge found that Piwnicki had violated the man's Constitutional rights. Despite the Court's finding and the substantial evidence upon which it was based, the Police Department refused to sustain the complaint or even re-open the complaint for further investigation.

- In spite of an obvious and abhorrent record of abusing women from when he started police training to when he was ultimately suspended for abducting and raping a woman, Officer Ernest Marsalis was never monitored, properly supervised, or disciplined for his improper and abusive conduct. Within two years on the police force, Marsalis had been charged with more than twenty complaints of threatening or violent behavior, nearly all of them filed by women,

- Officer Rex Hayes amassed over 65 official misconduct complaints and ten civil lawsuits (costing the City more than $2.5 million dollars), primarily for excessive force and verbal abuse from 1979 to 1999. Despite Hayes' pattern of abuse, the City's supervisory and disciplinary policies were utterly ineffectual in preventing the abase.

- Torture of civilians in Area 2 Chicago Police Headquarters occurred on a systematic basis for more than a decade without disciplinary action by the City. As Judge Shadur recognized, "It is now common knowledge that in the early to mid 1980's Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those that those beatings and other means of torture occurred as an established practice, not just on an insolated basis." *Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D.IU. 1999), Indeed, the Police Department's internal investigation concluded that methodical abuse and torture occurred in Area 2 Chicago Police Headquarters for more than a decade. Despite this "common knowledge" of outright torture, the City did not refer a single Chicago police officer for criminal prosecution.

**ANSWER:** Defendants deny that they engaged in any pattern of abuse. Further answering, Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations of this paragraph.

79. On information and belief, four police officers who worked the night shift with the Individual Defendants on the same tactical team in public housing in 2003 and 2004, collectively have been charged with official misconduct on far more than a hundred occasions within four years of Defendants' abuse of Ms. Bond. On information and belief, the City has never exacted meaningful discipline upon any of the four officers or taken other remedial action to prevent the Defendants' pattern of abuse of members of public housing communities on the South Side of Chicago.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

80.     As a matter of practice, police supervisors are not informed of disciplinary complaints against their subordinate officers. Supervisors are thus kept unaware of their subordinates' patterns of abuse, disciplinary complaints, and misbehavior, and do not intervene to prevent abuse.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

81.     Chicago police supervisors do not believe that misconduct complaints should be considered in evaluating officer performance or completing performance ratings cards.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

82.     The City also maintains an unwritten policy, practice, and custom of a police code of silence. According to standard practice, police officers refuse to report instances of police misconduct, despite their obligation under police regulations to do so. Police officers either remain silent or give false and misleading information during official investigations in order to protect themselves and fellow officers from internal discipline, civil liability, and criminal charges.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

83.     The City has turned a blind eye to the existence of the code of silence and has exhibited a deliberate indifference to its natural consequences-police abuse of our citizenry, including Ms, Bond. In fact, City policy further supports the maintenance of the code of silence by forbidding its Police Department from granting whistleblowers transfers from their unit of assignment to protect them from retaliation.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

## CAUSATION

84.     The Individual Defendants, having full knowledge of and experience with the City of Chicago's policies, practices, and customs of failing to supervise, monitor, discipline, counsel, and otherwise control police officers, subjected Plaintiff to repeated sexual, physical, and mental abuse with absolute impunity.

**ANSWER:**     Defendants deny the allegations of this paragraph.

85.     The Individual Defendants have engaged in a years-long pattern of abuse of persons living in public housing communities on the South Side of Chicago.

**ANSWER:**     Defendants deny the allegations of this paragraph.

86.     On information and belief, the City has never disciplined any of the Individual Defendants for their abuse.  Because of its deficient supervisory, monitoring and disciplinary systems, the City had not even "identified" any of the Individual Defendants as in need of corrective action or behavioral intervention at any time prior to the Defendants' abuse of Plaintiff.

**ANSWER:**     Defendants deny that they engaged in any pattern of abuse and deny the remaining allegations of this paragraph.

