**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DIANE BOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 C 2617 |
| | ) | |
| CHICAGO POLICE OFFICERS EDWIN | ) | Judge Lefkow |
| UTRERAS (Star No. 19901), ANDREW | ) | |
| SCHOEFF.(Star No. 4436), CHRIST | ) | Magistrate Judge Keys |
| SAVICKAS (Star No. 5991), ROBERT | ) | |
| STEGMILLER (Star No. 18764), JOSEPH | ) | Jury Demand |
| SEINITZ (Star No. 4947), LORI LIGHTFOOT, | ) | |
| Former Chief Administrator of the Office of | ) | |
| Professional Standards; PHILIP CLINE; | ) | |
| Superintendent of the Chicago Police | ) | |
| Department, TERRY HILLARD, Former | ) | |
| Superintendent of the Chicago Police | ) | |
| Department, in their individual capacities; and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS CLINE, HILLARD, AND LIGHTFOOT'S JOINT ANSWER,
DEFENSES AND JURY DEMAND TO PLAINTIFF'S AMENDED COMPLAINT**

Defendants Philip Cline, Terry Hillard, and Lori Lightfoot (collectively, the "Supervisory

Defendants"), by Mara S. Georges, Corporation Counsel, answer plaintiff's Amended Complaint

and state:

1.    This is a civil rights action for damages and injunctive relief brought pursuant to

the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and

1988, 28 U.S.C. § 2201 et seq., the Illinois Hate Crimes Act, and Illinois common law for the

torts of assault and battery, false arrest and imprisonment, and intentional infliction of emotional

distress.

**ANSWER:**    The Supervisory Defendants admit that plaintiff purports to bring a civil

rights action for damages against all defendants pursuant to 42 U.S.C. § 1983 and for injunctive

relief against certain defendants. The Supervisory Defendants further admit that plaintiff brings

certain Illinois state common law and statutory claims against certain defendants. The

Supervisory Defendants deny that the United States Constitution provides plaintiff with a direct

cause of action. The Supervisory Defendants further deny that this court has jurisdiction over

any claims in this action pursuant to 42 U.S.C. § 1988. The Supervisory Defendants lack

sufficient knowledge or information to form a belief as to the truth of the remaining allegations

of this paragraph.

   2. Plaintiff Diane Bond, a fifty-year-old African-American woman, sues the
Individual Defendants[1] for their sexual, physical and psychological abuse and intimidation of Ms.
Bond in and around her own home, perpetrated under their color of authority as Chicago police
officers, and motivated by Defendants' gender and racial anima against Ms. Bond. From April
2003 to March 2004, Defendants, a small crew of Chicago police officers who had engaged in a
pattern of abuse in Chicago public housing communities on the South Side of Chicago,
committed multiple acts of abuse and preyed upon Ms. Bond. The Defendants invaded the
sanctity, safety, and comfort of her home. They violated her body in multiple acts of sexual
abuse. They threatened to plant drugs on her and to arrest her on false charges. They desecrated
religious items sacred to her. They verbally assaulted her with racial and gender-based epithets.
They used instruments such as a loaded gun, needle-nosed pliers, and a screwdriver to threaten
her, leaving her convinced they were planning to kill or rape her. They beat and choked her.
They beat her teenage son. They forced her to watch as they coerced her son to beat another
member of her community. The defendants committed each and every one of these acts with the
knowledge that they would be treated with impunity and with absolute confidence that Ms. Bond
would be powerless to stop their abuse. The effect of the Defendants' repeated abuses was to
destroy the sense of safety and security that Ms. Bond had worked her whole life to build.

   **ANSWER:** The Supervisory Defendants admit that plaintiff Diane Bond has brought

this lawsuit. The Supervisory Defendants lack sufficient knowledge or information to form a

belief as to the truth of the remaining allegations of this paragraph.

---

  [1] Hereafter, Defendants Utreras, Schoeff, Savickas, Stegmiller and Seinitz shall collectively
be referred to as the "Individual Defendants." Defendants Cline, Hillard, and Lightfoot shall be
referred to as the "Supervisory Defendants."

3.    Plaintiff sues the City and Supervisory Defendants for their policies, practices, and customs that caused and encouraged the Individual Defendants to repeatedly abuse Ms. Bond.

**ANSWER:**    The Supervisory Defendants admit that plaintiff purports to sue the City and Supervisory Defendants for their policies, practices, and customs that caused and encouraged the Individual Defendants to repeatedly abuse plaintiff.  The Supervisory Defendants deny that they are or were aware that the City has any of the policies, practices, and customs alleged in the Amended Complaint, and that such policies, practices, and customs exist or existed.  Answering further, the Supervisory Defendants deny that they are or were deliberately indifferent to the constitutional rights of citizens, including plaintiff.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

## JURISDICTION AND VENUE

4.    The jurisdiction of the Court is conferred by 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction is conferred by 28 U.S.C. § 1367.

**ANSWER:**    The Supervisory Defendants admit the allegations of this paragraph.

5.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because all defendants reside in the district.

**ANSWER:**    The Supervisory Defendants admit the allegations of this paragraph.

## PARTIES

6.    Plaintiff Diane Bond is a fifty-year-old African-American woman, a resident of Cook County, Illinois, and a United States citizen.

**ANSWER:**    On information and belief, the Supervisory Defendants admit the allegations of this paragraph.

-3-

7. Defendants Edwin Utreras, Andrew Schoeff, Christ Savickas, Robert Stegmiller, and Joseph Seinitz are sworn officers of the Chicago Police Department who are sued in their individual capacities for actions they took by virtue of their authority as police officers.

**ANSWER:** The Supervisory Defendants admit that plaintiff purports to sue defendants Utreras, Schoeff, Savickas, Stegmiller, and Seinitz in their individual capacities for actions they allegedly took by virtue of their authority as police officers. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

8. Defendant Edwin Utreras, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

9. Defendant Andrew Schoeff, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

10. Defendant Christ Savickas, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

11. Defendant Robert Stegmiller, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

12. Defendant Joseph Seinitz, at all times relevant to this Complaint, acted under color of state law as a police officer of the City of Chicago, and acted in the course and within the scope of his employment.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

13. Defendant Lori Lightfoot was the Chief Administrator of the Chicago Police Department's Office of Professional Standards (OPS) from August 2002 to July 2004, and at all times material to this complaint, acted in the course and within the scope of her employment. Lightfoot is sued in her individual capacity for her actions and omissions, by virtue of her authority as Chief Administrator for the Office of Professional Standards.