87.     On information and belief, none of the Individual Defendants' immediate supervisors in Public Housing South ever counseled or admonished the Individual Defendants regarding patterns of abuse complaints against them, or otherwise intervened to prevent further abuse.

**ANSWER:**     Defendants deny that they engaged in any pattern of abuse and deny the remaining allegations of this paragraph.

88.     On information and belief, none of the Individual Defendants' immediate supervisors in Public Housing South ever downgraded their performance ratings due to the Defendants' pattern of misconduct complaints.  In fact, Defendant Schoeff was promoted shortly after having abused Ms. Bond.

**ANSWER:**     Defendants deny that they engaged in any pattern of abuse and deny the remaining allegations.

89.     If the City had an effective early warning system or appropriate disciplinary, supervisory, and monitoring practices, the Individual Defendants, individually and as a group, would have been detected and stopped, long before they ever had the opportunity to abuse Ms, Bond in 2003 and 2004.

**ANSWER:**     Defendants deny that they engaged in any wrongful conduct and deny the remaining allegations of this paragraph.

90.     On information and belief, collectively, the five Individual Defendants have amassed scores of abuse complaints within four years of their abuse of Ms. Bond.  The Individual Defendants worked together as a team or "crew" for at least two years. Based on the substantial number of

19

complaints against the Defendants individually, it would have been readily apparent to the City that a significant behavior problem existed with respect to each member of the team, if the City had minimally effective early warning system or supervisory practices. The Defendants' collective pattern of abuse would have been even more apparent if the City had a working system.

**ANSWER:** Defendants admit that they worked together as a team for at least two years

but deny the remaining allegations of this paragraph.

91. The number of abuse complaints against the Individual Defendants is even more striking because they have engaged in a pattern of conduct to prevent their names from being known to their victims.

**ANSWER:** Defendants deny the allegations of this paragraph.

92. The Individual Defendants have also intimidated their abuse victims to prevent the bringing of complaints. For example, when a Cook County Public Defender, an officer of the court, took note of their misconduct, Defendant Utreras threatened the attorney in open court in the presence of two Assistant State's Attorneys for Cook County.

**ANSWER:** Defendants deny the allegations of this paragraph.

93. The City's response to Ms. Bond's complaints to the Police Department's Office of Professional Standards further encouraged the Defendants' continued abuse. Ms. Bond's report of Defendants' abuse on April 13, 2003 did not in any way deter the Defendants from abusing her again just two weeks later on April 28. Or two days later on April 30. Or even almost a year later on March 29 and 30, 2004. Knowing the City's deficient disciplinary, supervisory, and monitoring practices, the Defendants were certain that they were immune from punishment.

**ANSWER:** Defendants deny the allegations of this paragraph.

94. The City's deliberate indifference to the police code of silence further encouraged the Individual Defendants' abuse of Ms. Bond. The Individual Defendants knew that their misconduct would go unchecked because their fellow officers would lie to protect them from punishment or turn a blind eye to their abuse. On information and belief, other Chicago police officers have been present on occasions in which the Individual Defendants have been charged with abuse. In no instance, however, has a fellow Chicago police officer ever reported or otherwise corroborated Defendants' abuse. Moreover, members of the Individual Defendants have been present when fellow Defendants have been charged with abuse. In each instance, the Defendants have stood behind the police code of silence and covered up one another's abuse, by either refusing to report the abuse or lying about their fellow Defendants' misconduct.

**ANSWER:** Defendants deny the allegations of this paragraph.

20

95.     As a direct and proximate result of the City policies, practices, and customs described above, Ms. Bond suffered and continues to suffer from severe post traumatic stress disorder and major depression, and other mental and emotional distress, including but not limited to extreme fear, anxiety, mental pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to her self esteem, and the loss of the sense of personal safety in and around her home. In addition, Ms, Bond suffered physical pain to her head, neck, face, and eye; she suffered intense pain in her right arm, which was required to be immobilized in a sling; and she was deprived of personal property inside her home.