**ANSWER:** The Supervisory Defendants admit that defendant Lori Lightfoot was the Chief Administrator of the Office of Professional Standards from approximately August 2002 to approximately July 2004. The Supervisory Defendants further admit that during this period of time Lightfoot acted in her capacity as Chief Administrator of OPS. Answering further, the Supervisory Defendants admit that plaintiff purports to sue Lightfoot in her individual capacity for her alleged actions and omissions, by virtue of her authority as Chief Administrator for OPS. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

14. Defendant Philip Cline is the Superintendent of the Chicago Police Department, and has been the Superintendent since August 2003. As Superintendent, Cline is responsible for the overall management of the Chicago Police Department. At all times material to this complaint, Cline acted in the course and within the scope of his employment. Cline is sued in his individual capacity.

**ANSWER:** The Supervisory Defendants admit that defendant Cline is Superintendent of the Chicago Police Department and that Cline has been the Superintendent of the CPD since

approximately August 2003. The Supervisory Defendants further admit that during this period of

time Cline has acted in his capacity as the Superintendent of the CPD. Answering further, the

Supervisory Defendants admit that plaintiff purports to sue Cline in his individual capacity. The

Supervisory Defendants state that plaintiff's allegation that as Superintendent, Cline is

responsible for the overall management of the Chicago Police Department is a vague,

incomplete, or incorrect statement of the Superintendent's relation to the Chicago Police

Department under Illinois law and City ordinance, and therefore this allegation is deemed denied.

The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the

truth of the remaining allegations of this paragraph.

15. Defendant Terry Hillard was the Superintendent of the Chicago Police
Department and served in that capacity until August 15, 2003, during some of the time period
relevant to this Complaint. At all times material to this complaint, Hillard acted in the course
and within the scope of his employment. Hillard is sued in his individual capacity.

**ANSWER:** The Supervisory Defendants admit that defendant Hillard was

Superintendent of the Chicago Police Department from approximately March 1998 to

approximately August 2003. The Supervisory Defendants further admit that during this period of

time Hillard acted in his capacity as the Superintendent of the CPD. Answering further, the

Supervisory Defendants admit that plaintiff purports to sue Hillard in his individual capacity.

The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the

truth of the remaining allegations of this paragraph.

16. Defendant City of Chicago ("City") is an Illinois municipal corporation that
operates the Chicago Police Department. The City was, at all times material to this Complaint,
the employer and principal of the Individual and Supervisory Defendants.

-6-

**ANSWER:** The Supervisory Defendants admit that defendant City of Chicago is an Illinois municipal corporation.  The Supervisory Defendants further admit that the City was the employer and principal of defendant Lightfoot in her capacity as Chief Administrator of OPS on April 13, 28, and 30, 2003, and on March 29 and 30, 2004; that it was the employer and principal of defendant Hillard in his capacity as Superintendent of CPD on April 13, 28, and 30, 2003; and that it was the employer and principal of defendant Cline in his capacity as Superintendent of CPD on March 29 and 30, 2004.  The Supervisory Defendants state that plaintiff's allegation that the City operates the Chicago Police Department is a vague, incomplete, or incorrect statement of the City's relation to the Chicago Police Department under Illinois law and City ordinance, and therefore this allegation is deemed denied.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the remaining truth of the remaining allegations of this paragraph.

## FACTS
### April 13, 2003 Incident

17.    At approximately 5:00 p.m. on April 13, 2003, Plaintiff Diane Bond encountered Defendants Savickas, Utreras, Stegmiller, and Schoeff outside her home in Stateway Gardens, a Chicago Housing Authority residence, located at 3651 South Federal in Chicago, Illinois.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

18.    Defendant Savickas, without any provocation or lawful justification, pressed his loaded gun against Ms. Bond's temple and demanded to know where she lived.  Keeping his gun pressed against Ms. Bond's head, he tore her house keys from her hand, opened the door to her home, and forced Ms. Bond inside the apartment.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

-7-

19.     After Savickas opened the door to Ms. Bond's home, three or more additional Chicago Police Officers entered Ms. Bond's apartment.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

20.     The Individual Defendants imprisoned Ms. Bond in her own home, handcuffing her behind her back, while they searched her home.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

21.     The Individual Defendants threw Ms. Bond's personal belongings throughout the apartment and damaged her personal property.  Among other things, they broke her drinking glasses and certain objects that held religious meaning to Ms. Bond.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

22.     Ms. Bond's then teen-age son and his friend were also present inside her home. Ms. Bond was forced to watch in handcuffs as members of the Individual Defendants entered her son's bedroom, handcuffed her son and his friend, and beat them.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

23.     In response to Ms. Bond's verbal protest to Defendants' search of her home and beating of her son, Defendant Savickas yelled, "Shut up, Cunt!" as he struck her in the face and kicked her in the side.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

24.     He then knocked down a painting of a brown-skinned Jesus Christ that was hanging above Ms. Bond's head.  When she asked him to pick up her picture of Christ, he cursed, "Fuck Jesus and you too, Bitch," mocking her deeply held religious beliefs.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

25.    Defendant Stegmiller forced Ms. Bond up, as she sat crying on the floor.  He took Ms. Bond inside her bedroom, closed the bedroom door, removed his police vest from his body, and laid the vest down near Ms. Bond's bed.  He then removed Ms. Bond's handcuffs, and threatened to plant drugs on her and to falsely charge her with a crime if she did not do what he demanded.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

26.    Defendant Utreras entered Ms. Bond's bedroom, seized her by her arm, and ordered her to accompany him inside her closet-sized bathroom.  He closed the door to the bathroom and stood within a foot or two of her body.  Utreras ordered Ms. Bond to unfasten her bra and shake it out.  He commanded that she open her pants and pull them down.  He then ordered her to place her full hand inside the front of her panties.  Defendant Utreras then forced her to push the front of her panties away from her body and toward him, exposing the most private areas of her body, as he stared and smirked.  He then compelled Ms. Bond to bring panties back in contact with her pubic area, keeping her hand inside the front side of her underwear near her vagina.  He ordered Ms. Bond to do it again and again.  Defendant Utreras threatened to incarcerate Ms. Bond, if she did not submit to his commands.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