**ANSWER:**     Defendants deny the allegations of this paragraph.

## CITY'S DELIBERATE INDIFFERENCE TO
## PLAINTIFF'S RIGHTS AND SAFETY

96.     The City was aware of its lack of an effective early warning system and deficient disciplinary, supervisory and monitoring policies, practices, and customs, but consciously decided not to remedy them. The City knew that because it did not have an effective system to identify, punish, and deter officers who engage in patterns of misconduct, that its officers would continue to abuse and inflict harm on members of the public. The City's disregard of these obvious and known risks demonstrated a conscious, deliberate, and reckless indifference to Ms. Bond's rights and safety.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

97.     In 2003, when the individual Defendants first targeted Ms. Bond for abuse, the City had been aware for many years of the ineffectiveness of its disciplinary and monitoring practices, particularly with respect to repeal offenders.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

98.     In 1981, the United States Civil Rights Commission recommended that police departments implement early warning systems to identify abusive officers and promote police integrity. The International Association of Chiefs of Police echoed this recommendation in 1989.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

99.     The City, aware of its broken system and failure to track and punish repeat abusers, developed an early intervention system in 1995, which it called the "Brainmaker" program. This program would identify repeat abusers and officers at risk of becoming repeat abusers for closer monitoring, counseling, and supervision. Top Police Department officials found that the program

was 95% effective in identifying problems and preventing abuse. The Department used Brainmaker to compile a list of potential problem officers. In spite of its knowledge that such a program would prevent abuse, the City intentionally abandoned plans to use the program in 1996 because of opposition by the Police Union. The City promptly deleted all data contained in the program (including the list of problem officers), knowing that it would have provided the Police Department with information needed to prevent police abuse.

      **ANSWER:**    Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

      100.    In 1997, the City's own Commission on Police Integrity, led by former United States' Attorney, Dan Webb, reported, "Virtually every major city police department in the country has recognized the need for a mechanism which alerts command personnel that an officer may be involved in a pattern of misconduct. The premise is simple: small problems become big ones if left unattended." (Report on the Commission on Police Integrity at p. 20.)

      **ANSWER:**    Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

      101.    The Mayor's Commission further documented that "[t]he need for a sophisticated and thorough early warning system" in Chicago was evident from the Department's failure to identify ten officers from the City's Austin and Gresham Districts who were later indicted on federal charges for their longstanding pattern of police abuse. *Id*, at 21. The Commission noted that the seven indicted Austin officers had a total of 93 complaints lodged against them in their respective careers. Only two of the complaints were sustained by the City. The three indicted Gresham officers had a combined 40 complaints during their careers, with only three being sustained. *Id*. On information and belief, the number of abuse complaints lodged against the Individual Defendants within four years of their abuse of Plaintiff surpasses the number of complaints against the indicted officers within a similar time frame. The Commission found that, if the City had an effective early warning system, it could have prevented the widespread abuses committed by the Austin and Gresham officers, just as it could have prevented the Individual Defendants1 pattern of abuse of people in public housing here.

      **ANSWER:**    Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

      102.    The Commission also found that abusive officers, like the small crew of Individual Defendants, tend to "bond together in groups." *Id*. The Commission noted that the ten officers under indictment did not come from ten different units of assignment spread throughout the Department, but rather from two particular units. Accordingly, the Commission made clear that the Chicago Police Department must "look not just at the records of individual officers but also at units within the Department." *Id*. The Commission develop an

22

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

103.     The City's Commission concluded that a "fully computerized" early warning system was necessary to identify officers, groups of officers, and police units that engage in patterns of misconduct.  *Id*.  It found that the system must collect and analyze a variety of data that, at minimum, include non-sustained complaints, civil lawsuits, use of force, and medical time. *Id*. Despite its acknowledged need since at least 1997, the City chose and continues to choose through the date of this Complaint not to implement an effective computerized early warning system.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

104.     In 2000, the City continued to refuse to implement an effective early warning system, even after the City Council resolution by its Chief of the Police and Fire Committee concerning Chicago police officers' knowledge of the complete lack of accountability in the Chicago Police Department.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

105.     In 2001, the Commission on Accreditation for Law Enforcement Agencies adopted the following standard mandating early warning systems for large agencies like Chicago:

A comprehensive Personnel Early Warning System is an essential component of good discipline in a well-managed law enforcement agency.