27.    In the hope of ending her abuse, Ms. Bond held out her hands in front of her body so that Utreras could handcuff her again and take her to jail.  Instead, he opened the door to the bathroom and ordered Ms Bond to sit on the floor, while Defendant Schoeff beat a middle-aged African-American man, whom Defendants had brought inside Ms. Bond's home without her permission or consent.  Defendant Schoeff punched him in the face causing him to fall into Ms. Bond's framed painting of the Last Supper and breaking the glass inside the frame.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

28.    The Individual Defendants uncuffed Ms. Bond's son and his friend and ordered them to punch and  beat up the middle-aged African-American man whom Defendants brought uninvited inside Ms. Bond's home.  They compelled Ms. Bond to watch, while they forced her

-9-

son to perform a sadistic, racist, and demeaning show for the amusement of the Defendants, at the threat of incarceration. The Individual Defendants left Ms. Bond's home laughing, after they had degraded Ms. Bond and her son.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

29.    At no time on April 13, 2003, did Ms. Bond give her permission or consent to any of the Individual Defendants to enter or search her home.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

30.    At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to search or seize her person, her home, or her personal belongings.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

31.    The Individual Defendants did not possess any search warrant to search Ms. Bond's home nor an arrest warrant to arrest anyone in Ms. Bond's household.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

32.    The Individual Defendants' physical and mental abuse and humiliating search of Ms. Bond were excessive, unreasonable, and unsupported by any legal justification.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

33.    On April 14, 2003, Ms. Bond reported the Individual Defendants' abuse of their police powers to the City of Chicago's Office of Professional Standards.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

**April 28, 2003**

34.     Two weeks later, at approximately 7:30 p.m., on April 28, 2003, Defendant Seinitz, along with Defendant Savickas, seized Ms. Bond in the stairway leading to her apartment, without any probable cause or other lawful justification.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

35.     They dragged her up the stairs by her coat.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

36.     The Defendants shouted and cursed at Ms. Bond, "Give me your fucking keys!" As Defendant Seinitz held Ms. Bond by her coat, Defendant Savickas demanded Ms. Bond's house keys and struck Ms. Bond in her face, causing her to urinate on herself out of fear.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

37.     Defendants seized Ms. Bond's keys from her person against her will and used the keys to unlock the front door to her home.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

38.     The five Individual Defendants entered Ms. Bond's home without her permission or consent.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

39.     The Defendants also seized two young African-American men and brought them inside Ms. Bond's home without her permission or consent.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

40.     The Individual Defendants searched through Ms. Bond's home and possessions. When Ms. Bond begged them not to destroy certain items of religious significance, one of the Individual Defendants intentionally knocked Ms. Bond's icon of the Virgin Mary to the floor, broke the statue, and mocked Ms. Bond and her beliefs. "Fuck the Virgin Mary," he said.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

41.     Three male Chicago police officers demanded that Ms. Bond join them inside her bedroom. They ordered her to undress.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

42.     The Defendants forced Ms. Bond to pull down her pants and underwear. They ordered her to turn her back to them and bend over, exposing her genitalia to the male Defendants. The Individual Defendants further commanded that Ms. Bond reach inside her vagina as they looked on. Defendant Seinitz thrust a pair of needle-nosed pliers in Ms. Bond's face and threatened to pull out her teeth, unless she complied with their demands.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

43.     The Individual Defendants threatened to plant drugs on her and incarcerate her, and otherwise verbally abused, intimidated, and humiliated her.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

44.     At no time on April 28, 2003 did Ms. Bond give her permission or consent to any of the Individual Defendants or any other Chicago police officer to enter or search her home or to search her body.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

45. The Individual Defendants did not possess any search warrant to search Ms. Bond's home nor an arrest warrant to arrest anyone in Ms. Bond's household.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

46. At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to search or seize her person, her home, or her personal belongings.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

47. The Individual Defendants' physical abuse and humiliating search of Ms. Bond were excessive, unreasonable, and unsupported by any legal justification.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

48. Ms. Bond filed a second official misconduct complaint with the City of Chicago's Office of Professional Standards against the Individual Defendants for their abuse on April 28, 2003.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

**April 30, 2003**

49. Two days later, on April 30, 2003, at approximately 11:30 p.m., Defendants Stegmiller and Savickas confronted Ms. Bond in the lobby of her apartment building at 3651 South Federal in Chicago.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

-13-

50.     Defendant Stegmiller seized Ms. Bond by her arm, and demanded the keys to her home.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

51.     As Ms. Bond stood in fear of another assault, Defendant Stegmiller grabbed Ms. Bond around her throat, pushed her up against the elevator door to her apartment building, and threatened, "I'll beat your motherfucking ass."

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

52.     Ms. Bond cried for help, as Stegmiller choked and cursed her.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

53.     Despite Ms. Bond's pleas, Defendant Savickas stood by and kept a look out for his partner, while he choked Ms. Bond.  He facilitated and assisted Stegmiller's choking of Ms. Bond, and refused to intercede despite a reasonable opportunity to do so.  When a private citizen pleaded with him to aid Ms. Bond, Defendant Savickas thumped his hand against the man's chest and refused to intervene.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

54.     Other residents from the building responded to Ms. Bond's cries for help.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

55.     Due to their intervention, the Defendants ultimately released Ms. Bond's throat and told her to "get the fuck out of here."

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

56.     At no time did Ms. Bond provide the Individual Defendants with probable cause or any legal justification to seize her person.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

57.     The Individual Defendants' seizure and physical abuse of Ms. Bond were unreasonable, excessive, and unsupported by any legal justification.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

### March 29 and 30, 2004

58.     Almost a year later, at approximately 11:40 p.m., on March 29, 2004, Ms. Bond was walking down the stairs of her apartment building at 3651 South Federal.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

59.     Defendant Stegmiller accosted her again, this time in the stairwell with a screwdriver in his hand. Stegmiller ordered Ms. Bond to come to him and threatened to stick her in the neck with the screwdriver.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

60.     Defendant Stegmiller and his partner seized Ms. Bond and wrestled her to the ground. They pulled and twisted Ms. Bond's arm behind her back, causing her extreme pain, and forced handcuffs around her wrists. Ms. Bond screamed and cried for help, in fear for her life and of further sexual abuse.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

61.     As Ms. Bond continued to scream for help, Defendant Stegmiller and his partner pulled her off of the ground and removed her handcuffs. Stegmiller placed his finger over his lips, and warned her not to say anything about what happened.