 CALEA Standard 35.1.15 (2001).  Notwithstanding the CALEA Standards, the City refused to take steps to implement an effective early warning system or otherwise improve its procedures for monitoring, supervising, and disciplining repeat abusers.

**ANSWER:**     Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph.

106.     Also in 2001, the Justice Coalition of Greater Chicago (JCGC), a coalition of more than a hundred community groups, presented findings of its study and experience with the Chicago Police Department to Mayor Daley, Defendant Hillard, and the Chicago Police Board.  The JCGC's study confirmed that the Chicago Police Department lacked many of the basic management tools necessary to identify, monitor, punish and prevent police misconduct and brutality, including adequate early warning, disciplinary, and monitoring systems.  In response, the Chicago Police

Board, the civilian oversight panel appointed by the Mayor to regulate the activities of the Chicago Police Department and to adopt rules and regulations governing police conduct, made clear that the City "recognizes the importance of an effective early warning system to identify and remedy potential disciplinary problems." (Letter of Demetrius Carney, President of Chicago Police Board, dated June 13,2001). The Police Board acknowledged that the Police Department's system in this regard was a "work in progress," and it recommended the development of an "effective and automated early warning system." *Id*. The City refused to do so.

      **ANSWER:** Defendants lack sufficient knowledge or information to form a belief as to the

truth or falsity of the allegations of this paragraph.

      107.    In 2003, after a jury trial, Judge Holderman found that the City maintained a custom and practice of not adequately investigating, disciplining, or prosecuting Chicago police officers. *Garcia*, 2003 U.S. Dist. Lexis 16565. The Court also found that the Police Department's "environment" (code of silence) that permits the perpetration of abuse with impunity was proven to be a "widespread custom and practice within the CPD regarding off-duty police misconduct." *Id*.

      **ANSWER:** Defendants lack sufficient knowledge or information to form a belief as to the

truth or falsity of the allegations of this paragraph.

      108.    The City, at all times material to this Complaint, knew from reliable national, local, community, and internal sources, including the Department of Justice, community groups, members of the police department and its policymakers, and local elected officials, about the problems presented by repeat abusers, such as the Individual Defendants. Knowing that an early warning system is needed to identify repeat offenders, that repeat offenders continue to abuse with impunity, and that the result of the broken system is that that these officers would continue to abuse, the City made a conscious choice to maintain the status quo. The City has repeatedly turned a blind eye to problem officers, and a deaf ear on the concerns of national, local and community voices. Such inaction constitutes deliberate indifference and acquiescence to the predictable results that directly caused and encouraged Individual Defendants to inflict repeated and sustained sexual, physical, and mental abuse on Ms. Bond.

      **ANSWER:**    Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

## SUPERVISORY LIABILITY OF DEFENDANTS
## CLINE, HILLARD AND LIGHTFOOT

      109.    Defendants Cline, Hillard, and Lightfoot caused and participated in the deprivations of the Plaintiff's constitutional rights and injuries as alleged above.

**ANSWER:**        Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

110.    Defendants Cline, Hillard and Lightfoot, at all times material 10 this complaint, were aware that the City maintained a widespread and settled policy, practice and custom of failing to properly supervise, monitor, discipline, counsel, and otherwise control its police officers.  The Supervisory Defendants were also aware that the maintenance of these practices would result in preventable police abuse.