-15-

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

62.    The next night, March 30, 2003, after 8:00 p.m., Defendant Stegmiller stood outside Ms. Bond's home.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

63.    Ms. Bond emerged wearing a sling on her right arm that the Defendant had pulled and twisted the night before.  Defendant Stegmiller called to Ms. Bond and nodded at her arm, "What happened to you?" he mocked in feigned ignorance.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

64.    At no time did Ms. Bond provide Defendant Stegmiller or his partner with probable cause or any legal justification to seize her person.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

65.    The Defendant's seizure and physical abuse of Ms. Bond were unreasonable, excessive, and unsupported by any legal justification.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

## ALLEGATIONS OF INTENTIONAL CONDUCT AND CAUSATION RELATED TO THE INDIVIDUAL DEFENDANTS

66.    Each of the Individual Defendants acted or failed to act knowingly and intentionally, maliciously, wantonly or with reckless or callous disregard of, or indifference to, the rights of Ms. Bond.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

67.     The Individual Defendants' seizures of Ms. Bond, the searches of her body, home, and belongings, physical beatings, physical abuse, choking, assaults, intimidation, and humiliation of Ms. Bond, destruction of her property, and vilification of Ms. Bond's religious beliefs and certain icons were undertaken with the intent to discriminate against Ms. Bond's on account of her gender, race, and the color of her skin.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

68.     By their actions and omissions, the Individual Defendants violated and abused Ms. Bond's body and home, desecrated her most treasured icons and religious beliefs, violated her Constitutional rights, and robbed Ms. Bond of any feeling of security, leaving Ms. Bond traumatized and violated, in a constant state of fear in and around her own home.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

69.     As a direct and proximate result of the conduct of the Individual Defendants described above, Ms. Bond suffered and continues to suffer from severe post traumatic stress disorder and major depression, and other mental and emotional distress, including but not limited to extreme fear, anxiety, mental pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to her self esteem, and the loss of the sense of personal safety in and around her home.  In addition, Ms, Bond suffered physical pain to her head, neck, face, and eye; she suffered intense pain in her right arm, which was required to be immobilized in a sling; and she was deprived of personal property inside her home.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

## CITY OF CHICAGO POLICY, PRACTICE AND CUSTOM

70.     The City maintains a de facto policy, practice and custom of failing to properly supervise, monitor, discipline, counsel, and otherwise control its police officers.  The City's policy, practice, and custom caused the Individual Defendants to repeatedly violate Ms. Bond's Constitutional rights.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

-17-

policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

71.    In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council, submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

**ANSWER:**    On information and belief, the Supervisory Defendants admit that in January 2000, Alderman William Beavers, then Chairman of the Committee on Police and Fire of the Chicago City Council, proposed a resolution that stated, in part, that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct." The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

72.    The Individual Defendants knew that the City, because of its deficient disciplinary, supervisory, and monitoring practices, rarely imposed meaningful discipline on police officers charged with abuse of civilians.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

73.    The Individual Defendants knew that the chance of criminal prosecution for their abuse was virtually nonexistent. On information and belief, in the five years preceding the incidents alleged here, the City has received approximately 8,000 to 10,000 official misconduct complaints a year against Chicago police officers. Approximately 2,500 to 3,000 of those complaints each year charged Chicago police officers with brutality. However, over the fifteen years leading up to the Defendants' abuse of Ms. Bond, there was only one instance of an Illinois state criminal prosecution of a Chicago police officer for brutality committed while on duty, as a result of the Chicago Police Department's referral of a complaint to the Cook County State's Attorney's Office.

**ANSWER:**    On information and belief, the Supervisory Defendants admit that from 1999 to 2004 the City has received approximately 8,000 to 10,000 complaints of police misconduct a year.  On information and belief, the Supervisory Defendants further admit that approximately 2,500 to 3,000 of these complaints involved allegations of excessive force.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

74.    From 2001 through 2003, the City received at least 7,610 brutality complaints against Chicago police officers.  The City imposed meaningful discipline in only 13 of those 7,610 complaints: 6 officers were fired and 7 suspended for 30 days or more.  In other words, between 2001 and 2003, a Chicago police officer charged with criminal brutality had only a 0.08% (significantly less than a one in a thousand) chance of being fired, and a 0.17% (less than one-fifth of 1 percent) chance of having any meaningful discipline being imposed.

**ANSWER:**    On information and belief, the Supervisory Defendants admit that from 2001 through 2003 the City received approximately 7,000 to 8,000 complaints of excessive force against Chicago police officers.  On information and belief, the Supervisory Defendants deny that the City imposed meaningful discipline in only thirteen of those complaints.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

75.    During this time period, Judge Holderman, after a full trial in *Garcia v. City of Chicago*, 2003 U.S. Dist. LEXIS 16565 (N.D.Il1. Sep. 19, 2003), found that the City's police abuse "investigations were incomplete, inconsistent, delayed, and slanted in favor of the officers." *Id*. at *5.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph, insofar as any reference in the opinion issued by Judge Holderman in *Garcia v. City of Chicago* to investigations being incomplete, inconsistent, delayed, and slanted in favor of the officers was limited to investigations of "off-duty police officer violence," and insofar as the trial in *Garcia*

was by jury, there were no judicial "findings" in the opinion referred to in the allegations of this paragraph. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

76.     On information and belief, less than 5 percent of sworn Chicago police officers account for the majority of official complaints of civilian abuse.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

77.     The City, however, lacks any effective early warning system to identify, track and monitor problematic police behavior, much less patterns of abuse of individuals or groups of officers.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City has any of the policies, practices, and customs alleged in the Amended Complaint, and that such policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

78.     The Individual Defendants knew that the aforementioned City policies allowed officers who have engaged in patterns of abuse to continue to abuse with impunity. Time and again, the Defendants have seen in their own experience and even in widely reported, high profile cases that obvious patterns of abuse are not punished or stopped. For example,

•     Officer Raymond Piwnicki, who also policed public housing developments on Chicago's South Side, amassed 56 *(fifty-six)* official abuse complaints within the seven years preceding the Defendants' abuse of Ms. Bond. Despite Piwnicki's pattern of complaints, the City has never imposed any meaningful discipline or even identified Piwnicki as in need of behavioral intervention. For example, after abusing a middle-aged African-American man in Stateway Gardens (the site of Defendants' abuse of Ms. Bond), a Cook County Circuit Court judge found that Piwnicki had violated the man's Constitutional rights. Despite the Court's finding and the substantial evidence upon which it was based, the Police Department

-20-

refused to sustain the complaint or even re-open the complaint for further investigation.