**ANSWER:**        Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

111.    The Supervisory Defendants oversaw, endorsed, condoned, and acquiesced in the above-mentioned policies, practices, and customs, and refused to take steps to correct them.

**ANSWER:**        Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

112.    The Supervisory Defendants, at all times material to this complaint, caused and facilitated the systematic denial of Plaintiff's constitutional rights, by, among other things: (a) failing to monitor police officers and groups who violate the constitutional rights of citizens; (b) failing to discipline police officers who engaged in constitutional rights violations; (c)turning a blind eye to repeated and systemic abuses of the constitutional rights of citizens, including the Plaintiff; and (d) failing to develop and implement an effective early warning system to identify police officers and groups who systematically violate the constitutional rights of citizens.

**ANSWER:**        Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

113.    The Supervisory Defendants were, at all times material to this complaint, deliberately indifferent to the rights and safety of Plaintiff, as evidenced by their acquiescence to and support of these policies and their obvious consequences.

**ANSWER:**        Defendants lack sufficient knowledge or information to form a belief as to

the truth or falsity of the allegations of this paragraph.

## CLAIM 1: FOURTH AND FOURTEENTH AMENDMENTS
### (Illegal Search of Person, Home, and Effects)

25

114.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**    Defendants adopt and realleges their answers to paragraphs 1-113 as though fully set forth here.

115.    Plaintiff asserts Claim I of this action against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs. Claim I arises under 42 U.S.C. § 1983.

**ANSWER:**    Defendants admit that Claim I purports to state claims against the Defendants in their individual capacities under 42 U.S.C. § 1983, but deny the factual and substantive basis of these claims.

116.    The Defendants' unreasonable and illegal searches of Plaintiff's person, home, and personal possessions, undertaken without a warrant, probable cause, or reasonable suspicion, deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be secure in her person, home, papers, and effects against unreasonable searches and seizures.

**ANSWER:**    Defendants deny the allegations in this paragraph.

117.    The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

**ANSWER:**    Defendants deny the allegations in this paragraph.

118.    Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.

**ANSWER:**    Defendants deny the allegations in this paragraph.

119.    The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:**    Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

26

## CLAIM II: FOURTH AND FOURTEENTH AMENDMENTS
### (Unlawful and Unreasonable Seizure and Detention)

120.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**        Defendants adopt and reallege their answers to paragraphs 1-113 as though fully set forth here.

121.    Plaintiff asserts Claim II of this action against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs.  Claim II arises under 42 U.S.C. § 1983.

**ANSWER:**        Defendants admit that Claim II purports to state claims against the Defendants in their individual capacities under 42 U.S.C. § 1983, but deny the factual and substantive basis of these claims.

122.    The Defendants' false arrests of Plaintiff and unlawful and unreasonable seizures of Plaintiff's person and effects without a warrant, probable cause, or reasonable suspicion, deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be secure in her person, home, papers, and effects against unreasonable searches and seizures.

**ANSWER:**        Defendants deny the allegations in this paragraph.

123.    The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

**ANSWER:**        Defendants deny the allegations in this paragraph.

124.    Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.

**ANSWER:**        Defendants deny the allegations in this paragraph.

125.    The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:**        Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## CLAIM III: FOURTH AND FOURTEENTH AMENDMENT
### (Excessive Force)

126.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**    Defendants adopt and reallege their answers to paragraphs 1-113 as though fully set forth here.

127.    Plaintiff asserts Claim III of this action against the Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs.  Claim III arises under 42 U.S.C. § 1983.

**ANSWER:**    Defendants admit that Claim III purports to state claims against the Defendants in their individual capacities under 42 U.S.C. § 1983, but deny the factual and substantive basis of these claims.

128.    The Defendants' physical beating, physical abuse, choking, assault, intimidation, and humiliation of Plaintiff without probable cause deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be free from the use of excessive and unreasonable force.

**ANSWER:**    Defendants deny the allegations in this paragraph.

129.    The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Individual Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, destruction of her personal property, and loss of personal freedom, as set forth more fully above.