- In spite of an obvious and abhorrent record of abusing women from when he started police training to when he was ultimately suspended for abducting and raping a woman, Officer Ernest Marsalis was never monitored, properly supervised, or disciplined for his improper and abusive conduct. Within two years on the police force, Marsalis had been charged with more than twenty complaints of threatening or violent behavior, nearly all of them filed by women.

- Officer Rex Hayes amassed over 65 official misconduct complaints and ten civil lawsuits (costing the City more than $2.5 million dollars), primarily for excessive force and verbal abuse from 1979 to 1999. Despite Hayes' pattern of abuse, the City's supervisory and disciplinary policies were utterly ineffectual in preventing the abuse.

- Torture of civilians in Area 2 Chicago Police Headquarters occurred on a systematic basis for more than a decade without disciplinary action by the City. As Judge Shadur recognized, "It is now common knowledge that in the early to mid 1980's Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those that those beatings and other means of torture occurred as an established practice, not just on an insolated basis." *Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D.I11. 1999). Indeed, the Police Department's internal investigation concluded that methodical abuse and torture occurred in Area 2 Chicago Police Headquarters for more than a decade. Despite this "common knowledge" of outright torture, the City did not refer a single Chicago police officer for criminal prosecution.

**ANSWER:** The Supervisory Defendants deny that they are or were aware that the City has any of the policies, practices, and customs alleged in the Amended Complaint, and that such policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

79.     On information and belief, four police officers who worked the night shift with the Individual Defendants on the same tactical team in public housing in 2003 and 2004, collectively have been charged with official misconduct on far more than a hundred occasions within four years of Defendants' abuse of Ms. Bond. On information and belief, the City has never exacted meaningful discipline upon any of the four officers or taken other remedial action to prevent the Defendants' pattern of abuse of members of public housing communities on the South Side of Chicago.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

80.     As a matter of practice, police supervisors are not informed of disciplinary complaints against their subordinate officers. Supervisors are thus kept unaware of their subordinates' patterns of abuse, disciplinary complaints, and misbehavior, and do not intervene to prevent abuse.

**ANSWER:**     On information and belief, the Supervisory Defendants deny that as a

matter of municipal practice, police supervisors are not informed of disciplinary complaints

against their subordinate officers.  The Supervisory Defendants lack sufficient knowledge or

information to form a belief as to the truth of the remaining allegations of this paragraph.

81.     Chicago police supervisors do not believe that misconduct complaints should be considered in evaluating officer performance or completing performance ratings cards.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

82.     The City also maintains an unwritten policy, practice, and custom of a police code of silence.  According to standard practice, police officers refuse to report instances of police misconduct, despite their obligation under police regulations to do so.  Police officers either remain silent or give false and misleading information during official investigations in order to protect themselves and fellow officers from internal discipline, civil liability, and criminal charges.

**ANSWER:**     On information and belief, the Supervisory Defendants deny the

allegations of this paragraph.

83.     The City has turned a blind eye to the existence of the code of silence and has exhibited a deliberate indifference to its natural consequences—police abuse of our citizenry, including Ms. Bond. In fact, City policy further supports the maintenance of the code of silence by forbidding its Police Department from granting whistleblowers transfers from their unit of assignment to protect them from retaliation.

**ANSWER:**     On information and belief, the Supervisory Defendants deny the

allegations of this paragraph.

## CAUSATION

84.     The Individual Defendants, having full knowledge of and experience with the City of Chicago's policies, practices, and customs of failing to supervise, monitor, discipline, counsel, and otherwise control police officers, subjected Plaintiff to repeated sexual, physical, and mental abuse with absolute impunity.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

85.     The Individual Defendants have engaged in a years-long pattern of abuse of persons living in public housing communities on the South Side of Chicago.

**ANSWER:**     The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

86.     On information and belief, the City has never disciplined any of the Individuals Defendants for their abuse.  Because of its deficient supervisory, monitoring and disciplinary systems, the City had not even "identified" any of the Individual Defendants as in need of corrective action or behavioral intervention at any time prior to the Defendants' abuse of Plaintiff.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

87.    On information and belief, none of the Individual Defendants' immediate supervisors in Public Housing South ever counseled or admonished the Individual Defendants regarding patterns of abuse complaints against them, or otherwise intervened to prevent further abuse.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

88.    On information and belief, none of the Individual Defendants' immediate supervisors in Public Housing South ever downgraded their performance ratings due to the Defendants' pattern of misconduct complaints.  In fact, Defendant Schoeff was promoted shortly after having abused Ms. Bond.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

89.    If the City had an effective early warning system or appropriate disciplinary, supervisory, and monitoring practices, the Individual Defendants, individually and as a group, would have been detected and stopped, long before they ever had the opportunity to abuse Ms. Bond in 2003 and 2004.

**ANSWER:**    The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

90.    On information and belief, collectively, the five Individual Defendants have amassed scores of abuse complaints within four years of their abuse of Ms. Bond.  The Individual Defendants worked together as a team or "crew" for at least two years.  Based on the substantial number of complaints against the Defendants individually, it would have been readily apparent to

the City that a significant behavior problem existed with respect to each member of the team, if the City had minimally effective early warning system or supervisory practices. The Defendants' collective pattern of abuse would have been even more apparent if the City had a working system.

**ANSWER:**    The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

91.    The number of abuse complaints against the Individual Defendants is even more striking because they have engaged in a pattern of conduct to prevent their names from being known to their victims.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

92.    The Individual Defendants have also intimidated their abuse victims to prevent the bringing of complaints. For example, when a Cook County Public Defender, an officer of the court, took note of their misconduct, Defendant Utreras threatened the attorney in open court in the presence of two Assistant State's Attorneys for Cook County.

**ANSWER:**    The Supervisory Defendants lack sufficient knowledge or information to

form a belief as to the truth of the allegations of this paragraph.

93.    The City's response to Ms. Bond's complaints to the Police Department's Office of Professional Standards further encouraged the Defendants' continued abuse. Ms. Bond's report of Defendants' abuse on April 13, 2003 did not in any way deter the Defendants from abusing her again just two weeks later on April 28. Or two days later on April 30. Or even almost a year later on March 29 and 30, 2004. Knowing the City's deficient disciplinary, supervisory, and monitoring practices, the Defendants were certain that they were immune from punishment.