**ANSWER:**    Defendants deny the allegations in this paragraph.

130.    Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.  The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:**    Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## CLAIM IV: FOURTEENTH AMENDMENT
### (Equal Protection)

131.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**        Defendants adopt and reallege their answers to paragraphs 1-113 as though fully set forth here.

132.    Plaintiff asserts Claim IV of this action against the Individual Defendants in their individual capacities.  Claim IV arises under 42 U.S.C. § 1983.

**ANSWER:**        Defendants admit that Claim IV purports to state claims against the Defendants in their individual capacities under 42 U.S.C. §1983, but deny the factual and substantive basis of these claims.

133.    The actions and omissions of the Defendants, in seizing Plaintiff, searching her body, home, and belongings, physical beating and abusing her, assaulting, intimidating, and humiliating her, were undertaken with the intent to discriminate against Plaintiff on account of Plaintiff's gender, race, and color of her skin, denying Plaintiff of her Fourteenth Amendment right to equal protection under the law.

**ANSWER:**        Defendants deny the allegations in this paragraph.

134.    The Individual Defendants singled Plaintiff out for abuse (as set forth more fully above) and treated her differently from other similarly situated persons. The Individual Defendants' differential treatment of Plaintiff was intentional, malicious, and motivated by ill-will.  Their differential treatment was also motivated by their gender and racial animus.  In addition, their differential treatment of Plaintiff was arbitrary and irrational.

**ANSWER:**        Defendants deny the allegations in this paragraph.

135.    The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

**ANSWER:**      Defendants deny the allegations in this paragraph.

136.    Each of the Defendants' actions and omissions was intentional, willful and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.

**ANSWER:**      Defendants deny the allegations in this paragraph.

137.    The award of punitive damages against each Individual Defendant is necessary to punish him for his misconduct, and to deter similar misconduct.

**ANSWER:**      Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## CLAIM V: ILLINOIS HATE CRIME STATUTE

138.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**      Defendants adopt and reallege their answers to paragraphs 1-113 as though fully set forth here.

139.    Plaintiff asserts Claim V of this complaint, arising under the private right of action included in the Illinois Hate Crimes Statute, 720ILCS 5/12-7.1, against the Individual Defendants and their employer, the City of Chicago.  This Court has jurisdiction of this claim under 28 U.S.C. § 1367.

**ANSWER:**      Defendants admit that Claim V purports to state claims against the Defendants in their individual capacities under 42 U.S.C. §1983, but deny the factual and substantive basis of these claims.

140.    The Individual Defendants' assault, battery, trespass to her home, and damage to her property, as set forth more fully above, were intentional, willful, wanton, malicious, and motivated, in whole or in part, by the Plaintiff's gender, race, color, and ancestry, in violation of Illinois statute 720lLCS5/12-7.1(a).

**ANSWER:**      Defendants deny the allegations in this paragraph.

30

141.    The aforementioned actions of the Individual Defendants were the direct and proximate cause of Plaintiff's physical and emotional injuries and loss of personal property, as set forth more fully above.

**ANSWER:**    Defendants deny the allegations in this paragraph.

142.    The actions committed by the Individual Defendants were undertaken within the scope of their employment as police officers of the City of Chicago.

**ANSWER:**    Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## CLAIM VI: ILLINOIS BATTERY

143.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**    Defendants adopt and realleges their answers to paragraphs 1-113 as though fully set forth here.

144.    Plaintiff asserts Claim VI of this complaint, arising under Illinois common law, against the Individual Defendants and their employer, the City of Chicago.  This Court has jurisdiction of this claim under 28 U.S.C. § 1367.

**ANSWER:**    Defendants admit that Claim VI purports to state claims against the Defendants in their individual capacities under 42 U.S.C. §1983, but deny the factual and substantive basis of these claims.