**ANSWER:**    The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

94.     The City's deliberate indifference to the police code of silence further encouraged the Individual Defendants' abuse of Ms. Bond. The Individual Defendants knew that their misconduct would go unchecked because their fellow officers would lie to protect them from punishment or turn a blind eye to their abuse. On information and belief, other Chicago police officers have been present on occasions in which the Individual Defendants have been charged with abuse. In no instance, however, has a fellow Chicago police officer ever reported or otherwise corroborated Defendants' abuse. Moreover, members of the Individual Defendants have been present when fellow Defendants have been charged with abuse. In each instance, the Defendants have stood behind the police code of silence and covered up one another's abuse, by either refusing to report the abuse or lying about their fellow Defendants' misconduct.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

95.     As a direct and proximate result of the City policies, practices, and customs described above, Ms. Bond suffered and continues to suffer from severe post traumatic stress disorder and major depression, and other mental and emotional distress, including but not limited to extreme fear, anxiety, mental pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to her self esteem, and the loss of the sense of personal safety in and around her home. In addition, Ms. Bond suffered physical pain to her head, neck, face, and eye; she suffered intense pain in her right arm, which was required to be immobilized in a sling; and she was deprived of personal property inside her home.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed. The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

## CITY'S DELIBERATE INDIFFERENCE TO PLAINTIFF'S RIGHTS AND SAFETY

96.     The City was aware of its lack of an effective early warning system and deficient disciplinary, supervisory and monitoring policies, practices, and customs, but consciously decided not to remedy them.  The City knew that because it did not have an effective system to identify, punish, and deter officers who engage in patterns of misconduct, that its officers would continue to abuse and inflict harm on members of the public.  The City's disregard of these obvious and known risks demonstrated a conscious, deliberate, and reckless indifference to Ms. Bond's rights and safety.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

97.     In 2003, when the Individual Defendants first targeted Ms. Bond for abuse, the City had been aware for many years of the ineffectiveness of its disciplinary and monitoring practices, particularly with respect to repeat offenders.

**ANSWER:**     The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

98.     In 1981, the United States Civil Rights Commission recommended that police departments implement early warning systems to identify abusive officers and promote police integrity.  The International Association of Chiefs of Police echoed this recommendation in 1989.

**ANSWER:** On information and belief, the Supervisory Defendants state that plaintiff's allegations regarding the recommendations of the United States Civil Rights Commission and the International Association of Chiefs of Police are vague, incomplete, or incorrect statements of these recommendations, and therefore these allegations are deemed denied. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

99. The City, aware of its broken system and failure to track and punish repeat abusers, developed an early intervention system in 1995, which it called the "Brainmaker" program. This program would identify repeat abusers and officers at risk of becoming repeat abusers for closer monitoring, counseling, and supervision. Top Police Department officials found that the program was 95% effective in identifying problems and preventing abuse. The Department used Brainmaker to compile a list of potential problem officers. In spite of its knowledge that such a program would prevent abuse, the City intentionally abandoned plans to use the program in 1996 because of opposition by the Police Union. The City promptly deleted all data contained in the program (including the list of problem officers), knowing that it would have provided the Police Department with information needed to prevent police abuse.

**ANSWER:** On information and belief, the Supervisory Defendants state that plaintiff's allegations regarding the so-called Brainmaker system are vague, incomplete, or incorrect statements of, *inter alia*, the nature and capacity of this system, and its use and discontinuation by the Chicago Police Department, and therefore these allegations are deemed denied. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

100. In 1997, the City's own Commission on Police Integrity, led by former United States' Attorney, Dan Webb, reported, "Virtually every major city police department in the country has recognized the need for a mechanism which alerts command personnel that an officer may be involved in a pattern of misconduct. The premise is simple: small problems become big ones if left unattended." (Report on the Commission on Police Integrity at p. 20.)

**ANSWER:**  On information and belief, the Supervisory Defendants admit that the

allegation of this paragraph quotes accurately from the Webb Report on the Commission on

Police Integrity.  The Supervisory Defendants lack sufficient knowledge or information to form a

belief as to the truth of the remaining allegations of this paragraph.

101.    The Mayor's Commission further documented that "[t]he need for a sophisticated
and thorough early warning system" in Chicago was evident from the Department's failure to
identify ten officers from the City's Austin and Gresham Districts who were later indicted on
federal charges for their longstanding pattern of police abuse.  *Id*. at 21.  The Commission noted
that the seven indicted Austin officers had a total of 93 complaints lodged against them in their
respective careers.  Only two of the complaints were sustained by the City.  The three indicted
Gresham officers had a combined 40 complaints during their careers, with only three being
sustained.  *Id*.  On information and belief, the number of abuse complaints lodged against the
Individual Defendants within four years of their abuse of Plaintiff surpasses the number of
complaints against the indicted officers within a similar time frame.  The Commission found that
if the City had an effective early warning system, it could have prevented the widespread abuses
committed by the Austin and Gresham officers, just as it could have prevented the Individual
Defendants' pattern of abuse of people in public housing here.

**ANSWER:**  On information and belief, the Supervisory Defendants state that plaintiff's

allegations regarding the Webb Report on the Commission on Police Integrity are vague,

incomplete, or incorrect statements of the purported findings and conclusions of this report, and

therefore these allegations are deemed denied.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

102.    The Commission also found that abusive officers, like the small crew of
Individual Defendants, tend to "bond together in groups."  *Id*.  The Commission noted that the
ten officers under indictment did not come from ten different units of assignment spread
throughout the Department, but rather from two particular units.  Accordingly, the Commission
made clear that the Chicago Police Department must "look not just at the records of individual
officers but also at units within the Department."  *Id*.  The Commission develop an [sic]

-29-

**ANSWER:** On information and belief, the Supervisory Defendants state that plaintiff's allegations regarding the Webb Report on the Commission on Police Integrity are vague, incomplete, or incorrect statements of the purported findings and conclusions of this report, and therefore these allegations are deemed denied. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

103. The City's Commission concluded that a "fully computerized" early warning system was necessary to identify officers, groups of officers, and police units that engage in patterns of misconduct. *Id*. It found that the system must collect and analyze a variety of data that, at minimum, include non-sustained complaints, civil lawsuits, use of force, and medical time. Id. Despite its acknowledged need since at least 1997, the City chose and continues to choose through the date of this Complaint not to implement an effective computerized early warning system.

**ANSWER:** On information and belief, the Supervisory Defendants state that plaintiff's allegations regarding the Webb Report on the Commission on Police Integrity are vague, incomplete, or incorrect statements of the purported findings and conclusions of this report, and therefore this allegation is deemed denied. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

104. In 2000, the City continued to refuse to implement an effective early warning system, even after the City Council resolution by its Chief of the Police and Fire Committee concerning Chicago police officers' knowledge of the complete lack of accountability in the Chicago Police Department.