145.    The Individual Defendants subjected Plaintiff to contact of an insulting and provoking nature and caused Plaintiff bodily harm, directly and proximately causing Plaintiff's physical and emotional injuries, as set forth above.  The Individual Defendants thereby subjected Plaintiff to the tort of battery under Illinois law.

**ANSWER:**    Defendants deny the allegations in this paragraph.

146.    The Individual Defendants' actions and omissions, as set forth above, were intentional, willful, wanton, malicious, and without probable cause, provocation, or legal justification, and/or with reckless disregard for their natural consequences.

31

**ANSWER:**        Defendants deny the allegations in this paragraph.

147.    The actions committed by the Individual Defendants described above were undertaken within the scope of their employment as police officers of the City of Chicago.

**ANSWER:**        Defendants deny the allegations in this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

### CLAIM VII: ILLINOIS FALSE ARREST AND IMPRISONMENT

148.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**        Defendants adopt and reallege their answers to paragraphs 1-147 as though fully set forth here.

149.    Plaintiff asserts Claim VII of this complaint, arising under Illinois common law, against the individual Defendants and their employer, the City of Chicago.  This Court has jurisdiction of this claim under 28 U.S.C. § 1367.

**ANSWER:**        Defendants admit that Claim VII purports to state claims against the Defendants in their individual capacities under 42 U.S.C. § 1983, but deny the factual and substantive basis of these claims.

150.    The Individual Defendants' seizure and arrest of the Plaintiff without a warrant and without probable cause were intentional, willful, wanton, and unreasonable; they denied Plaintiff her personal liberty against her will; and they constitute the tort of false arrest and imprisonment under Illinois law.  Further, these actions directly and proximately caused Plaintiff's injuries as set forth more fully above.

**ANSWER:**        Defendants deny the allegations in this paragraph.

151.    The actions committed by the Individual Defendants described above were undertaken within the scope of their employment as police officers of the City of Chicago.

**ANSWER:**        Defendants deny the allegations of this paragraph.

32

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## CLAIM VIII: ILLINOIS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

152.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**    Defendants adopt and reallege their answers to paragraphs 1-113 as though fully set forth here.

153.    Plaintiff asserts Claim VIII of this action, an Illinois common law action for intentional infliction of emotional distress, against the Individual Defendants and their employer, the City of Chicago.  This Court has jurisdiction of this claim under 28 U.S.C. § 1367.

**ANSWER:**    Defendants admit that Claim VIII purports to state claims against the Defendants in their individual capacities under 42 U.S.C. §1983, but deny the factual and substantive basis of these claims.

154.    The actions committed by the Individual Defendants as described above were extreme and outrageous; they were undertaken willfully, wantonly and maliciously, with the intent to cause Plaintiff severe emotional distress; and they caused and continue to cause Plaintiff severe emotional distress.

**ANSWER:**    Defendants deny the allegations of this paragraph.

155.    The actions committed by the Individual Defendants described above were undertaken within the scope of their employment as police officers of the City of Chicago.

**ANSWER:**    Defendants deny the allegations of this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, and to award such costs and other relief that this Court deems just and proper.

## CLAIM IX: ILLINOIS LOCAL GOVERNMENT AND LOCAL GOVERNMENT EMPLOYEES TORT IMMUNITY ACT (745 1LCS 10/9-102B)

156.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**        Defendants adopt and reallege their answers to paragraphs 1-155 as though fully set forth here.

157.    Claim IX of this Complaint is an Illinois statutory claim against Defendant City of Chicago.  This Court has jurisdiction of this claim under 28 U.S.C. § 1367.

**ANSWER:**        Defendants admit that Claim IX purports to state claims against the Defendants in their individual capacities under 42 U.S.C.§1983, but deny the factual and substantive basis of these claims.

158.    Defendant City of Chicago is the employer of each of the Individual Defendants.

**ANSWER:**        Defendants admit the allegations of this paragraph.

159.    Each of the Individual Defendants committed the acts and omissions alleged above under color of state law and in the scope of their employment as employees of the City of Chicago.