**ANSWER:** The Supervisory Defendants deny that they are or were aware that the City has any of the policies, practices, and customs alleged in the Amended Complaint, and that such policies, practices, and customs exist or existed. On information and belief, the Supervisory

Defendants state that plaintiff's allegations regarding the proposed resolution in 2000 by

Alderman William Beavers are vague, incomplete, or incorrect statements of the purported

findings and conclusions of this resolution, and therefore these allegations are deemed denied.

The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the

truth of the remaining allegations of this paragraph.

105. In 2001, the Commission on Accreditation for Law Enforcement Agencies adopted the following standard mandating early warning systems for large agencies like Chicago:

> A comprehensive Personnel Early Warning System is an essential component of good discipline in a well-managed law enforcement agency.

CALEA Standard 35.1.15 (2001). Notwithstanding the CALEA Standards, the City refused to take steps to implement an effective early warning system or otherwise improve its procedures for monitoring, supervising, and disciplining repeat abusers.

**ANSWER:** On information and belief, the Supervisory Defendants admit that the

allegation of this paragraph accurately quotes from CALEA Standard 35.1.15. The Supervisory

Defendants deny that they are or were aware that the City has any of the policies, practices, and

customs alleged in the Amended Complaint, and that such policies, practices, and customs exist

or existed. The Supervisory Defendants lack sufficient knowledge or information to form a

belief as to the truth of the remaining allegations of this paragraph.

106. Also in 2001, the Justice Coalition of Greater Chicago (JCGC), a coalition of more than a hundred community groups, presented findings of its study and experience with the Chicago Police Department to Mayor Daley, Defendant Hillard, and the Chicago Police Board. The JCGC's study confirmed that the Chicago Police Department lacked many of the basic management tools necessary to identify, monitor, punish and prevent police misconduct and brutality, including adequate early warning, disciplinary, and monitoring systems. In response, the Chicago Police Board, the civilian oversight panel appointed by the Mayor to regulate the activities of the Chicago Police Department and to adopt rules and regulations governing police conduct, made clear that the City "recognizes the importance of an effective early warning system to identify and remedy potential disciplinary problems." (Letter of Demetrius Carney,

President of Chicago Police Board, dated June 13, 2001). The Police Board acknowledged that the Police Department's system in this regard was a "work in progress," and it recommended the development of an "effective and automated early warning system." *Id.* The City refused to do so.

**ANSWER:** The Supervisory Defendants deny that they are or were aware that the City has any of the policies, practices, and customs alleged in the Amended Complaint, and that such policies, practices, and customs exist or existed. On information and belief, the Supervisory Defendants state that plaintiff's allegations regarding the Justice Coalition of Greater Chicago and the Chicago Police Board are vague, incomplete, or incorrect statements of the findings and recommendations of these entities, and therefore these allegations are deemed denied. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

107. In 2003, after a jury trial, Judge Holderman found that the City maintained a custom and practice of not adequately investigating, disciplining, or prosecuting Chicago police officers. *Garcia*, 2003 U.S. Dist. Lexis 16565. The Court also found that the Police Department's "environment" (code of silence) that permits the perpetration of abuse with impunity was proven to be a "widespread custom and practice within the CPD regarding off-duty police misconduct." *Id.*

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph, insofar as the municipal custom and practice at issue in *Garcia v. City of Chicago* was limited to off-duty Chicago police officers; the trial in *Garcia* was by jury, so that there were no judicial "findings" in the opinion referred to in the allegations of this paragraph; and there was no finding by judge or jury that a "code of silence" exists within the Chicago Police Department or that in any way refers to a "code of silence." The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

-32-

108.    The City, at all times material to this Complaint, knew from reliable national, local, community, and internal sources, including the Department of Justice, community groups, members of the police department and its policymakers, and local elected officials, about the problems presented by repeat abusers, such as the Individual Defendants.  Knowing that an early warning system is needed to identify repeat offenders, that repeat offenders continue to abuse with impunity, and that the result of the broken system is that these officers would continue to abuse, the City made a conscious choice to maintain the status quo.  The City has repeatedly turned a blind eye to problem officers, and a deaf ear on the concerns of national, local and community voices.  Such inaction constitutes deliberate indifference and acquiescence to the predictable results that directly caused and encouraged Individual Defendants to inflict repeated and sustained sexual, physical, and mental abuse on Ms. Bond.

**ANSWER:**    The Supervisory Defendants deny that they are or were aware that the City

has any of the policies, practices, and customs alleged in the Amended Complaint, and that such

policies, practices, and customs exist or existed.  The Supervisory Defendants lack sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of this

paragraph.

## SUPERVISORY LIABILITY OF DEFENDANTS CLINE, HILLARD AND LIGHTFOOT

109.    Defendants Cline, Hillard, and Lightfoot caused and participated in the deprivations of the Plaintiff's constitutional rights and injuries as alleged above.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph.

110.    Defendants Cline, Hillard and Lightfoot, at all times material to this complaint, were aware that the City maintained a widespread and settled policy, practice and custom of failing to properly supervise, monitor, discipline, counsel, and otherwise control its police officers.  The Supervisory Defendants were also aware that the maintenance of these practices would result in preventable police abuse.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph.

111.    The Supervisory Defendants oversaw, endorsed, condoned, and acquiesced in the above-mentioned policies, practices, and customs, and refused to take steps to correct them.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph.

112.     The Supervisory Defendants, at all times material to this complaint, caused and facilitated the systematic denial of Plaintiff's constitutional rights, by, among other things: (a) failing to monitor police officers and groups who violate the constitutional rights of citizens; (b) failing to discipline police officers who engaged in constitutional rights violations; (c) turning a blind eye to repeated and systemic abuses of the constitutional rights of citizens, including the Plaintiff; and (d) failing to develop and implement an effective early warning system to identify police officers and groups who systematically violate the constitutional rights of citizens.

**ANSWER:**     The Supervisory Defendants deny the allegations of this paragraph.

113.     The Supervisory Defendants were, at all times material to this complaint, deliberately indifferent to the rights and safety of Plaintiff, as evidenced by their acquiescence to and support of these policies and their obvious consequences.

**ANSWER:**     The Supervisory Defendants deny the allegations of this paragraph.

### CLAIM I:  FOURTH AND FOURTEENTH AMENDMENTS
### (Illegal Search of Person, Home, and Effects)

114.     Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**     The Supervisory Defendants reallege their answers to paragraphs 1

through 113.