**ANSWER:**        Defendants admit that during the times relevant to the complaint, they acted within the course and scope of their employment as police officers for the City of Chicago, but deny the remaining allegations of this paragraph.

WHEREFORE, Defendants pray that this Court dismiss plaintiff's complaint, enter judgment in favor of defendants and against plaintiff and to award such costs and other relief that this Court deems just and proper.

## FED. R. CIV. P. 12(b)(6) DEFENSES

1.    The Amended  Complaint fails to state claims upon which relief can be granted against defendants in Claim IV for Equal Protection as a matter of law and Claim IV should therefore be dismissed with prejudice

2.    The Amended Complaint fails to state claims upon which relief can be granted

34

against defendants in Claim V under the Illinois Hate Crime Statute as a matter of law and Claim V should therefore be dismissed with prejudice.

3.     The Amended Complaint fails to state claims upon which relief can be granted against defendants in Claim VIII for intentional infliction of emotional distress as a matter of law and Claim VIII should therefore be dismissed with prejudice.

4.     An award of punitive damages would deprive Defendants Utreras, Savickas, Stegmiller, Seinitz and Schoeff due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution where:

> (a)  liability for punitive damages has not been proven beyond a reasonable doubt, or at least by clear and convincing evidence;
>
> (b)  the award of punitive damages is disproportionate to actual damages.

## FIRST AFFIRMATIVE DEFENSE

Defendants are government officials who perform discretionary functions.  As to the federal claims against defendants, at all times material to the events alleged in plaintiff's complaint, a reasonable police officers objectively viewing the facts and circumstances that confronted the defendant officers, could have believed their actions to be lawful, in light of the clearly established law and the information that defendants possesses.  The Individual Defendants, therefore, are entitled to qualified immunity as a matter of law.

## SECOND AFFIRMATIVE DEFENSE

Where defendants may be liable in damages, the total amount of damages to which Plaintiff would otherwise be entitled must be reduced by application of principles of comparative fault and contributory fault in proportion to the amount of the willful and wanton or negligent or

other wrongful conduct of Plaintiff's which were the proximate cause of these injuries and damages.

### THIRD AFFIRMATIVE DEFENSE

Under the Illinois Tort Immunity Act, the defendants are not liable for the claims alleged because a public employee is not liable for his or her acts or omission in the execution or enforcement of any law, unless such acts or omissions constitute wilful and wanton or negligent or other wrongful conduct of Plaintiff's which were the proximate cause of these injuries and damages.

### FOURTH AFFIRMATIVE DEFENSE

Under the Tort Immunity, defendants are not liable for the allegations because a public employee, as such and acting with the scope of his or her employment, is not liable for any injury caused by the act or omission of another person. 745 ILCS 10/2-204.

### FIFTH AFFIRMATIVE DEFENSE

Under the Tort Immunity Act, defendants are not liable for any of the claims alleged because the decision as to what actions taken with regard to the plaintiff, were discretionary decisions for which the City and its employees are immune from liability. 745 ILCS 10/2-201.

### SIXTH AFFIRMATIVE DEFENSE

To the extent that any Defendant is found to have used force, Defendants were justified in the use of force against Plaintiff because they reasonably believed that such force was necessary to prevent bodily harm to themselves or others. 720 ILCS 5/8-1 or 720 ILCS 5/7-5.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent that plaintiff failed to mitigate any of her claimed injuries or damages, any verdict or judgment obtained by plaintiff must be reduced by the application of the principle that plaintiff has a duty to mitigate attributed to plaintiff by the jury in this case.

## JURY DEMAND

The Individual Defendants request trial by jury.


Respectfully submitted,

*/s/ Thomas J. Platt*
Thomas J. Platt
Senior Corporation Counsel


30 N. LaSalle Street,          July 14, 2006
Suite 1400
Chicago, Illinois 60602
(312) 744-8307
(312) 744-6566 (Fax)
Atty. No. 06199995