115.     Plaintiff asserts Claim I of this action against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs.  Claim I arises under 42 U.S.C. § 1983.

**ANSWER:**     The Supervisory Defendants admit that Claim I of this action purports to

be against Individual and Supervisory Defendants in their individual capacities, and against the

City of Chicago for its alleged unconstitutional policies, practices, and customs.  The Supervisory

Defendants further admit that this claim purportedly arises under 42 U.S.C. § 1983.

116.     The Defendants' unreasonable and illegal searches of Plaintiff's person, home, and personal possessions, undertaken without a warrant, probable cause, or reasonable suspicion, deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be secure in her person, home, papers, and effects against unreasonable searches and seizures.

-34-

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

117. The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph to the extent that they allege that their conduct was the direct and proximate cause of the constitutional violations and injuries alleged by plaintiff. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

118. Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph, to the extent that they are brought against them. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

119. The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph, insofar as these allegations are directed to them. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

## CLAIM II: FOURTH AND FOURTEENTH AMENDMENTS
### (Unlawful and Unreasonable Seizure and Detention)

120. Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:** The Supervisory Defendants reallege their answers to paragraphs 1 through 113.

121. Plaintiff asserts Claim II of this action against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs. Claim II arises under 42 U.S.C. § 1983.

**ANSWER:** The Supervisory Defendants admit that Claim II of this action purports to be against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its alleged unconstitutional policies, practices, and customs. The Supervisory Defendants further admit that this claim purportedly arises under 42 U.S.C. § 1983.

122. The Defendants' false arrests of Plaintiff and unlawful and unreasonable seizures of Plaintiff's person and effects without a warrant, probable cause, or reasonable suspicion, deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be secure in her person, home, papers, and effects against unreasonable searches and seizures.

**ANSWER:** The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

123. The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, loss of personal freedom, and loss of personal property, as set forth more fully above.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph to the extent that they allege that their conduct was the direct and proximate cause of the constitutional violations and injuries alleged by plaintiff. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

124. Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph, to the extent that they are brought against them.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

125.    The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:**    The Supervisory Defendants deny the allegations of this paragraph, insofar as these allegations are directed to them.  The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

### CLAIM III: FOURTH AND FOURTEENTH AMENDMENT
### (Excessive Force)

126.    Plaintiff realleges and incorporates herein paragraphs 1 through 113 above.

**ANSWER:**    The Supervisory Defendants reallege their answers to paragraphs 1 through 113.

127.    Plaintiff asserts Claim III of this action against the Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its unconstitutional policies, practices, and customs.  Claim III arises under 42 U.S.C. § 1983.

**ANSWER:**    The Supervisory Defendants admit that Claim III of this action purports to be against Individual and Supervisory Defendants in their individual capacities, and against the City of Chicago for its alleged unconstitutional policies, practices, and customs.  The Supervisory Defendants further admit that this claim purportedly arises under 42 U.S.C. § 1983.

128.    The Defendants' physical beating, physical abuse, choking, assault, intimidation, and humiliation of Plaintiff without probable cause deprived Plaintiff of her Fourth and Fourteenth Amendment rights to be free from the use of excessive and unreasonable force.

**ANSWER:** The City lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

129. The aforementioned actions and omissions in the face of a Constitutional duty to intercede by the Individual Defendants were the direct and proximate cause of Plaintiff's Constitutional violations, physical and emotional injuries, destruction of her personal property, and loss of personal freedom, as set forth more fully above.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph to the extent that they allege that their conduct was the direct and proximate cause of the constitutional violations and injuries alleged by plaintiff. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

130. Each of the Defendants' actions and omissions was intentional, willful, and exhibited a conscious disregard or reckless indifference to Plaintiff's rights. The award of punitive damages against each Individual and Supervisory Defendant is necessary to punish the Defendant for his or her misconduct, and to deter similar misconduct.

**ANSWER:** The Supervisory Defendants deny the allegations of this paragraph, to the extent that they are brought against them. The Supervisory Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

## CLAIM IV: FOURTEENTH AMENDMENT
### (Equal Protection)

The Supervisory Defendants are not party-defendants in Claim IV. Therefore, they do not answer the allegations in that count.

## CLAIM V: ILLINOIS HATE CRIME STATUTE

The Supervisory Defendants are not party-defendants in Claim V. Therefore, they do not answer the allegations in that count.

## CLAIM VI: ILLINOIS BATTERY

The Supervisory Defendants are not party-defendants in Claim VI. Therefore, they do not answer the allegations in that count.

## CLAIM VII: ILLINOIS FALSE ARREST AND IMPRISONMENT

The Supervisory Defendants are not party-defendants in Claim VII. Therefore, they do not answer the allegations in that count.

## CLAIM VIII: ILLINOIS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Supervisory Defendants are not party-defendants in Claim VIII. Therefore, they do not answer the allegations in that count.

## CLAIM IX: ILLINOIS LOCAL GOVERNMENT AND LOCAL GOVERNMENT EMPLOYEES TORT IMMUNITY ACT
## (745 ILCS 10/9-102B)

The Supervisory Defendants are not party-defendants in Claim IX. Therefore, they do not answer the allegations in that count.

## DEFENSES

1.      An award of punitive damages would deprive the Supervisory Defendants of due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution where:

   a)      liability for punitive damages has not been proven beyond a reasonable doubt, or at least by clear and convincing evidence; and

   b)      the award of punitive damages is disproportionate to actual damages.

2.      At all times material to the events alleged in plaintiff's complaint, a reasonably competent supervisor, objectively viewing the facts and circumstances then confronting the

Supervisory Defendants, could have believed that the actions taken by them were objectively reasonable and were within constitutional limits that were clearly established at the time. The Supervisory Defendants, therefore, are entitled to qualified immunity as a matter of law.

3.    To the extent any injuries or damages claimed by plaintiff were proximately caused, in whole or in part, by the negligent, willful, wanton and/or other wrongful conduct on the part of the plaintiff, any verdict or judgment obtained by plaintiff must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to plaintiff by the jury in this cause.

## JURY DEMAND

Defendants Cline, Hillard, and Lightfoot request trial by jury.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

By:    **/s/ George J. Yamin, Jr.**
Senior Counsel

30 North LaSalle Street
Suite 1610
Chicago, Illinois 60602
(312) 744-0454
Attorney No. 06217483