UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**F I L E D**

MAR 1 5 2007
03-15-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DIANE BOND, )
)
    Plaintiff )
) No. 04 C 2617
v. )
) Judge Joan Humphrey Lefkow
CHICAGO POLICE OFFICERS EDWIN )
UTRERAS (Star No. 19901), et al., ) Magistrate Judge Arlander Keys
)
    Defendants )

Jamie Kalven's Petition to Intervene and
Motion to Unseal Public Documents Relating to Allegations of Police Misconduct

    Petitioner JAMIE KALVEN, by his counsel LOEVY & LOEVY, respectfully seeks leave to intervene in this case to gain access for the public to a variety of public documents relating to allegations of police officer misconduct. In support of his petition, Mr. Kalven submits the following:

## INTRODUCTION

    We live in a free and open society. Our liberty is derived from the fact that our government is of, by, and owned by us. The government *is* us, the people.

    Our freedoms are not, however, inherent, self-executing, or even necessarily permanent. History teaches that one of the most significant threats to continuing freedoms is governmental secrecy. Indeed, secrecy in government operations, particularly as to allegations of government corruption, is anathema to democracy. Such secrecy encourages and perpetuates official abuses.

    Governmental bureaucracies – from the centralized federal to the smallest local – push back against openness, preferring to avoid scrutiny when it would cast officials in poor public light. Our constitutional drafters understood this when they sought to ensure that governmental operations occur in the open. The courts have a particularly important role in that regard as the principal bulwark of government accountability.

1

This motion seeks to draw back our local government's veil of secrecy regarding a matter of distinct public interest: allegations of police misconduct. For the reasons discussed below, this Court should permit the petitioner to intervene to challenge the City of Chicago's attempts to keep these facts of distinct public concern from the public.

## BACKGROUND

This case involves a horrific tale of police misconduct. Diane Bond, a 52-year-old African-American resident of Stateway Gardens housing development, brought suit to address repeated sexual, physical and psychological abuse inflicted on her by a group of five Chicago police officers. Ms. Bond alleges that the officers forced her to show them her genitals, beat and choked her, put a gun to her head, threatened to pull her teeth out with pliers and plant drugs on her, desecrated her religious items, assaulted her with racial epithets, beat her teenage son, and forced her to watch as they made her son beat a middle-aged neighbor. The officers terrorized Ms. Bond repeatedly in the course of a year, never once charging her with a crime.

Ms. Bond also alleged that before the five defendant officers targeted her, they committed repeated abuse against other South Side public housing residents that went unchecked by the City of Chicago. According to the Complaint, the City and supervisors in the police department failed as a matter of policy to properly monitor, discipline and control its officers, and the defendant officers – well aware of such failures – relied on them to abuse Ms. Bond, confident that the City would never hold them accountable.

During the course of the litigation, the City of Chicago produced to Ms. Bond certain documents of intense public interest including lists of Chicago police officers who were repeatedly charged with official misconduct ("Repeaters") and the areas of the City in which the Repeaters operate; documents that reveal how the Chicago Police Department addresses or fails to address individual and group patterns of misconduct charges; and closed Complaint Register files ("CRs") documenting both the official misconduct charges against one of the most notorious police crews in the City and the City's investigation into those charges. When the City turned these documents over, however, it designated them "confidential" apparently pursuant to a protective order. Consequently, no one outside the litigation has been able to view the documents.

2

Petitioner Jamie Kalven, a journalist who has written extensively about Chicago public housing residents and their experience with police misconduct, seeks these documents' release. See Exhibit A, Declaration of Jamie Kalven.

Ms. Bond and the defendants have recently agreed to a settlement that will shortly be presented to this Court.[1] There remains no good cause, as required by the Federal Rules of Civil Procedure, for these crucial documents of alleged police misconduct to be kept from the public. To begin, the lists of officers who amassed numerous complaints is not confidential under the terms of the protective order and never should have been so labeled. And the files documenting the City's investigation into misconduct complaints against the defendant officers are quintessential records of deep public concern. The public interest in and non-private nature of these documents demand that they be made available to Mr. Kalven and the public.[2]

## I.   THE COURT SHOULD PERMIT PUBLIC ACCESS TO THE IMPORTANT PUBLIC INTEREST DOCUMENTS

In our society, in which the average person has "but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." Cox Broad. Corp. v. Cohn, 420 U.S. 469, 491(1975). The public also relies on the courts to protect its interest in learning about the workings of its government, particularly where – as here – the government affirmatively attempts to prevent the public from accessing information about it. "We have an especially weighty responsibility as 'the judge is the primary representative of the public interest' in reviewing [protective order] motions." In re Bridgestone/Firestone Inc., 198 F.R.D. 654, 657 (S.D.Ind. January 26, 2001) (quoting

---

[1] Petitioner Kalven understands that Ms. Bond has reached a settlement in principle with the defendants. See Exhibit B, "Alleged Cop Brutality Case Settled – But Is it Just One of Many?" Chicago Sun Times.

[2] Mr. Kalven does not seek access to any of the parties' personal information (home address, phone, or social security number) or the names or contact information of civilian third parties which may be contained in the defendants' CR files. Mr. Kalven suggests that the information simply be redacted from the files. Indeed, the existing Protective Order allowed for the redaction of such party information. Exhibit C, Dckt. No. 33.

<u>Citizens First Nat'l Bank v. Cincinnati Ins. Co.</u>, 178 F.3d 943, 945 (7th Cir. 1999)). The
Court should therefore carefully scrutinize the City's attempt to keep confidential
information about itself and our police officers.

**A.    The Lists of Officers With Numerous Complaints Against Them Were
        Improperly Designated as Confidential, and Should Be Released**

During discovery, Magistrate Judge Keys ordered the City to provide a list of all
Chicago police officers who had more than ten official complaints lodged against them in
a five-year period. <u>Bond v. Utreras</u>, 2006 WL 695447, at *1 (N.D. Ill. March 10, 2006).
The City consequently produced documents (the "Repeater List") containing the relevant
officers' names and units of assignment.   The Repeater List also contains, for each
official investigation ("CR") into the officers' alleged misconduct within the five-year
period, the CR's identification number, dates of initiation and completion, investigatory
outcome ("sustained," "unsustained," "unfounded," or "exonerated"), and discipline
imposed against the officer, if any, as a result of the investigation.[3]

In addition, the City was ordered to produce a separate list (the "Intervention
List") of the Repeaters who participated in any of the police department's "early
warning" programs, designed to identify and deal with potentially problematic officers.
<u>See</u> Dckt. No. 220. The Intervention List contains the officers' names, program enrolled
in, and the dates of enrollment.   The defendants also produced to Ms. Bond a list of
Repeaters who were formerly assigned to the Chicago Police Department's Public
Housing South Unit, which encompasses her home. <u>See</u> Dckt. No. 196, Exhibit 14
(Request No. 3).

The Defendants designated the Repeater, Intervention, and Public Housing South
Lists "confidential" before producing them to Plaintiff.   Such designation was improper,
because the Lists are not the "confidential matter" that the protective order in this case
was designed to shield from public access.   The Order defines "Confidential Matter" as:

> medical, employment, disciplinary, investigatory, financial, or other
> information that is of a sensitive or non-public nature regarding plaintiff,

---

[3] The Repeater List also contains the employee number of each officer who amassed
more than 10 complaints.  Petitioner would not object to the redaction of the employee
numbers.

> defendants, non-party witnesses and non-party employees of the City of
> Chicago that may be subject to discovery in this action. "Confidential
> Matter["] includes, but is not limited to photographs of individual
> defendants and other police officers. "Confidential Matter" also includes
> files generated by the investigation of complaints of misconduct by
> Chicago police officers (generally referred to as "Complaint Register"
> files), including information in the Complaint Register files that identifies
> the complainant and civilian witnesses, including photographs or personal
> identifying information; personal identifying information of police
> officers; and PHI.

Exhibit C, Dckt. No. 33, protective order, part A.6.

The Repeater List – a simple tally of the number of complaints against repeatedly-complained about officers – does not contain sensitive information. It does not consist of CRs, nor does it furnish substantive information contained in the CR files themselves, such as information "that identifies the complainant and civilian witnesses, including photographs or personal identifying information." Id. The only information the Repeater List provides beyond the number of complaints is the City's finding at the end of each investigation, and any discipline that may have been imposed. This is precisely the information that the public has a right to know—official misconduct charges against public officers and the outcomes of those charges. The Public Housing South List simply enumerates the Repeaters who were assigned to patrol public housing communities on the South Side of Chicago. The Intervention List, containing only the fact of certain officers' enrollment in Department programs, also lacks any sensitive information.

The protective order provides that "the designation of material as 'Confidential Matter' does not create any presumption for or against that treatment." Id. Because the Lists contain no sensitive information and the data contained there is highly valuable to the public, this Court should reject the City's attempt to keep the information from public view by improperly designating it confidential. And because the Lists are not protected by the Protective Order, the public is presumptively entitled access to them under the Federal Rules.

Even if this Court were to find that the defendants properly applied the confidential designation at the time they produced the Lists to Plaintiff, there is no "good

cause," as required by Federal Rule of Civil Procedure 26(c), for the Lists to remain secret. See discussion, Part B, *infra*.

The public interest in the information is undeniable. See Exhibit A, Declaration. Police officers are public officials. In the lives of many, they are the most important public officials. (This is especially true in communities such as Stateway Gardens where the police are the primary representatives of civic authority.) We entrust them with great powers—the power to arrest and detain, to use force and, under certain circumstances, to kill—and we allow them considerable discretion in the performance of their duties. In our democracy it is axiomatic that public officials in whom we vest substantial power must be subject to public scrutiny. This core principle applies every bit as much to the police officer on the street as it does to the high government official. See Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir. 1990) (*en banc*) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."); In re Application of CBS, Inc. (Shannon), 540 F.Supp. 769, 771 (N.D.Ill. 1982) (recognizing significant public interest in evidence of misconduct or corruption of a public agency).

There is thus an obvious public interest in citizens knowing the names of officers and groups of officers who have amassed exceptionally high numbers of complaints of official misconduct. This is in itself important public information. And, if made available, it will interact with other information already in the public domain to help citizens assess the performance of these public officials and better understand issues of police accountability.

There is similarly a strong public interest in the Intervention and Public Housing South Lists. The information they contain is relevant to the question of whether the Chicago Police Department has adequate systems for supervision, monitoring, and discipline in place. That question stands at the center of a profoundly important public debate. There is no longer any question that Commander Jon Burge and officers under him tortured African-American suspects to coerce confessions during the period 1973 to 1991. These abuses have been established by the City, the federal judiciary, and most recently, the *Report of the Special State's Attorney*, 2006, ordered in 2001 Misc. No. 4, Judge Biebel. Mayor Daley has described them as "a shameful episode in our history."

6

See Exhibit D, "Statement of Mayor Richard M. Daley, Special Prosecutors Report," July 21, 2006. The question now being intensely debated is whether the underlying systemic conditions that allowed Burge and his men to operate with impunity for nearly two decades remain in place. See Exhibit A, Jamie Kalven's exchange with IAD supervisor Debra Kirby; Exhibits D and E (Chicago Police Superintendent Philip Cline's statement on the special prosecutor's report).

The documents at issue would shed light on this question. The list of officers with more than ten official misconduct complaints who participated in the Chicago Police Department's ("CPD") early warning/intervention programs would contribute to an assessment of the City's repeated public claims that it has in place an effective system to identify officers who tend to commit misconduct. See, e.g. Exhibit D. And the list of officers with more than ten official misconduct complaints who were assigned to Public Housing South would make possible an assessment of the CPD's capacity to track patterns of alleged misconduct by groups of officers working together. It would also allow inquiry into whether a disproportionate number of officers with high numbers of complaints were concentrated in a unit policing one of the poorest, most vulnerable populations in the city. See Exhibit A.

For all of the foregoing reasons, the Lists' confidential designations should be stricken.

## B. Based on the Public's Interest in the CR Files and on the Federal Rules of Civil Procedure, the Files Should Not Remain Secret

The defendants designated all CR files that they produced in this litigation "confidential."[4] This includes CRs documenting the City's investigations into complaints against the five defendant officers, Edwin Utreras, Christ Savickas, Robert Stegmiller, Joseph Seinitz and Andrew Schoeff. Also marked "confidential" by defendants are CRs

---

[4] "A CR file is opened by the Chicago Police Department's Office of Professional Standards ('OPS'), when a complaint against an officer is received. All complaints against officers and employees are initially received and recorded by members of OPS, which retains and investigates those complaints ... not forwarded to the Internal Affairs Division for investigation." Doe v. White, 2001 WL 649536, at *1 n. 1 (N.D. Ill. June 8, 2001).

documenting complaints - made by Plaintiff and her neighbor - against the defendant officers, in which the City failed to "identify" the officers despite being given identifying information such as license plate numbers. The Defendants also designated confidential the defendants' Employee Complaint Histories, which are simple lists of CRs opened against each officer.

Due to the great public interest in these CR documents and due to Petitioner's willingness to redact all identifying information of third parties and all sensitive information about the officers, there is no cause for the documents to remain hidden.

### 1. Documents are presumptively public under FRCP 26, and good cause must be shown for the files to remain confidential

Under Seventh Circuit precedent, doubts about whether documents should be shielded from public view "must be resolved in favor of disclosure." Grove Fresh Distribs., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994). "[T]he tradition that litigation is open to the public is of very long standing." Union Oil Co. of Cal. v. Leavell, 220 F.3d 562, 567 (7th Cir. 2000); see also Citizens First Nat'l Bank, 178 F.3d at 945. Courts are permitted to issue orders allowing for confidentiality, but Federal Rule of Civil Procedure 26(c) mandates that "good cause" must be shown for such an order.

Although the Protective Order accords CRs confidential status, good cause must be shown for why the files should continue to remain secret in light of this motion for access to them. "We are satisfied that after the court enters such an order there must be good cause to maintain the order in the face of a motion to vacate it, *particularly when, as here, the moving party did not have an opportunity to oppose the entry of the protective order in the first instance*." Shingara v. Skiles, 420 F.3d 301, 306 (3rd Cir. 2005) (emphasis added). Neither Mr. Kalven nor any other member of the press or public had the opportunity to oppose the parties' stipulated Order at the time it was entered. The Court should now consider Mr. Kalven's argument for public access to the files in light of his role as a proponent of the public's right to keep track of its authorities. Leathers v. Medlock, 499 U.S. 439, 447 (1991) ("The press plays a unique role as a check on government abuse" and is a "watchdog of governmental activity").

8

## 2. Courts in this District Have Rejected Confidentiality for CR Files

Courts in this district, recognizing the public's need for information about its police force, have refused Chicago's attempts to categorically secrete complaint files. This Court, in <u>Doe v. White</u>, 2001 WL 649536, rejected the City's argument that CRs are confidential because they are exempt from disclosure under the Illinois Freedom of Information Act. To the contrary, the Freedom of Information Act provides that "disclosure of information that bears on the public duties of public employees and officials shall not be considered an invasion of personal privacy." <u>Id.</u> at *1 (quoting 5 ILCS sec 140/7(1)(b)). The Court found this provision "in line with the policy favoring the public's right to be informed of the conduct of public servants." <u>Id.</u> Consequently, this Court rejected the City's claims that "privacy interests" required confidentiality for CRs, and ordered the parties to draft an Order in which CRs could be disseminated to third parties, with complainants' identifying information redacted. <u>Id.</u> at *2.

In <u>Doe v. Marsalis</u>, 202 F.R.D. 233 (N.D. Ill. 2001), Judge Castillo granted intervenor <u>Chicago Reader</u>'s motion to obtain CRs, ruling that due to the perpetual problem of police misconduct, the public's interest in the disclosure of CRs "far outweighs" the City's asserted privacy interests in the files. He described the damage done by the misconduct:

> Simply put, the average Chicago citizen is tired of being the victim - either direct or indirect - of repeated police misconduct. Police misconduct creates one of the ultimate "lose/lose" situations in our democratic society. Police misconduct has multiple layers of victims. First, the real victim of police misconduct is the person who fully trusts the police motto "We Serve and Protect" only to be deceived and brutalized by a supposed law enforcement officer. No price can be placed on this paradoxical betrayal. Second, the additional victims of police misconduct are those courageous and righteous law enforcement officers who every day risk their lives to protect their community only to suffer from the "bad cop" label caused by the misdeeds of a rogue fellow officer. Third, law enforcement efforts suffer because the public loses important trust in the street guardians of our legal system. Fourth, there are instances where real criminals avoid responsibility for their actions because cases or evidence is lost as a result of police misconduct. Fifth, the community at large suffers from the public perception that local law enforcement cannot be relied upon.

Id. at 238. Judge Castillo concluded that the City could not end police misconduct on its own. "Some of these issues require public debate and appropriate media scrutiny." Id.

In response to the City's attempt last year to make CRs confidential, Judge Shadur concluded simply that "Complaint Register ('C.R.') files *are public documents*." See Exhibit F, Protective Order, Ramirez v. City of Chicago, 05 C 3317 (N.D. Ill.) (emphasis added); see also Exhibit G, Transcript of Ramirez Proceedings of April 12, 2006.[5]

In Wiggins v. Burge, 173 F.R.D. 226 (N.D. Ill. 1997), the court granted press-intervenors' motion to strike the confidential designation applied to a number of CRs produced during discovery into torture allegations against a group of officers from Area 2. The court rejected all of the City's contentions in support of secrecy, including the notion that the public lacks interest in CRs. In fact, "[p]olice officers are public servants sworn to serve and protect the general public. The general public's health and safety are at issue whenever there are serious allegations of police torture. The manner in which such allegations are investigated is a matter of significant public interest." Id. at 229.

As this Court may be aware, the District's granting of access to misconduct materials is significant a reason we now know so much about the extreme misconduct at Area 2. See collected articles of John Conroy about police torture in Chicago, Chicago Reader, http://www.chicagoreader.com/policetorture/.

### 3. The Public Has Significant Interest in the CR Files at Issue

For all of the reasons explained by this Court in Doe, and in the other District cases noted above, there is a strong public interest in the official misconduct complaints against this group of five defendant officers. The defendant officers have been repeatedly

---

[5] Some judges in the District have concluded differently about CRs but not, to petitioner's knowledge, in the instant context of the press's motion to intervene post-settlement. See Paine v. City of Chicago, 2006 WL 3065515 (N.D. Ill. October 26, 2006) (Magistrate Judge Valdez denied newspaper's motion at the outset of litigation for, *inter alia*, access to unredacted statements of "private citizen witnesses" and CRs); Coffie v. City of Chicago, 2006 WL 1069132 (N.D. Ill. Apr. 21, 2006) (no party intervened; Magistrate Judge Nolan allowed CRs to be defined as confidential at beginning of litigation, but specifically provided that the court would consider future request to disseminate them).

accused of abusing some of the most vulnerable residents of Chicago: "The gravity of the alleged abuses, the pervasiveness of the apparent patterns, and the impact on particular communities bear comparison to the Burge abuses," and surely merit further public inquiry. See Exhibit A, para. 5. Police misconduct in Chicago cannot adequately be addressed without public disclosure, scrutiny, and informed debate. See Doe v. Marsalis, 202 F.R.D. at 238. Even the handful of defendant officers' CRs that the public has learned about in this litigation indicates that the full files would well illuminate the practices of the police department and the City. For example, OPS investigated allegations that Defendant Seinitz stole money from a civilian (CR 261514), planted drugs on a civilian (CR 276011), and pointed a gun at a civilian and threatened that person (CR 293008). See Dkct. No. 73, Plaintiff's Motion to Compel Disciplinary Records, para. 18.

Importantly, the files will also shed light on the City's efforts to police its police. Are these officers the victims of a string of false complaints, or is the City an active participant in covering up their misconduct? [6] For example, Judge Keys described CR file 265893, in which eleven civilians alleged that Defendants Seinetz, Utreras and Schoeff verbally and/or physically abused them. Judge Keys emphasized that the City had failed to complete this investigation years after the file was opened. He ruled that the file "is clearly relevant to Plaintiff's claim that the Individual Officer Defendants engaged in a pattern of abuse against Chicago citizens, spanning many years, and that certain Defendant Officers acted in concert with each other... And given the City's failure to resolve this investigation after five years, the CR may also prove useful in Plaintiff's Monell claims against the City." Bond v. Utreras, 2006 WL 1343666, at *2 (N.D. Ill. May 12, 2006). In fact, Ms. Bond asserts that the officers who tormented her were never disciplined by the City, despite the City's receipt of many complaints against them. See Amended Complaint, Dckt No. 57, para. 86.

Thus, the CR files will reveal not only the nature and frequency of civilians' allegations against the defendant officers, but perhaps more importantly – as Judge Keys has recognized - the City's response to those allegations. In short, the public has a need

---

[6] As this Court is aware, the City has effectively avoided litigating federal civil rights suits on such issues through the repeated use of its so-called "stipulation."

and a right to be able to observe how the City's supervises, monitors and disciplines its officers. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 572 (1980).

### 4. The Defendants Cannot Present Evidence of Specific Harm Necessary to Establish Good Cause for Confidentiality

The Defendants bear the burden of proof if they continue to insist on confidentiality for the documents produced in discovery, Bell v. Woodward Governor Co., 2004 WL 3121301, at *3 (N.D. Ill. Dec. 20, 2004), and at the very least they must present evidence of *specific* harm they would suffer as a result of public access to the documents. To establish good cause, they must show that disclosure "will result in a 'clearly defined and very serious injury,'" Andrew Corp v. Rossi, 180 F.R.D. 338, 341 (N.D. Ill. 1998) (internal citations omitted), and must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n. 16 (1981) (internal citations omitted); Doe v. White, 2001 WL 649536, at *1 (citing Moriarty v. LSC Illinois Corp., 1999 WL 1270711, *4 (N.D. Ill. Dec. 29, 1999)). See also Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.").

Courts have recognized that public officials executing public duties are in a very different position than civilians vis-à-vis their expectations of privacy. See In Re A Witness Before The Special Grand Jury 2000-2, 288 F.3d 289, 294 (7th Cir. 2002) ("Public officials are not the same as private citizens precisely because they exercise the power of the state. With this responsibility comes also the responsibility to act in the public interest.") Because the CR files and the Lists reflect on police officers' performance of their public duties, any conceivable "privacy" interests of the officers in the non-personal information contained there are greatly diminished.[7] See Shingara v.

---

[7] Petitioner does not seek any "Personal Identifying Information" about Chicago police officers, and therefore has no objection to the redaction of social security numbers,

Skiles, 420 F.3d at 307 (3rd Cir. 2005) ("privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny") (quoting Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787 (3d Cir. 1994)); Hawley v. Hall, 131 F.R.D. 578, 585 (D.Nev. 1990) ("The public interest in the conduct of public officials, ... outweighs the minimal harms tendered by the defendants as good cause in this case.").[8]

To the extent that the Court is concerned about the privacy interests of civilian third parties (i.e., witnesses and complainants), petitioner submits that the third parties' identities may be fully redacted from the files. See Doe v. White, 2001 WL 649536, at *2 (permitting public disclosure of CR files with identifying information of complainants redacted); Escobar v. Foster, 2000 WL 631312, at *2-3 (N.D. Ill. May 16, 2000) (ordering CR files produced as non-confidential matter pursuant to a protective order preserving complainants' anonymity); Sasu v. Yoshimura, 147 F.R.D. 173, 176 (N.D. Ill. 1993) (plaintiffs could distribute "nonconfidential information, including redacted versions of documents and statistical information about police practices"). Redacting this information will not prevent the public from obtaining important information about the operations of its police force and those who oversee the force.

## II.  THE COURT SHOULD PERMIT JOURNALIST JAMIE KALVEN TO INTERVENE ON BEHALF OF THE PUBLIC

### A.  Petitioner Jamie Kalven is a Journalist Who Reports Extensively on Police Misconduct in Chicago

Jamie Kalven is an award-winning professional journalist who has spent years researching and writing about victims of violence, about Chicagoans who reside in public housing, and about patterns of police abuse in Chicago public housing. Mr. Kalven has

---

telephone numbers, addresses, and officers' family details from the CR files. See Exhibit C, part A.5.

[8] Anticipating an objection raised by the City in the past, the City will no doubt respond that the documents it seeks to keep shielded are merely "allegations" and not proof of misconduct. That may be true, but the Court need not accept the City's urging of paternalism regarding the City's ability to discern the difference for itself. See Wiggins v. Burge, 173 F.R.D. at 230 ("The general public is sophisticated enough to understand that a mere allegation of police torture, just like a lawsuit, does not constitute actual proof of misconduct.).

published a critically-acclaimed book about his family's recovery from violence; written for many periodicals including the <u>Chicago Sun-Times</u>, <u>The Nation</u>, and <u>Slate</u>; facilitated the work of journalists from the <u>Wall Street Journal</u>, <u>New York Times</u>, <u>National Public Radio</u>, "60 Minutes," and other media; and received philanthropic support for his writings, including from the John D. and Catherine T. MacArthur Foundation, the Soros Foundation, and the Richard H. Driehaus Foundation.

In 2001, Mr. Kalven and his colleagues launched the web publication <u>The View from the Ground</u> to report in detail about conditions in Chicago public housing communities. An article published in 17 installments on the website from 2005 to 2006, "Kicking the Pigeon," describes both Ms. Bond's allegations against the defendant officers and the broader context in which she alleges such acts were permitted to occur. <u>See</u> Exhibit A.

Mr. Kalven is now writing a book on patterns of human rights abuses by police and the official response to them. Documents produced by defendants in this lawsuit, but designated confidential by them, contain valuable information about the workings of the Chicago Police Department and Chicago officials' response - or lack of response - to that information. Mr. Kalven seeks, on behalf of the public, to obtain these documents in order to use them in his published writings and to provide the public with direct access to the information they contain. <u>See</u> <u>id.</u>

## B. Journalists May Intervene in Suits to Challenge Confidentiality Designations

In the Seventh Circuit, it is clear that "the press [has] standing to challenge a protective order for abuse or impropriety." <u>Grove Fresh Distribs.</u> 24 F.3d at 898 (citing <u>In re Cont'l Ill. Sec. Litig.</u>, 732 F.2d 1302 (7th Cir. 1984)); <u>see also</u> <u>In re Associated Press v. Ladd</u>, 162 F.3d 503, 507 (7th Cir. 1998).

The Seventh Circuit has also determined that "the most appropriate procedural mechanism by which to accomplish this task is by permitting those who oppose the suppression of materials to intervene for that limited purpose." <u>Id.</u> at 507 (citing numerous cases); <u>see also</u> <u>Public Citizen v. Liggett Group, Inc.</u>, 858 F.2d 775, 783 (1st Cir. 1988) ("...where intervention is available (<i>i.e.</i> civil cases), it is an effective

14

mechanism for third-party claims of access to information generated through judicial proceedings."). Mr. Kalven petitions to intervene pursuant to Federal Rule of Civil Procedure 24, which courts have widely accepted as the appropriate provision for the specific relief he seeks. "[E]very court of appeals to have considered the matter has come to the conclusion that Rule 24 is sufficiently broad-gauged to support a request of intervention for the purposes of challenging confidentiality orders." Jessup v. Luther, 227 F.3d 993, 997 (7th Cir. 2000).

Accordingly, Mr. Kalven has a right to intervene here on behalf of the public to release "confidential" documents.

## CONCLUSION

The public must not be asked to blindly trust that the City and its police department are uncovering, addressing, and informing them about all allegations of police corruption. Rather, the public should have the benefit of the actual data and information; if serious misconduct is occurring, it stands a much better chance of being dealt with in the public than in the shadows.

In granting the public the benefit of certain CR files, Judge Castillo recalled Martin Luther King, Jr.'s Letter from a Birmingham Jail: "Like a boil that can never be cured as long as it is covered up but must be opened with all its pus-flowing ugliness to the natural medicines of air and light, injustice must likewise be exposed, with all of the tension its exposing creates, to the light of human conscience and the air of national opinion before it can be cured." Wiggins v. Burge, 173 F.R.D. at 230.

WHEREFORE, Petitioner, Jamie Kalven respectfully requests that this Court remove any confidential designation from, and allow the public access to, the following materials produced in this litigation:

- The list of all Chicago police officers who had more than ten official complaints lodged against them from 2001 to 2006;
- The list of officers who had more than ten official complaints lodged against them from 2001 to 2006 and who were referred to one of Chicago's "early warning" programs;

15

- The list of officers who had more than ten official complaints lodged against them from 2001 to 2006 and who worked in the Public Housing South Unit;
- The defendant officers' Employee Complaint Histories;
- The CR files opened against the individual defendant officers; and
- The CR files directly related to plaintiff Diane Bond's complaints

RESPECTFULLY SUBMITTED,

S/ Samantha Liskow
ATTORNEY FOR JAMIE KALVEN

Jon Loevy
Samantha Liskow
LOEVY & LOEVY
312 N. May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DIANE BOND,                                    )
                                               )
            Plaintiff                          )
                                               )      No. 04 C 2617
v.                                             )
                                               )      Judge Joan Humphrey Lefkow
CHICAGO POLICE OFFICERS EDWIN                  )
UTRERAS (Star No. 19901), et al.,              )      Magistrate Judge Arlander Keys
                                               )
            Defendants                         )

## DECLARATION OF JAMIE KALVEN

Jamie Kalven, for his declaration, states as follows:

1. I am a professional writer. I am the author of *Working With Available Light: A Family's World After Violence* (W. W. Norton, 1999) and the editor of *A Worthy Tradition: Freedom of Speech in America* (Harper & Row, 1988) by Harry Kalven, Jr. As a journalist, I have written for a wide range of publications; among them, *Slate*, *Nation*, *New Republic*, *University of Chicago Magazine*, *Chicago Reader*, and *Chicago Sun-Times*. I am also a contributor to the program "Eight Forty-Eight" on Chicago Public Radio.

2. Since the early 1990s, I have been deeply involved in the life of Stateway Gardens, a public housing development on the South Side of Chicago. For a number of years, I served as advisor to the Stateway Local Advisory Council (the resident council) and maintained an office in one of the buildings. I have participated in a number of initiatives at Stateway; among them, a web publication titled *The View From The Ground* dedicated to human rights documentation.

3. It was through my immersion in day-to-day life at Stateway that I first became aware of a group of Chicago police officers—the individual defendants in *Bond v. Utreras*— variously known as "the skullcap crew," "the skinhead crew," and "the Macintosh crew." Again and again, residents told me deeply disturbing stories about this crew. These officers, they stressed, are "different." What sets them apart, according to residents, is the degree of their brutality, the extent of their corruption, and, above all, their evident pleasure in inflicting racial humiliation.

4. I wrote two articles in *The View From The Ground* about cases in which members of this crew were allegedly involved, and I investigated a number of others. On the basis of my ongoing inquiry, I became convinced that these officers were engaging in egregious patterns of abuse and that they were doing so with virtual impunity. In 2005-2006, I wrote a 17-part series titled "Kicking the Pigeon" about the *Bond* case and its contexts. I

1

am now working on a book, based on my experiences and research at Stateway, about police abuse and official denial.

5. The *Bond* case will be settled, but my journalistic inquiry continues, as does an intense public debate about issues of police accountability. It has been officially acknowledged that Commander Jon Burge and officers under his command tortured African-American suspects during the period 1973 to 1991. Mayor Daley has called their crimes "a shameful episode in our history." Against this background, a critically important public issue is currently being debated in Chicago: have the systemic conditions that allowed these officers to operate for years with impunity been corrected? That is the context in which I am seeking relief from the protective order with respect to the certain documents produced by the City of Chicago in *Bond v. Utreras*.

6. I am requesting that this Court find that the protective order does not apply to the following document:

- List of officers who amassed more than ten official misconduct complaints during 2001-2006 and the units to which they were assigned.

7. There is an obvious public interest in citizens knowing the names of officers and groups of officers who have amassed exceptionally high numbers of complaints of official misconduct. This information will help citizens assess the performance of these public officials and better understand issues of police accountability.

8. I am also requesting that this Court find that the protective order does not apply to the following documents:

- List of officers with more than ten official misconduct complaints during 2001-2006 who participated in the CPD's early warning/intervention programs.

- List of officers with more than ten official misconduct complaints during 2001-2006 who were assigned to Public Housing South.

9. Taken together, these documents would advance the public debate over the adequacy of the CPD's systems for supervision, monitoring and discipline. Their relevance is illustrated by a recent exchange between Deputy Superintendent Debra Kirby, the director of the Internal Affairs Division of the CPD, and myself. Writing in the *Sun-Times*, I questioned statements by the Mayor and Superintendent of Police, following the release of the *Report of the Special State's Attorney*, that the underlying conditions that allowed Burge and his men to operate with impunity have been corrected. Deputy Superintendent Kirby challenged my commentary in a letter to the *Sun-Times*. I responded, in turn, in *The View From The Ground*. See the exchange between myself and Debra Kirby, attached. Were the documents at issue publicly available, this debate between the senior official responsible for internal investigations and a public critic would be deepened and advanced, enabling others to better assess the merits of our respective arguments.

10. Finally, I am requesting that this Court find that the protective order does not apply to the following documents:

- The employee complaint histories for the five individual defendants in *Bond*— Officers Utreras, Savickas, Stegmiller, Seinitz, and Schoeff.

- The Complaint Register files for the five individual defendants in *Bond*.

- Complaint Register files related to the complaints filed by Diane Bond with respect to the alleged incidents on April 13, 2003 and April 28, 2003.

11. There is a strong public interest in knowing the specific content of the complaints against Officers Utreras, Savickas, Stegmiller, Seinitz, and Schoeff. This public interest can be served, while respecting the legitimate privacy interests of the officers and the complainants. These officers have been repeatedly accused of abusing African-Americans, including some of the most vulnerable residents of Chicago. The gravity of the alleged abuses, the pervasiveness of the apparent patterns, and the impact on particular communities bear comparison to the Burge abuses. Surely if we have learned anything from that "shameful episode in our history," it is that our most fundamental values are best served when information bearing on allegations of human rights violations by public officials is not withheld from public scrutiny.

I declare under penalty of perjury that the foregoing is true and correct.

Jamie Kalven
Jamie Kalven
March 15, 2007

3

Back to regular view • Print this page

# '97 blueprint for reining in rogue cops gathering dust today
(http://www.suntimes.com/news/otherviews/193203,CST-EDT-REF01.article)

January 1, 2007

**BY JAMIE KALVEN**

In a commentary published in the Sun-Times on Sept. 16, I described the human rights scandal disclosed by statistics, provided by the Chicago Police Department, on its internal investigations of citizen complaints of police misconduct. During 2002-2004, for example, an officer accused of excessive force had a 2-in-1,000 chance of receiving meaningful punishment (defined as a suspension of seven days or more). These numbers reveal conditions under which officers with criminal tendencies operate with impunity. And they demonstrate why the performance of the Office of Professional Standards, the section within the Police Department that investigates excessive-force complaints, has long been an issue in the African-American and Hispanic neighborhoods where most abuse occurs.

On Oct. 10, Mayor Daley announced the resignation of the head of OPS, and the formation of a panel to help select the next head of the agency and to suggest reforms. The chairman of the panel is former police Supt. Terry Hillard. The other members are Rita Fry, former Cook County public defender; the Rev. Michael Pfleger of St. Sabina Catholic Church; Andre Grant, an attorney who has repeatedly sued the Police Department, and Juan Rangel, director of the United Neighborhood Association.

A measure of perspective is provided by a similar occasion nine years ago. Then as now, Daley was confronted with an emerging police scandal. The circumstances were strikingly similar. In recent months, four tactical officers from the Englewood District have been convicted in federal court on charges of robbing drug dealers; seven Special Operation Section officers face an array of charges in state court, and two tactical officers from the Morgan Park District were indicted after being caught in an FBI sting stealing money from storage lockers they thought had been rented by a drug dealer. More indictments are expected.

In 1997, seven tactical officers in the Austin District and three in the Gresham District were accused of robbing drug dealers. Daley responded by creating the Commission on Police Integrity to investigate the underlying causes of the scandal and make recommendations for reform.

The commission was similar in composition and flavor to the current panel. Led by former U.S. Attorney Dan Webb, it included Sharon Gist Gilliam, former city budget director and current head of the Chicago Housing Authority; Fred Rice, former superintendent of police, and Anita Alvarez of the Cook County state's attorney's office.

In November 1997, the commission presented its report to Daley. It made several key recommendations.

Recommendation: The CPD should institute a "fully computerized" early-warning system to identify officers engaged in misconduct. "The premise is simple," the commission observed. "Small problems become big ones if left unattended." The 10 Austin and Gresham officers whose crimes precipitated the scandal had accumulated 133 complaints in their careers (only five of which were sustained) -- an average of 13 complaints per officer. An effective early-warning system, the commission concluded, would have detected patterns of misconduct and prevented some of the crimes they subsequently committed.

Current status: The Police Department still does not track patterns of abusive behavior. It has sought to portray recent indictments as evidence the system is working, but in every instance the indicted officers were identified by means other than internal CPD investigations. As in 1997, the absence of an effective early-warning system is revealed by the fact that various of the officers facing criminal charges had accumulated citizen complaints alleging abuses consistent with the pattern involved in the criminal case, but never received intervention and/or discipline.

The city has long promised a computerized system for tracking citizen complaints. On July 21, Daley went so far as to say that such a system is "in place." The reality is that it remains in the planning stage and has not been implemented.

Recommendation: The department should provide close supervision of tactical units assigned to narcotics enforcement because "the corruption problem in law enforcement today is inextricably linked to the flourishing narcotics trade."

Current status: Police scandals in Chicago and elsewhere have almost always, like the current cases, involved elite tactical units engaged in "the war on drugs." Yet these units continue to receive relatively little supervision.

Recommendation: The department should track patterns with respect to groups of officers as well as

Case: 1:04-cv-02617 Document #: 242  Filed: 03/15/07 Page 22 of 83 PageID #:2534

individuals. "Corrupt police officers," stated the commission, "tend to band together in groups."

Current status: Police officials responsible for internal investigations recently acknowledged that they do not track complaints by units or groups of officers.

As we await the recommendations of the current panel, we would do well to recall the fate of the Commission on Police Integrity. Daley welcomed its report in 1997 as "an excellent blueprint for change." Today, nearly a decade later, its principal recommendations remain unimplemented.

*Chicago writer Jamie Kalven is working on a book on patterns of police abuse.*

© Copyright 2007 Sun-Times News Group | User Agreement and Privacy Policy

**Back to regular view · Print this page**

## Police Dept. handcuffs misconduct
(http://www.suntimes.com/news/commentary/letters/202474,CST-EDT-VOX09A.article)

January 9, 2007

Jamie Kalven's Jan. 1 commentary leaves citizens with the impression that the Chicago Police Department has done nothing since 1997 to address the issue of police misconduct. Nothing could be further from the truth. Many of blue-ribbon committee's recommendations for improved integrity and accountability have been fully implemented.

Both the Office of Professional Standards and the Internal Affairs Division actively investigate and respond to complaints regarding officer misconduct. More important, Supt. Philip Cline has strengthened even further the internal investigative process by ensuring that every command staff member reach out to every community to educate them about the process.

To be clear, we have remained committed to rooting out bad cops who violate the public's trust. The recent arrests of Special Operations Section officers underscores that commitment.

While we appreciate Kalven's recommendations to track patterns of complaints against police officers, and the supervision of tactical units, readers should know that we are already doing so and have reorganized citywide response units to provide closer supervision with better tactical responses in monitoring officers and their actions.

Furthermore, Kalven claims that officers who are accused of misconduct have a "2-in-1,000" chance of receiving what he considers "meaningful punishment." There is no question that Supt. Cline has prioritized the commitment to integrity, honesty and professionalism within the Chicago Police Department. For the record, Supt. Cline has recommended the terminations of more than 100 police officers -- recommendations that are governed and decided solely by an independent police board. It should also be noted that complaints must be investigated and mistakes are not the same as misconduct. The department regularly makes recommendations for appropriate discipline based on the factual findings of the disciplinary investigation.

Recommendations on police integrity and progress in reform have been and continue to be made. We are fully committed to evaluating all such recommendations.

Our mission and challenge are to discipline effectively and fairly without compromising the public's trust or the morale of the more than 13,600 decent and hardworking men and women who serve this department and city every day.

**Debra Kirby,**

**assistant deputy superintendent, Internal Affairs,**

**Chicago Police Department**

© Copyright 2007 Sun-Times News Group | User Agreement and Privacy Policy

# The View From The Ground

- Contact
- Help Us
- About
- Archives
- Home

A publication of the Invisible Institute

 Search

# Exchange with Deputy Superintendent Kirby

Published March 9th, 2007

On January 1, I published an op-ed piece in the *Chicago Sun-Times* on Mayor Daley's Commission on Police Integrity. Appointed in 1997 in the wake of a police scandal in the Austin and Gresham Districts, the Commission was charged with investigating the underlying causes of the scandal and making recommendations for reform. The Mayor welcomed the Commission's report as "an excellent blueprint for change." Yet nearly a decade later, I argued, the City has still not implemented the Commission's primary recommendations.

In a letter to the *Sun-Times* published on January 9, Deputy Police Superintendent Debra Kirby, the head of the Internal Affairs Division, responded to my piece:

> *Jamie Kalven's Jan. 1 commentary leaves citizens with the impression that the Chicago Police Department has done nothing since 1997 to address the issue of police misconduct. Nothing could be further from the truth. Many of the blue-ribbon committee's recommendations for improved integrity and accountability have been fully implemented.*

Apart from repeatedly asserting the CPD's "commitment" to professionalism and accountability, Kirby makes several points. I will respond to each in turn.

* * * *

> *Both the Office of Professional Standards and the Internal Affairs Division actively investigate and respond to complaints regarding officer misconduct.*

My point is not that the CPD has no systems for supervising, monitoring and disciplining officers. It is that those systems are ineffective. In an earlier *Sun-Times* op-ed piece, published on September 16, 2006, I used the CPD's own statistics to demonstrate this. Since then, the CPD's data has been further analyzed by Dr. Steven Whitman, an epidemiologist who was an expert witness for the plaintiff in *Bond v. Utreras*. (Statistical tables generated by Dr. Whitman are available here.) Among his findings:

- During 2002-2004, citizens filed 10,149 complaints alleging police abuses in the categories of excessive force, illegal arrest, illegal searches, racial abuse and sexual abuse. Only 124 of these

complaints were sustained--slightly more than 1 percent.

- If "meaningful discipline" is defined as a suspension of 7 days or more, only 19 of the 10,149 complaints resulted in "meaningful discipline"--a rate of less than 2 per 1,000 complaints.

- According to a U. S. Department of Justice report, the national sustained rate for excessive force complaints filed with "large municipal police departments" in 2002 was 8 percent. By contrast, the CPD's sustained rate during 2004, the most recent year for which it has released figures, was less than half of one percent (0.48%). In other words, excessive force--brutality--complaints are 94 percent less likely to be sustained by the CPD than they are by other large municipal police departments across the country.

- Contrary to Kirby's assertion that the CPD has "improved integrity and accountability" in the years since 1997, the percentage of sustained complaints steadily declined during the period 1999-2004. The sustained rate for all civilian abuse complaints decreased from 3.7% in 1999 to 0.6% in 2004--a decline of 84%. The sustained rate for excessive force complaints decreased from 4.8% to 0.5%--a decline of 90%.

- The odds that a CPD officer who abuses a citizen will receive meaningful discipline are in reality even less than 2 in 1,000--substantially less. Citizens who believe they have been victims of police abuse often do not file formal complaints. Among the reasons are fear of reprisals and distrust of the investigatory process. A national survey conducted by the U. S. Department of Justice found that only 10% of those who believed they suffered excessive force in an encounter with the police reported the incident to the agency employing the officer. If we use that baseline, an incident in Chicago in which a citizen believes the police used excessive force will result in meaningful discipline in 2 in 10,000 cases.

These numbers evoke the conditions of impunity under which abusive CPD officers operate. It is hard to believe, given such odds, that an officer with criminal tendencies would be deterred from wrongdoing by fear of being investigated and punished.

\* \* \* \*

*To be clear, we have remained committed to rooting out bad cops who violate the public's trust. The recent arrests of Special Operations Section officers underscores that commitment.*

The CPD has repeatedly claimed that the SOS case and other recent indictments prove it has adequate systems in place to identify and discipline rogue officers. These indictments are not, however, evidence the system is working. They are evidence it is broken.

The internal investigation of the SOS officers was initiated after lawyers in the State's Attorney's Office informed the CPD that the officers in question were consistently missing court appearances. It was not triggered by the CPD's supervisory and monitoring systems but by the intervention of another agency. It would be interesting to know how many internal complaints the CPD had received over the years regarding these officers as individuals and as a group.

Similarly, the tactical officers in the Englewood district who recently pled guilty on charges arising from their practice of robbing drug dealers were not brought down by internal CPD mechanisms of accountability. The case was precipitated by federal agents who observed the officers interacting with drug dealers they had under surveillance. The agents' interest was piqued, when they noticed a Fraternal

Order of Police bumper sticker on the officers' vehicle. One of these officers, it has been reported, had amassed 31 citizen complaints within the two years prior to his indictment, while another had amassed 24.

This is just one of many high-profile criminal cases over the years in which officer defendants proved to have high numbers of citizen complaints alleging abuses consistent with the pattern involved in the criminal case but had never received meaningful intervention and/or discipline.

Again and again, the CPD has responded the same way to cases such as these that carry the threat of a widening police scandal. It announces that bad cops will not be tolerated and that vigorous investigations are ongoing. The Mayor may appoint a special body to address the problem such as the Commission on Police Integrity in 1997 or the current panel advising him on selection of a director for the Office of Professional Standards. Then, when public attention wanes, the status quo is restored without any meaningful reforms having been instituted.

Consider, for example, the recent verdict in the case against the City brought by Michael Casali, an ATF agent, and his wife Diane Klipfel, a former AFT agent. In 1992, these federal agents reported criminal acts by Officer Joseph Miedzianowski to their supervisors. Described by federal prosecutors as "the most corrupt cop in Chicago history," Miedzianowski is currently serving a life sentence for running a Miami-Chicago drug ring out of the Gang Crimes unit. By the time he was finally arrested in 1998, he had amassed more than 40 complaints; among them, 20 brutality complaints, none of which had resulted in meaningful intervention or punishment. In their suit, Casali and Klipfel charged that the CPD retaliated against them rather than investigating their complaints, allowing Miedzianowski and his cronies to terrorize them. After a five-week trial that included testimony from Superintendent Phil Cline, the jury found in favor of the couple and awarded them $9.75 million. In post-trial interviews, jurors made it clear that the crux of the case, as one of them put it, was the CPD's "incompetent, lazy and overall negligent" investigation of Miedzianowski. Another remarked, "What investigation did the Chicago Police Department do? Mike and Diane were wronged. It was the city's policies that created that."

\* \* \* \*

In my op-ed piece, I noted that the Commission on Police Integrity recommended that the CPD institute a "fully computerized" early warning system to identify officers engaged in misconduct and that it emphasized the importance of tracking patterns with respect to groups of officers as well as individuals.

Kirby responds:

> *While we appreciate Kalven's recommendations to track patterns of complaints against police officers . . . readers should know that we are already doing so . . .*

Again, the issue is not whether or not the City has a system. It is the adequacy of that system. The City has repeatedly declared it is in the process of instituting a state-of-the-art computerized system for tracking patterns of misconduct. Technology may well be forcing the City's hand: it is increasingly hard to justify the use of high tech tools to identify criminal patterns in the general population, while refusing to do the same with respect to criminals in uniform. There is, however, no evidence such a system has been implemented. What we know about the system currently in place is that it yields outcomes such as those described above. And we know that police officials responsible for investigating citizen complaints have acknowledged that the CPD does not currently track complaints by groups of officers. In other words, it chooses not to know things within its power to know about patterns of abuse.

Case: 1:04-cv-02617 Document #: 242 Filed: 03/15/07 Page 27 of 83 PageID #:2539

Viewed against this background, Dr. Whitman's analysis of CPD data regarding officers who have amassed unusually large numbers of complaints is telling. Among his findings:

- During the period May 2001 - May 2006, 10,387 officers had 0 to 3 complaints. Another 2,451 officers had 4 to 10 complaints. 662 officers had more than 10 complaints.

- The 662 "repeaters" were named in 10,733 complaints. Only 236 or 2.2% of these complaints were sustained.

- Only 22 of the 10,733 complaints or 0.2% resulted in "meaningful discipline"--i.e., a suspension of 7 days or more.

- Of the 662 "repeaters," only 25% ever received *any* discipline, however nominal, while 75% were never disciplined at all.

- Among the "repeaters," 33 officers were named in 30 or more complaints within a five year period. Of these, four had 50 or more complaints. Taken together, these 33 officers had, at a minimum, well over 1,000 complaints. Yet only 6 of these complaints were sustained and only one resulted in meaningful punishment.

- The CPD has two programs that it describes as its "early warning system": the Behavior Intervention System and the Personnel Concerns Program. The purpose of an early warning system is to identify officers in need of intervention before, in the words of the Commission on Police Integrity, "small problems become big ones." It is a measure of the inadequacy of the CPD's early warning system that only 89 (13.4%) of the 662 "repeaters" have been identified by these programs. More than 86% "repeaters" have not been identified as needing intervention; among them, officers who amassed 50 or more complaints over a five year period.

* * * *

The Commission recommended that the CPD provide closer supervision of tactical units assigned to enforcing narcotics laws, because this is the setting in which most abuses occur. According to Kirby:

> . . . readers should know that we . . . have reorganized citywide response units to provide closer supervision with better tactical responses to monitoring officers and their actions.

I am not altogether sure what this means and whether it translates into more stringent accountability standards and practices. I do know that Superintendent Phil Cline stated, in the wake of the SOS indictments, that members of that unit would be placed under closer supervision. He also said he did not think it necessary to disband SOS altogether, as had been done to Gang Crimes in 2000 after Miedzianowski was convicted on racketeering charges for running a drug ring out of the unit. The underlying issue here goes to the deployment strategy adopted by the City. Instead of strengthening the units based in particular districts, it has opted to create special units that operate city-wide with a high degree of autonomy. A byproduct of this strategy, as we have seen with Gang Crimes and SOS, is that these units are relatively unaccountable and prone to high levels of abuse. What does it mean when Cline and Kirby say there will be "closer supervision" of these units? Will supervisors have access to effective tools for enforcing accountability? Will they be directed to make vigorous use of those tools?

* * * *

> *... Kalven claims that officers who are accused of misconduct have a "2-in-1,000" chance of receiving what he considers "meaningful punishment." There is no question that Supt. Cline has prioritized the commitment to integrity, honesty and professionalism within the Chicago Police Department. For the record, Supt. Cline has recommended the terminations of more than 100 police officers—recommendations that are governed and decided solely by an independent police board.*

My statement that officers accused of misconduct had a 99.8% chance of not receiving meaningful discipline is not based on the full universe of allegations of misconduct but on complaints involving direct abuse of citizens (excessive force, illegal search, etc.). There are a range of other sorts of administrative infractions and matters of non-performance that do not figure in this analysis.

Kirby responds by citing the number of officers Cline has recommended terminating during his three-and-a-half-year tenure. It is not surprising that in a force of 13,600 the superintendent would have occasion to recommend the firing *for all causes* of 100 officers over more than three years. This is, however, unresponsive to the point I am raising about the CPD's ineffectiveness in responding to citizen complaints of abuse. How many officers has Cline recommended terminating on the grounds that they abused citizens?

* * * *

Kirby closes her letter with these words:

> *Our mission and challenge are to discipline effectively and fairly without compromising the public's trust or the morale of the more than 13,600 decent and hardworking men and women who serve this department and city every day.*

That is indeed what is at stake. A small percentage of the police force commit the vast majority of the abuse. Allowed to operate with impunity, these "few bad apples" do great damage to both the public's trust and the morale of the rest of the force.

Jamie Kalven

Permalink: http://www.viewfromtheground.com/archive/2007/03/exchange-with-kirby.html

## Join the Discussion

Logged in as Jamie Kalven Logout »

# EXHIBIT B

Westlaw.

NewsRoom

12/18/06 CHISUN 14

12/18/06 Chi. Sun-Times 14
2006 WLNR 21939223

Chicago Sun Times (IL)
Copyright 2006 ProQuest Information and Learning Company; All Rights Reserved.

December 18, 2006

Section: News

Alleged cop brutality case settled -- but is it just one of many?:
Investigative blogger says 'meaningful discipline' meted out in 18 out of
10,000 allegations

Abdon M. Pallasch ; The Chicago Sun-Times

City of Chicago officials are preparing to settle a police brutality case
that has generated no stories in the mainstream media -- but which watchers in
the blogosphere say threatened to expose widespread patterns of abuse in the
Chicago Police Department.

Diane Bond said she was physically accosted and sexually humiliated on
many occasions by a special team of officers assigned to her building in the
Stateway Gardens housing complex.

The plight of Bond and her son was chronicled by blogger Jamie Klaven. City
lawyers had a companion lawsuit going against Klaven to get a judge to force
him to turn over all his notes of interviews with everyone in the housing
project -- even on issues unrelated to Bond's case.

That potential First Amendment showdown was averted when the city and Bond's
lawyers reached a tentative settlement of $150,000 last week. That figure must
be approved by the Chicago City Council. The settlement will end the city's
action against Klaven.

In the course of the lawsuit, Bond's lawyer, Craig Futterman, a public

interest lawyer with the University of Chicago's Mandel Legal Aid Clinic, obtained extensive records of the Police Department's disciplining of officers in response to brutality complaints.

As Klaven reported on his blog, the numbers show that of the 10,150 complaints of excessive force, illegal arrest, illegal searches, racial and sexual abuse filed against Chicago officers between 2002 and 2004, only 18 times were officers suspended for seven days or more.

'50 OR MORE COMPLAINTS'

That means an officer accused of abuse has a 99.8 percent chance of getting off without any "meaningful discipline," Futterman said. The figure exposes as a lie the department's attempts to portray the abuse under former Police Cmdr. Jon Burge as ancient history and practices as having been reformed, Futterman said.

"They've been engaged in a pattern of abuse against public housing residents on the South Side," Futterman said. "There are officers with 50 or more complaints who were never disciplined."

In Bond's case, in April of 2003, an officer put a gun to her head and demanded to know where she lived, the lawsuit said. He and a team of officers took her keys and forced their way into her home, beat her son, forced her son to beat another person, threatened to plant drugs on her if she did not follow his instructions, and then had her undress for him so he could stare at her private parts, according to the lawsuit.

That was just the first of several incidents by the same group of officers, according to Bond's lawsuit. Bond was never charged with any crime.

City Law Department spokeswoman Jennifer Hoyle confirmed that attorneys have reached a tentative settlement in the case.

apallasch@suntimes.com

---- INDEX REFERENCES ----

COMPANY: UNIVERSITY OF CHICAGO

REGION:  (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language:  EN

OTHER INDEXING:  (CHICAGO; CHICAGO CITY; CHICAGO POLICE DEPARTMENT; CITY LAW DEPARTMENT; MANDEL LEGAL AID CLINIC; POLICE CMDR; POLICE DEPARTMENT; STATEWAY GARDENS; UNIVERSITY OF CHICAGO)  (Bond; City; Craig Futterman; Diane Bond; Futterman; Investigative; Jamie Klaven; Jennifer Hoyle; Jon Burge; Klaven)

EDITION: Final

Word Count: 559
12/18/06 CHISUN 14
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DIANE BOND, )<br><br>Plaintiff )<br><br>v. )<br><br>CHICAGO POLICE OFFICERS EDWIN )<br>UTRERAS (Star No. 19901), ANDREW )<br>SCHOEFF (Star No. 4436), CHRIST )<br>SAVICKAS (Star No. 5991), ROBERT )<br>STEGMILLER (Star No. 18764), JOSEPH )<br>SEINITZ (Star No. 4947), ROBERT SHULTZ )<br>(Star No. 13882), NICHOLAS CORTESI (Star )<br>No. 15112), JOHN CANNON (Star No. )<br>12241), and JOHN DOES ONE through FIVE, )<br>in their individual capacities; and the CITY OF )<br>CHICAGO, )<br><br>Defendants. )<br>) | No. 04 C 2617<br><br>Judge Joan Humphrey Lefkow<br><br>Magistrate Judge Ashman |

## AGREED, QUALIFIED PROTECTIVE ORDER

Pursuant to Fed.R.Civ.P 26 (c) and 45 C.F.R. §§ 160 & 164, the parties to this action, by and through their respective counsel, have represented to the court and the court finds:

A. The following words and terms are defined for purposes of this agreed, qualified protective order:

1. "Signatories" shall mean defendant City of Chicago, plaintiff, the individual defendants, any additional party that this court may subsequently recognize as a signatory of this qualified protective order, and their attorneys.

1

2.  "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996.

3.  "Privacy Standards" shall mean the Standards for Privacy of Individually Identifiable Health Information. *See* 45 C.F.R. §§ 160 & 164 (2000).

4.  "PHI" shall mean protected health information, as that term is used in HIPAA and the Privacy Standards. "PHI" includes, but is not limited to, health information, including demographic information, relating to either (a) the part, present, or future physical or mental condition of an individual; (b) the provision of care to an individual; or (c) the payment for care provided to an individual, which identifies the individual or which reasonably could be expected to identify the individual.

5.  "Personal Identifying Information" shall mean an individual's social security numbers, home addresses, phone numbers, and the names or contact information of beneficiaries.

6.  "Confidential Matter" shall mean medical, employment, disciplinary, investigatory, financial, or other information that is of a sensitive or non-public nature regarding plaintiff, defendants, non-party witnesses and non-party employees of the City of Chicago that may be subject to discovery in this action. "Confidential Matter" includes, but is not limited to photographs of individual defendants and other police officers. "Confidential matter" also includes files generated by the investigation of complaints of misconduct by Chicago police officers (generally referred to as "Complaint Register" files), including information in the Complaint Register files that identifies the complainant and civilian witnesses, including photographs or personal identifying information; personal identifying information of police officers; and PHI. The portions

2

of Complaint Register File Nos. 261847, 288793, and 289089, numbered IDL_0001-IDL_0170, produced by the Individual Police Defendants, and Michael Reese Hospital records, Bates numbered 000068-000075, produced by Plaintiff, pursuant to Fed.R.Civ.P. 26(a)(1), shall be treated as having been designated as "Confidential Matter" under this Order. The designation of material as "Confidential Matter" does not create any presumption for or against that treatment.

7.  This order governs all discovery related to the exchange or dissemination of information or the production of documents designated as PHI and/or confidential matter.

B.  The signatories are familiar with HIPAA and the Privacy Standards.

C.  The parties recognize that it may be necessary during the course of this proceeding to produce, disclose, receive, obtain, subpoena, and/or transmit PHI of parties and non-parties to or from other parties and non-parties.

D.  The signatories agree to the following terms and conditions:

1.  The signatories agree to assist each other in the release of PHI by waiving all notice requirements that would otherwise be necessary.

2.  The signatories either seek or agree to the release of PHI specifically for, but not limited to, the following persons from the covered entity or entities identified in interrogatory answers, supplementary disclosures, deposition testimony, or other discovery tools:

### DIANE BOND

3.  The signatories agree not to use or disclose the PHI and Confidential Matter released in this proceeding for any other purpose or in any other proceeding.

3

4.  The signatories agree to store all PHI while it is in their possession according to the Privacy Standards.

5.  The individual pages of each document designated as Confidential Matter shall bear the following designation, or equivalent:

> CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT
> TO PROTECTIVE ORDER ENTERED IN 04 C 2617

No document containing the "confidential" stamp or any identifying number shall be copied in whole or in part without the "confidential" designation and the identifying number appearing on the copy.

6.  Before disclosing PHI or any information containing or reflecting PHI, and/or Confidential Matter, to any persons involved in the litigation, including but not limited to counsel, co-counsel, counsel's staff, or expert or consulting expert witnesses retained in connection with the litigation, counsel will be responsible for informing each such person that the PHI or documents and information containing or reflecting PHI, and/or the Confidential Matter to be disclosed are confidential, to be held in confidence, are to be used solely for the purpose of preparing for this litigation and further, that these restrictions are imposed by a court order.

7.  To the extent that a party believes it has a right to redact information, it may redact such information, provided that if a party redacts information from any confidential matter and the face of the document itself does not make clear and obvious the nature of the information redacted, the party shall provide in writing a specific category of information redacted (for example, social security number).

8.  By this protective order, the discovering party does not waive its right to make application to the court, with reasonable notice to the responding party and other

4

parties to the litigation, for a determination that any Confidential matter produced by the responding party does not contain sensitive and confidential information, or that in the circumstance the information should be released from the provisions of this protective order, with the burden on the party attempting to designate material as confidential matter. If disputes arise concerning the propriety of designating particular documents as confidential, whether certain documents or information should be released from the provisions of this protective order, or concerning any other matter relating to the application of this order, counsel shall attempt to resolve these disputes by agreement before asking the court to resolve these disputes pursuant to the applicable Federal Rules of Civil Procedure. The parties agree that the standard relevant to this determination is that of "good cause" under Rule 26(c).

9.  The signatories agree at the termination of this proceeding to return all PHI obtained during the course of this proceeding to the attorney representing the person whose PHI was released during the course of this proceeding, and to dispose of any PHI retained thereafter pursuant to the Privacy Standards. The signatories further agree that, upon request, all Confidential Matter produced during the course of this proceeding shall be returned to the producing party

10. Nothing in this protective order shall be deemed a waiver of the right of any part to object to a request for discovery on the basis of relevance, materiality, privilege, overbreadth, or any other recognized objection to discovery.

11. This protective order may be modified by further written stipulation signed by the undersigned attorneys and/or by further order of this court upon application to the court with notice.

5

12. No document treated as Confidential under this protective order may be filed under seal with the Court in reference to a dispositive motion or submitted as evidence at trial under seal, unless the Court, on separate motion for good cause shown, grants leave to file or submit into evidence such documents under seal.

ENTERED:

2-2-05

_____
CRAIG B. FUTTERMAN
Attorney for Plaintiff Diane Bond

_____
ARNOLD PARK
Attorney for Defendant City of Chicago

_____
THOMAS J. PLATT
SUSAN SULLIVAN
Attorney for Individual Police Defendants

6

# EXHIBIT D

**STATEMENT OF MAYOR RICHARD M. DALEY**
Special Prosecutors Report
Friday, July 21, 2006

This week, the court released a lengthy special prosecutors report on the practice of abuse and torture of suspects in the 1970s and 1980s at the Calumet police district.

The city strongly supported the release of this report because the public deserves to know the full story about this shameful episode in our history.

They also need to know that the city has, in the two decades since, put in place a series of safeguards aimed at preventing such abuses.

First, let me say, we ask a lot of our police. They put their lives on the line to protect our communities. They see tragedy and loss every day, and are forced to confront the people responsible and bring them to justice. It's a tough, dangerous and often heartbreaking job.

But even as they work in a violent world, these men and women have a responsibility to operate within the law they have taken an oath to uphold. It's this simple: You cannot enforce the law by breaking the law.

No matter how awful the crime, no suspect should be subject to the kinds of abuses detailed in this report. And no suspect should ever be coerced into confessing to crimes he did not commit.

It fundamentally undermines our system of justice, and destroys public confidence. It should never happen.

That is why we now videotape interrogations in murder cases.

That is why we, as department policy, release suspects within 48 hours if they are not formally charged.

That is why we have put in place a new personnel performance management system to detect patterns of misconduct on the part of individual officers, so the department can intervene early, modify their behavior or separate them from the force.

That is why we have greatly upgraded DNA testing and our computer data bases of mug shots and fingerprints to reduce the chances of mistaken identity.

# EXHIBIT E



# ——— NEWS RELEASE ———
## Chicago Police Department

| | |
|---|---|
| **Philip J. Cline**<br>Superintendent of Police | **Monique Bond**<br>Director of News Affairs |

For Immediate Release
July 19, 2006

Contact: Office of News Affairs
(312) 745-6110

## Statement from Chicago Police Supt. Philip J. Cline on Special Prosecutor's Report on Former Cmdr. Jon Burge

While I have not had an opportunity to review the special prosecutor's report in its entirety, the Chicago Police Department, the Mayor's Office and the City have always supported its release.

As a Department, we take this matter very seriously because past perceptions can erode all of the good work and progress that has been accomplished over the years and through previous administrations.

The Chicago Police Department is a very different Department today since that period of time. We have been taking aggressive steps over the years to build upon the public trust between police and the community. The Department has also continued to be innovative in the way it conducts police investigations.

The Detective Division has made significant advances to protect witnesses during the interrogation process, exceeding the requirements of the law.

The most important step we have taken is to implement the videotaping of interrogations so there is a record of the conduct of officers as well as those being questioned.

This Electronic Recording Interrogation System is an award winning model. In addition to the Electronic Recording Interrogation System, we adopted a new special order that outlines how witnesses are treated while discussing cases with investigators.

It provides clear-cut instructions to detectives on our standards on how witnesses should be treated. We also now provide model instructions in writing to be signed by the witness.

(MORE)

BURGE STATEMENT—Add 1

Advances in forensics go hand in hand with investigative work, and we continue to make progress in our widespread use of DNA with improved collection and testing.

We recently commenced a DNA audit to determine if we can find probative DNA evidence on old convictions where DNA was not available at the time.

Technology has also helped the Department to move forward with accuracy using the CLEAR system to check arrest records, mug shots and fingerprints.

Ongoing training for evidence coordinators and detectives by lab personnel as well as regular meetings has improved the flow of information. In fact, the Detective Unit now has its own training unit which also includes a module for ethics.

The Cold Case Unit that started in 1997 re-investigates cases and re-examines new evidence to solve homicides.

We conduct a monthly homicide audit which randomly selects two closed and two open murder cases in an area for examination to ensure that detectives have conducted them properly.

And in 2003, we implemented a limitation of 48 hours in which a suspect is charged or released. We also have made significant advances in officer accountability with the recently announced personnel performance management system.

All of these advancements in the area of police investigations are helping police fight crime, solve homicides and protect the rights and well being of witnesses.

Our progress demonstrates that we are committed to the fair treatment of victims and witnesses through the criminal justice system in our everyday battle to combat crime and keep our communities safe.

### #

# EXHIBIT F

JH

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LAURA RAMIREZ, JAMES RAMIREZ, and )
ANTHONY RAMIREZ, )
)
        Plaintiffs, )
)     No. 05 C 317
        v. )
)
CITY OF CHICAGO, CHICAGO POLICE )
OFFICERS CESAR CLAUDIO, MIKE WALSH, )     Judge Shadur
JOHN JOHNSON, MICHAEL O'DONNELL, )
TIMOTHY SHANAHAN, MICHAEL EGAN, )     Magistrate Judge Keys
LAWRENCE HERHOLD, JEROME FINNEGAN, )
LIEUTENANT CARSON EARNEST, SERGEANT)
JOHN KOHLES, CHRISTINE DEIERL, )
FRANCIS DEPEDER, ROBIN MAHONEY, )     Jury Demand
T. SILDER, CARNELO BAGLIERI, MICHAEL )
COSTELLO, JAMES VINS, R. HESKIN, )
E. DOUGHERTY, KEVIN MUTH, PATRICK F. )
GORDON, CARL J. GRAY, RICHARD J. )
PACHURA, DANIEL ERCHUL, ALAN BRZOZA,)
CHARLES JOHNSON, CUNNINGHAM, )
BROUDER, and AS-YET KNOWN )
CHICAGO POLICE OFFICERS, )
)
        Defendants. )

### PROTECTIVE ORDER

        Pursuant to Fed.R.Civ.P. 26 ( c ) and 45 C.F.R. §§ 160 & 164, the Court finds for good cause

shown:

        A.    The following words and terms are defined for purposes of this agreed, qualified

protective order:

        1.    Signatories shall mean defendant City of Chicago, all individual Defendants,

Plaintiffs, and any additional party that this Court may subsequently recognize as subject to this

qualified protective order, and their attorneys.

2.    "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996.

3.    "Privacy Standards" shall mean the Standards for Privacy of Individually Identifiable Health Information. *See* 45 C.F.R. §§ 160 & 164 (2000).

4.    "PHI" shall mean protected health information, as that term is used in HIPAA and the Privacy Standards. "PHI" includes, but is not limited to, health information, including demographic information, relating to either (a) the past, present, or future physical or mental condition of an individual; (b) the provision of care to an individual; or ( c ) the payment for care provided to an individual, which identifies the individual or which reasonably could be expected to identify the individual.

5.    When used in this Order, the word "document" or "documents"means all written, recorded, or graphic matter whatsoever, previewed or produced to date by a party pursuant to discovery, including but not limited to documents produced by any party or non-party in this action whether pursuant to Federal Rule of Civil Procedure 34, subpoena, or by agreement, deposition transcripts and exhibits, and any portion of court filings that quote from or summarize any of the foregoing.

6.    "Confidential Matter" shall mean documents that may contain confidential information that may be subject to discovery in this action, but that should not be generally available to the public because it may contain sensitive information or information of a non-public nature regarding plaintiffs, defendants and non-party witnesses.    The designation of material as "Confidential Matter" does not create any presumption for or against that treatment.

7.    This order governs all discovery related to the exchange or dissemination of information or the production of documents designated as PHI and/or Confidential Matter.

B.    The signatories are familiar with HIPAA and the Privacy Standards.

C.    The signatories recognize that it may be necessary during the course of this proceeding to produce, disclose, receive, obtain, subpoena, and/or transmit PHI and/or "Confidential Matter" of parties and non-parties to or from other parties and non-parties.

D.    The signatories agree to the following terms and conditions:

1.    The signatories agree to assist each other in the release of PHI by waiving all notice requirements that would otherwise be necessary.

2.    The signatories agree not to use or disclose the PHI and Confidential Matter released in this proceeding for any other purpose or in any other proceeding, except in accordance with the terms of this Order.

3.    The signatories agree to store all PHI while it is in their possession according to the Privacy Standards.

4.    The signatories agree at the termination of this proceeding to return all PHI obtained during the course of this proceeding to the attorney representing the person whose PHI was released during the course of this proceeding, and/or to dispose of any PHI retained thereafter pursuant to the Privacy Standards. The signatories further agree that, upon final termination of this action, all Confidential Matter produced during the course of this proceeding shall be returned to the producing party within sixty (60) days of the producing party's request.

5.    The individual pages of each document designated as Confidential Matter shall bear the following designation, or equivalent:

**CONFIDENTIAL: DOCUMENT PRODUCED PURSUANT**

**TO PROTECTIVE ORDER ENTERED IN 05 C 317**

No document containing the "confidential" stamp or any identifying number shall be copied

in whole or in part without the "confidential" designation and the identifying number appearing on the copy.

6.    Before disclosing PHI or any information containing or reflecting PHI, and/or Confidential Matter, to any persons involved in the litigation, including but not limited to counsel, co-counsel, counsel's staff, or expert or consulting expert witnesses retained in connection with the litigation, counsel will be responsible for informing each such person that the PHI or documents and information containing or reflecting PHI, and/or the Confidential Matter to be disclosed are confidential, to be held in confidence, are to be used solely for the purpose of preparing for this litigation and further, that these restrictions are imposed by a court order.

7.    To the extent that a party believes it has a right to redact information, it may redact such information, provided that if a party redacts information from any Confidential Matter and the face of the document itself does not make clear and obvious the nature of the information redacted, the party shall provide in writing a specific category of information redacted (for example, social security number).

8.    The discovering party reserves the right to make application to the Court for a determination that any matter designated as Confidential by responding party does not contain confidential information, or that in the circumstances the information should be released from the provisions of this protective order, with the burden on the party attempting to designate material as confidential matter. If disputes arise concerning the propriety of designating particular documents as confidential, whether certain documents or information should be released from the provisions of this protective order, or concerning any other matter relating to the application of this order, counsel shall attempt to resolve these disputes by agreement before asking the court to resolve these disputes pursuant to the applicable Federal Rules of Civil Procedure.

Case: 1:04-cv-02617 Document #: 242 Filed: 03/15/07 Page 49 of 83 PageID #:2561

Case 1:05-cv-00317    Document 115    Filed 05/19/2006    Page 5 of 5

9.      The relevant standard governing this protective order, and the terms
therein, is that of "good cause" under Rule 26 ( c ).

10.     Nothing in this protective order shall be deemed a waiver of the right of any
party to object to a request for discovery on the basis of relevance, materiality, privilege,
overbreadth, or any other recognized objection to discovery.

11.     This protective order may be modified by further written stipulation signed
by counsel of record and/or by further order of this Court upon application to the Court with notice.

E.      This Court finds that the Complaint Register ("C.R.") files are public documents, but
before C.R. files are given wider distribution than between the attorneys of record in this case, the
following procedures will apply to give fair notice and an opportunity to resolve any disputes that
may arise with distribution beyond the attorneys of record in this case:

1.      the full C.R. files, without any redactions, will be produced to Plaintiffs'
attorneys of record in this case only for viewing by Plaintiffs' attorneys of record in this case only.

2.      in the event that the C.R. files are to be disclosed to any individual, business
or other entity besides Plaintiffs' attorneys of record in this case, all identification information for
all police officers, complainants and witnesses will be redacted from the C.R. files. Identification
information includes: addresses, telephone numbers, social security numbers, and dates of birth;

3.      in the event that C.R. files are to be disclosed to any individual, business or
other entity besides Plaintiffs' attorneys of record in this case, the party disclosing the C.R. file will
tender to the opposing counsel of record a list of the proposed files to be tendered (including the
proposed redactions) and the identity of the proposed recipient of such file at least (14) days prior
to the proposed disclosure date.

Entered May 19, 2006      Cullen O Sudin
                                US District Judge

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LAURA RAMIREZ, ET AL.,            ) DOCKET NO. 05 C 3317
                              )
                Plaintiffs,)
                              )
    vs.                          )
                              )
CITY OF CHICAGO, ET AL.,        ) Chicago, Illinois
                              ) April 12, 2006
                 Defendants.) 9:45 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
MILTON I. SHADUR, Judge

APPEARANCES:

For the Plaintiffs:
        MR. MARK REYES

For the Defendants:
        MR. THOMAS J. PLATT,
        MS. EILEEN E. ROSEN,
        MS. MEGAN L. KASZUBINSKI AND
        MS. CATHERINE M. KELLY


JESSE ANDREWS
Official Court Reporter - U. S. District Court
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 435-6899

*    *    *    *    *    *

2

1          THE CLERK:   05 C 317, Ramirez vs. City of Chicago.

2          MR. REYES:   Good morning, Judge.  Mark Reyes on

3  behalf of the plaintiffs.

4          MS. KELLY:   Good morning.  Catherine Kelly on behalf

5  of the City of Chicago.

6          MR. PLATT:   Thomas Platt for the individual

7  defendants.

8          THE COURT:   Good morning.

9          Let me first get just a couple of purely matters out

10 of the way.  First of all, I am granting the motion for

11 plaintiffs to file what they have characterized as a surreply,

12 but it's really as I read it a response to defendants'

13 statement of legal position that really was fleshed out in the

14 defendants' filing.  I have also received the supplemental

15 reply to the plaintiffs' response, and so I taken that into

16 account.

17         Do you want to reflect your appearances?

18         MS. KASZUBINSKI:   Megan Kaszubinski here on behalf of

19 the individual defendants.

20         MS. ROSEN:   And Eileen Rosen on behalf of the

21 defendant police officers.

22         THE COURT:   Okay.

23         So I have everything in place and I've read it.  And

24 let me suggest that everybody sit down while I talk about the

25 issues, and then expect I will be hearing from counsel after

3

1 that.  Okay.

2          MR. REYES:  Very good, Judge.

3          THE COURT:  Let me say at the outset, and this is

4 really in an important sense a reflection of what I think is

5 good handling on both sides of this issue, that it's an area in

6 which there is a lot of room for argument on both sides.  And

7 the exercise as I think of it as judicial discretion in this

8 area is informed in part by a judge's view on the subject of

9 openness in the litigation process.

10          See for example the very strong statement that was

11 voiced a few years back by Judge Posner on behalf of the

12 Seventh Circuit in that Citizens First National Bank against

13 Cincinnati Insurance on the general subject of filings under

14 seal.  More recently I think that Judge Easterbrook has take up

15 the cudgels very vigorously (not a surprise to say very

16 vigorously) in the same area.  And I will confess that for my

17 own part I had long held views much like those that are

18 expressed in those opinions, and indeed had been acting on

19 those for a number of years before that.

20          All of us know that Ecclesiastes said "There is no

21 new thing under the sun."  I think that is the way it was

22 framed in Ecclesiastes.  Almost as if to prove that, one of the

23 things that plaintiffs' counsel had cited was what then lawyer

24 Louis Brandeis, later Justice Brandeis, said in his book "Other

25 People's Money," although in a different context.  More than 90

4

1  years ago, he said "Sunlight is said to be the best of

2  disinfectants." And regrettably we seem not to have learned

3  that lesson, because we have, as all of us know when we read

4  the papers every day, an ongoing phenomenon at the national

5  level of the executive branch fighting to keep under wraps as

6  undisclosed as much information as possible in a number of

7  areas, while other branches of government, and members of

8  public, or at least parts of those groups, wrap themselves in

9  the mantle of virtue by fighting for what they think of as the

10 Brandeis principle.

11        In the area that's in dispute, we don't have

12 considerations of national security as a kind of cover story

13 for an attempt to justify nondisclosure. But there are

14 certainly legitimate privacy concerns that militate as I think

15 of it against total openness. Yet it certainly operates, as I

16 think of it, to corrode public confidence in the very

17 institutions that seek to stress the need for that confidence

18 when the effect of efforts at nondisclosure tend to fuel the

19 fire for claimed arguments for example of a wall of silence,

20 because the results of internal investigations seem to run

21 counter to human experience.

22        You know when we see such an infinitesimally

23 testimony small percentage of civil rights complaints being

24 sustained by internal investigation, at the same time that so

25 many of those complaints that do see the sunlight of litigation

5

1 end up with liability (and major liability) on the part of the

2 public bodies, what for example I think that a kind of

3 overstatement of the arguments seems to refuse to recognize

4 that if there had been a different approach to the issue, it

5 would very likely not have permitted what has been revealed as

6 kind of scandalous set of practices of some outlaw officers,

7 people like John Burge and his associates, when those were

8 permitted to flourish in darkness. And I think everybody

9 regrets that. And I don't mean to say that you can cure or

10 avoid what rogue officers may do by taking a more open view.

11 But it's hard to think that those things are not at least

12 somewhat connected.

13          What I think is called for here is a reasonable

14 accommodation between the legitimate interests of police

15 officers, protecting for example against disclosure of their

16 addresses, the thing that all of us know is the reason for

17 handling of service of process in the way that it's handled,

18 where those things that are very sensitive are not revealed,

19 and quite properly not revealed, while at the same time the

20 City makes arrangements for the effective service of process by

21 taking the papers and then making sure that they are relayed.

22 And there are other facets that I think are similar to security

23 considerations. But I think it's essential really to try to

24 accommodate those concerns with the rights of plaintiffs.

25          There are a couple of questions that I think I have

6

1 really never heard responded to, and you may think of these

2 questions as simplistic.

3          One of them is once this kind of information is

4 properly bowdlerized by redacting you know the sort of things

5 that are properly protected, what matter of principle or policy

6 ought to prevent counsel from the general disclosure of the

7 that information?  Once the security considerations are

8 eliminated, to put it a little differently, what's wrong for

9 example with that information being made available in other

10 litigation?

11          Before I call for an answer to that, you know we see

12 this kind of thing in a different context.  Sometimes for

13 example cases are settled.  We see this in patent litigation,

14 for example.  Cases are settled and what the settling party

15 tries to do is to prevent the lawyer from utilizing or

16 disclosing that information in other litigation.  And of course

17 that tendency, in which you try to curb lawyers, tends to run

18 counter to the Code of Professional Responsibility, because you

19 really cannot properly inhibit lawyers in a kind of broad brush

20 bush way that some of those things are making an effort to do.

21          So I guess the way I come down on this thing -- and

22 by the way, you know I know for example there is a citation in

23 one of the most recent filings -- oh, no, I know what it was.

24 It was in Judge Manning's order that was attached to the last

25 filing that she referred to the Seventh Circuit decision in

7

1    that Jepson case that recognized the idea that things that are

2    disclosed in one case may perfectly appropriately be made

3    public for purposes of other litigation of a related nature

4    of -- wait a minute. Let me get the case. It's Jepson, Inc.

5    against Makita Electric Works Limited. It's 30 F.3d 854, and

6    this discussion exists over on pages 860 and 61, a 1994

7    decision from the Seventh Circuit.

8         So I guess I have got a two-part question. One is

9    addressed to both sides, and that is what, consistently with

10   what I have indicated, ought to be eliminated from the CR

11   information. That's really what we are talking about? That's

12   the only area in which the parties are butting heads -- what

13   ought to eliminated from the CR information in order to do what

14   I have characterized as bowdlerizing, to sanitize the things so

15   that they are made appropriate for public disclosure?

16        And second is the answer to the question that I guess

17   I am directing to the defendants. And that is what principle

18   or policy supports the notion that once you have got the thing

19   in appropriate form, somehow it should be constricted to this

20   litigation? That later may be an issue that I don't

21   necessarily have to face for now. But it seems to me it's a

22   question that we are going to have for sure. And so I would

23   like to pose it.

24        So let me if I might hear first from the defense side

25   about the aspects of the CRs that you think ought to be, for

8

1  example, either eliminated from disclosure, made the subject of

2  counsel's eyes only limitations or handle in some other

3  fashion.  And I suppose I ought to hear -- I don't know whether

4  I ought to hear from the City, which has a clear interest in

5  that, or from counsel for the individuals who are going to be

6  impacted.  But there are different considerations.  For

7  example, the individuals who are actually involved have an

8  interest in their situation.  The City has an interest

9  generally in CRs, even though they may not related to these

10 particular individuals.

11          So it's up to you.  Who wants to speak to the issues

12 first?  Mr. Platt.

13          MR. PLATT:  I will take a crack at it, Judge.  First

14 of all, I will answer your first question as to what ought to

15 be eliminated.  I mean it's more than just addresses, it's more

16 than just identities of individuals.  Because certainly it's it

17 conceivable that even the circumstances of an incident which

18 still might be left in a description of an incident could be

19 deduced to be, "that individual was involved," or "that officer

20 was involved," "this is my complaint."

21          So it seems to me that I don't think that you

22 could --

23          THE COURT:  Pardon me.  I don't mean to interrupt you

24 on that.  But you know in a sense that's kind of I won't say

25 amusing but bemusing, because I very often get situations in

9

1  which I get the answer, "You know, it impossible really to tell

2  from this thing who it was who was involved," where I get a

3  lawsuit that says "Unknown Officers." And so what happens is

4  that counsel for the defense go back and exercise good faith

5  efforts, you know, to find out who it is, and they can't get

6  from the description of the event the identity of the people

7  involved. So sometimes it doesn't work that way, but I

8  understand your point.

9          MR. PLATT: Right, it does. It depends on the level

10 of detail in the report, you could easily determine "Oh, it's

11 this officer," or "It's my complaint."

12         THE COURT: Okay.

13         MR. PLATT: So therefore I think that even just

14 eliminating just those types of identifiers, like name and

15 address and so forth, is not adequate.

16         And then secondly as to the policy considerations,

17 you know, it seems as though we are not just talking about

18 other civil litigation involved here. There is an impact upon

19 the criminal courts as well too, where lot of these CRs are

20 introduced or are attempted to be introduced as evidence in

21 criminal trials, as somehow impacting upon the credibility of

22 the officers in those cases. And in the McGee case where this

23 same issue was extensively litigated before Nolan and Judge

24 Manning, you know there were documents filed as part of the

25 records in that case from State's Attorneys and from the police

10

1  departments, indicating their grave concern about having public
2  availability of any CR to be used any other cases, including
3  criminal cases, in that it could have an impact upon how those
4  cases are litigated, the availability of discovery that might
5  not otherwise be available in those criminal cases because it's
6  being allowed in this case.

7         And thirdly, in this case we only have -- we have
8  what, 27 individual police officers, many of whom have not been
9  definitely been identified as having anything to do with the
10 circumstances that the plaintiffs are is making allegations on:
11 Their names may have appeared on a report or as part of a
12 narrative.  And the plaintiff in order to cover all his bases
13 has decided to name them just so he doesn't lose the statute of
14 limitations.

15        THE COURT:  Well, what happens in that case is that
16 for example if you have situations such as that, it seems to me
17 that a counsel's eyes only kind of limitation could essentially
18 deal with that.  Because I would expect that with plaintiffs in
19 a case such as this one is represented by responsible counsel,
20 if it turns out that they just covered their bases essentially
21 by including people not knowing what the response is, that once
22 that information is brought to them that says, "You really have
23 no claim against officer X or officer Y," I would expect that
24 they are going to dismiss out officer X or officer Y.

25        But the best way to do that, very frankly, is to

11

1  disclose and not subject an officer to what could be an

2  unjustified claim that is only going to get eliminated as the

3  result of a trial or a result of a motion for summary judgment

4  that uses people's resources unnecessarily.

5       MR. PLATT:  I guess that sort of leads to my point,

6  Judge, that you know there is no dispute here that CRs to some

7  extent, you know have to be disclosed within the litigation.

8  The issue here is public dissemination of this information.

9       THE COURT:  Yes.

10      MR. PLATT:  And that is the chief concern that we

11 have here.  Because it's not just this case, it's no longer

12 just counsel's eyes only.  Anybody could have access to this

13 for whatever reason.  And unless there is some particular

14 reason we need to be disseminating beyond this case --

15      THE COURT:  I can tell you what the reason is in

16 part, and that is all of us know that lawsuits of this nature

17 present serious issues of the credibility effort to prove by

18 creating inferences.  Our Court of Appeals has said often,

19 "Well, you know the plaintiff failed to come in with

20 statistical evidence," when the only way in which you can get

21 statistical evidence is by disclosure of this kind of

22 information.  And it's not just a matter -- you know it's not

23 really a matter of guilt by association at all.  It's the whole

24 idea that proof in these areas sometimes has to take the form

25 of what would or if it were not for this, what might be barred

12

1  under 404(b).  Because things go for example to motives, things
2  go to City liability in it which all of us know that Monell,
3  you know, sets a kind of high hurdle.  And about the only way
4  in which a lot of cases can overcome that is by getting the
5  sort of information that is obtainable only through this kind
6  of disclosure.
7          So that's the reason, you know, I started out by
8  saying I regard this as really a very delicate balance that has
9  to be identified.  And I am certainly not in a position of
10 saying, "Open everything up."  On the other hand, I am troubled
11 by what I think is kind of an overstatement on the thing in
12 order to say, "Let's keep it much more limited."
13         And again you know all of us get targeted by
14 criticism of our activities.  A litigant just filed a motion --
15 someone against whom I imposed sanctions filed an emergency
16 petition for a writ of mandamus, saying that I really shouldn't
17 be hearing the case.  And you know that's a public document.
18 And it perfectly proper for it to be a public document.  And
19 the public is entitled to make its own judgment about my
20 conduct, as it is about the conduct of anybody else.
21         Now I recognize that I suppose you can say, "Well,
22 you know, you chose to get into your profession and therefore
23 you know that's one of the risks that you take."  And I suppose
24 it may not be a fair parallel in that sense.  But the general
25 notion of litigation being open, including the discovery

13

1  aspects of litigation, seems to me to put some weight on that

2  scale so that balancing of those interests calls maybe for a

3  little more rather than a little less openness.  Although I

4  again emphasize, as I did from the very beginning, that I

5  welcome the idea of what kind of limitations out to be imposed.

6  But the policy question it seems to me is one on which the

7  statements on the defense side are really overstated.

8        MR. PLATT:  Well, perhaps then as a minimum, you know

9  to alleviate the Court's concerns about that, that somehow

10  there will be a motion brought before any public dissemination

11  be made of this information to show what grounds or what

12  purpose might be --

13        THE COURT:  I know that's what Judge Manning did.

14  But I am frankly, it seems to me that maybe it ought to be the

15  other way around:  that unless a motion is filed that says it

16  should not take place in this instance, that the default rule

17  ought to be the other way.

18        MR. PLATT:  How would we know, though, before the act

19  had already been completed?  That's why I suggest that the

20  plaintiff before they make the dissemination notify us --

21        THE COURT:  No reason that you can't get notification

22  from plaintiffs' counsel on that.  And I would expect that they

23  would do that if that's the kind of regime that we would

24  establish.  I am not going to -- you know you can't stuff the

25  bullet back in the muzzle once the trigger is pulled.

14

1        MR. PLATT:   That's what I am saying.

2        THE COURT:   But again it seems to me that it can be

3   handled by requiring disclosure on their part before -- so that

4   you would have an opportunity to say, "Well, no, no.  This one

5   should not be."  And the general notion would be one of

6   permitting, as I say, public dissemination, unless an

7   appropriate showing is made that it should not be so as to

8   whatever.  Okay.

9        MR. PLATT:   But I would think that you would want to

10  distinguish the types of information that they are proposing to

11  disclose.  As I said, you know the Court brought up the Jon

12  Burge information.  Well, that case has progressed far beyond

13  what we have here, which is nothing more than accusations and

14  unsubstantiated as we see it.

15       THE COURT:   Well, I was around at the time that the

16  Burge thing was a matter of what is characterized as

17  accusations.  And I think I may have been one of the few who

18  really called that one for what it was early on.  So I am not

19  for a moment suggesting that your people are paralleling that

20  situation.

21       MR. PLATT:   Undoubtedly they are not, Judge.

22       THE COURT:   I know that.

23       MR. PLATT:   And even the allegations in this case are

24  far from any degree of seriousness that they brought in that

25  case.

15

1          THE COURT:  Okay.  Well I think I have got your

2 perspective.

3          How about on the other defense side?

4          MS. KELLY:  Judge, again I am Catherine Kelly.  I

5 mirror what Mr. Platt said.  I do add, though, that as far as

6 your question as to what needs to be eliminated from the CR,

7 beyond the officers' interests, there are the interests of the

8 complainants, who go into the police department.  Every

9 allegation needs to be addressed if someone makes an accusation

10 against a member of the Chicago Police Department.

11          Your Honor, when those complainants go into the

12 Chicago Police Department they are guaranteed confidentiality.

13 And again removing their names is not going to remove their

14 identity because of the facts of the case and the specifics

15 around the case.

16          Judge, their interests are to be considered, and you

17 know, as we are saying, simply just removing their identifiers

18 does not appear to be enough.  In this case, Judge, just so you

19 can see the breadth of what plaintiff is looking for, he is

20 looking for all CRs from 2000 to the present dealing with the

21 Eighth District members for false arrests, excessive force and

22 one other category that escapes me right now, your Honor.

23 That's thousands of documents.  That's thousands of

24 complainants.  It's beyond just these plaintiffs in these

25 cases.  I mean they can't waive the right of the complainants,

16

1 you know, in the case for their confidentiality.

2        Your Honor, and I also point out as far a policy that

3 supports the notion that we can constrict this kind of

4 information, your Honor, these CRs are analogous to

5 disciplinary histories.  Basically they are complied as a

6 result of a complaint by a citizen in the community.

7 Everything that's part of that CR is part of investigating

8 whether or not the officer has done some wrongdoing.

9        THE COURT:  Yes.

10        MS. KELLY:  Judge, and looking at the Illinois

11 Personnel Records Review Act, disciplinary histories are

12 protected.

13        THE COURT:  I've looked at the statute.  I don't

14 think you are going to get any mileage out of that, very

15 frankly.  It's just not -- on top of which, of course we are

16 not bound by that.  That is, for federal litigation we are not

17 bound by that provision.  But I've got to tell you that doesn't

18 seem to me that, in word the of the patent bar, it reads on

19 this current issue.

20        As for the other problem about complainants' privacy,

21 you know in ancient times when I chaired the Chicago Bar

22 Association Judiciary Committee, and also later when I became

23 general counsel for the Illinois Judicial Inquiry Board, I used

24 to give talks about it, you know.  I quoted Emerson, "If you

25 shoot at a king you must kill him," and talked about the

17

1 difficulty of getting people to blow the whistle on judicial

2 misconduct.  I recognize that.

3         At the same time it, seems to me that the people who

4 generate complaints, whether substantiated or

5 unsubstantiated -- well, let me talk about people who generate

6 legitimate complaints.  They are people who are interested in

7 an outcome, and that's something that would tend to encourage

8 openness in terms of disclosing whether there is a real pattern

9 or not a real pattern of activity or wrongful activity.  Thta

10 is something that is in the interest of those people.

11         Now to the extent that if what you are saying is that

12 might invite retaliation, you know, that I will tell you is

13 something that should not operate to influence the Court's

14 activity, because that is something that's within the

15 control -- you know, if we have the idea that maybe disclosing

16 what A has complained about is going lead to different officers

17 efforts at retaliation, that's something that I have also seen

18 in lawsuits before me.  But certainly I don't think that's

19 something that ought to motivate the Court's determinations

20 that says, "No, we won't reveal this in order to avoid that

21 kind of conduct."

22         MS. KELLY:  Your Honor, just to emphasize your point,

23 shifting off of the you know officers and all of the things

24 that could potentially go wrong regarding the officers, there

25 is also the element as discussed by Mr. Platt that if these CRs

18

1  get in the hands of the defense attorneys and everybody else,

2  these cases often involve criminal activity.   These

3  complainants you know, also have to worry about retaliation

4  from citizens, I mean people who are accused of crimes who are

5  often involved in these.   It is not, you know, just the

6  officers.   And we would argue that isn't a consideration, but

7  it's other citizens in the community.

8         And I think that -- I draw your attention to Judge

9  Nolan's opinion in McGee.   She asked -- she -- it specifically

10 points out that the plaintiff's counsel has not indicated to

11 whom they want to disseminate these documents, and you know she

12 puts the burden onto the plaintiff to say "why and to whom do

13 you want to give these documents."   After entering the

14 protective order, she also went on to say that obviously

15 parties and nonparties can come to the court ask the court that

16 these documents be permitted for public use.   That's in our

17 protective order, Judge.   That's something that's been honored

18 by other courts.

19         THE COURT:   Some others.

20         MS. KELLY:   Some others.   And if the Court is

21 inclined to put, you know, the burden back on to the City and

22 the individual officers, then we would ask that plaintiffs'

23 counsel build into the protective order, give us you know 14

24 days notice or some such sock substantial amount of time so

25 that we have an opportunity to come to the Court and ask the

19

1  Court that those items not be disseminated if necessary.
2  Obviously that's going to build a big burden onto all the
3  parties and to the Court.  But you know I guess that's the
4  price that the plaintiffs pay for asking for the documents that
5  they are asking for, the breadth of documents.

6          I mean it is burdensome, but there has to be give and
7  take.  Obviously our preference would be that the documents be
8  marked "confidential."  And then if they want to disseminate
9  the documents for whatever reason, that they come the Court and
10 ask the Court that these items be marked as unconfidential.

11          THE COURT:  Mr. Reyes.

12          MR. REYES:  Judge, just to address the issue about
13 procedures, or everything?

14          THE COURT:  The whole works.

15          MR. REYES:  The whole works.  Okay.

16          Judge, let me start at procedures, since she kind of
17 ended there.  We don't have a problem with these public records
18 and we do believe that they are public records, Judge.  We
19 don't have a problem before disseminating these to the public,
20 we show them to defense counsel.  And we have very good reasons
21 to do that.

22          First of all, I do think that something something
23 should be redacted out of those -- and if we miss an item
24 that's not redacted, you know, we like at least for defense
25 counsel to say, "Hey, you missed an officer's address here."

1  Because with us, we don't want to be on the hook for liability

2  if something were to happen as a result of our disclosure.

3          THE COURT:  Right.

4          MR. REYES:  So I think that the Court's suggestion

5  about plaintiffs tendering any document to the defense before

6  public dissemination, I think that one that we definitely agree

7  to do.

8          THE COURT:  And counsel has said, you know, two

9  weeks.  It seems to me that's a reasonable -- certainly

10 reasonable -- time for them to look into the thing and be able

11 to respond by saying, "Don't do it."

12         MR. REYES:  Absolutely.  We don't need there to be

13 emergency motions to this Court because we say "Okay.  We are

14 going to send it out in one day."

15         THE COURT:  Yes.

16         MR. REYES:  That's something that's not necessary.

17         THE COURT:  Okay.

18         MR. REYES:  Judge, as far as what we think should be

19 kept secret in these documents, as far what is disseminated to

20 the public, we absolutely agree that addresses, dates or birth,

21 social security numbers, phone numbers of officers should be

22 kept off, as well as location information about complainants

23 should be kept off.  We agree that for public dissemination I

24 think that makes the most sense.

25         We do believe that as far as attorney's eyes only we

21

1   should receive the full CR. We think that we should have
2   access to an unredacted copy, and then when we talk about
3   public dissemination that we make the redactions that we think
4   are appropriate, submit those to defense, and then you know we
5   go from there.
6          I wanted to address a couple of issues and I just
7   want to do it just briefly. As far as the issue about the
8   criminal trials, judge, I don't think that's really something
9   that's before the Court. The criminal courts certainly have
10  procedures in place to deal with these CRs that are
11  disseminated. And I don't think that's something that makes
12  these documents less public.
13         We view these as very important public documents.
14  Our clients themselves agree to the dissemination of the CRs
15  that involve them. And you know, as I pointed out in the
16  surreply which really was kind of a reply, there just is no
17  privacy issue that's involved here when you start looking at
18  the redactions. And our clients recognize that, and we
19  recognize that. We think that public documents, Judge, are
20  appropriately considered public documents. And then if the
21  City or the individual defendants want to come before this
22  Court and argue for the specific ones that they don't want this
23  disseminated, that's a procedure that is the proper one as
24  opposed to branding them all private documents.
25         THE COURT: Okay.

22

1  MS. ROSEN: Your Honor, if I could respond --

2  THE COURT: Sure. Ms. Rosen, go ahead.

3  MS. ROSEN: -- to an issue that was just raised.

4 This issue about public dissemination hasn't been discussed

5 yet: Is you know, we are talking about dissemination in other

6 litigation, whether it be civil or criminal. But there is also

7 the issue of dissemination to the media.

8  And there is this issue that we have, and a concern

9 that we have, that the individual defendant's right to a fair

10 trial would be impacted depending on what they propose to do

11 with these documents. You know now we just heard that the CRs

12 related to the plaintiffs here, they appreciate that they don't

13 have any privacy concerns. And I do have a grave concern about

14 the plaintiffs in this case taking CRs, groups of CRs to the

15 media.

16  THE COURT: Are you talking about the plaintiffs'

17 lawyers or are you talking about the plaintiffs?

18  MS. ROSEN: Either. You know, because it's unclear

19 to me what, when we are talking about dissemination, what we

20 are talking about. And I would have a concern that we would

21 see the names of 27 police officers who have been named in a

22 complaint, and you know a series or articles regarding other

23 allegations against them before we get this case before a jury,

24 if that's what ends up happening.

25  THE COURT: Do you really believe, I guess, that

23

1 juries -- you must have a different notion of what seems to
2 inform the public these days than that experience tells us in
3 connection with trials. You know I have had the highest
4 profile cases in which I have been appalled at the level of
5 ignorance that has been exhibited by prospective jurors. You
6 know what happens is they seem to get the news from heaven
7 knows what, but certainly not from the print media, and often
8 not even from the viewing media, you know of television. It's
9 kind of striking that experience in these areas kind of
10 overstates what we had always been concerned with in my early
11 days of practice -- of free press and fair trial. You know I
12 used to write a lot about that, and it turns out to be all
13 fiction.

14          MS. ROSEN: Well, you know, your Honor, my own
15 personal experience has to do with the Ryan Harris case, and
16 quite frankly the media did impact the jury selection process
17 in the civil case that we tried last summer, and we saw that.

18          THE COURT: Well, think about the rarity of the
19 extraordinarily high profile case that has been occupying the
20 media to almost the exclusion of anything else.

21          But you know years ago when I had the case involving
22 the Continental Bank Vice-president and the fact than the
23 Continental Bank almost went down the tubes as a result of the
24 bad oil deals, every day it was appearing with streamer
25 headlines, you know, running across the entire pages of the

24

1  *Chicago Tribune. And when the jurors came they in, they never*
2  *read -- they skipped I think from the comic section to the*
3  *sports section nonstop, and weren't bothered by anything else.*
4       *So you know the one thing I think we learn is that*
5  *you don't generalize from the kind of extraordinary*
6  *circumstance that sometimes impacts cases, and that has led*
7  *lead for example to some of the Supreme Court decisions -- you*
8  *know the Sam Shepard case and the Mad Dog Irvin case, which is*
9  *before anybody's time around here.*
10      *So I am quite aware of that. And obviously if we*
11 *were to adopt a sort of Kantian approach -- that is, say that*
12 *this should be the universal principle -- I think that I would*
13 *oppose it being made the universal principle. It seems to me*
14 *that one size does not fit all, and that therefore the example*
15 *of the Ryan -- the other Ryan case -- is not one that we make a*
16 *generalization from.*
17      *MS. ROSEN: You know, to me it's a concern,*
18 *especially in light of the allegations that are being made in*
19 *this case, and the amount of officers that the allegation are*
20 *being brought towards. You know we have an in interest in*
21 *trying this case in this courtroom and not in the media, and I*
22 *just wanted to say that.*
23      *THE COURT: Well, I will tell you I am going to help*
24 *you on that. I am not going to issue a written opinion. Okay?*
25 *Because that's the kind of thing that media people are likely*

1  to pick up um.  And it seems to me that it's in nobody's

2  interest you know essentially to highlight the thing.  I am

3  perfectly happy to enter an appropriate protective order and

4  limit it at that.  And that's really a quite nonconspicuous

5  resolution of the issues.  And to that extent I certainly agree

6  with you I am not going to encourage anything of that nature,

7  so I appreciate that.

8          MS. ROSEN:  Thank you, your Honor.

9          THE COURT:  Okay.  Well it seems to me -- yes, I am

10 sorry.  Go ahead.

11         MS. KELLY:  I am sorry.  If I may just make one point

12 on something that Mr. Reyes brought up that says -- concerns

13 the City.  He had suggested that the unredacted versions of the

14 CRs get passed on to plaintiffs' counsel for attorney's eyes

15 only, which you know is a term that I have grown to become wary

16 weary of.

17         Judge, we would not agree to do that.  At a minimum

18 we would agree re redact a series, a sampling of the CRs and

19 present them to your Honor and ask you to look at them in

20 camera and see if they are agreeable.

21         THE COURT:  I am not going to do that.  You are not

22 going to involve me in a piece-by-piece thing.  Wait a minute.

23 Let me comment on something here.  You know I have the utmost

24 confidence in the integrity of all of the lawyers in this case.

25 There is nothing to suggest otherwise.  And the idea of saying

1   "Well, we want to have a prescreening or a preediting" of

2  something that's turned over to opposing counsel is really not

3  justified at all.

4        You know, if we were dealing -- if I thought that we

5  were dealing at all with irresponsible counsel, you know I

6  would listen to that kind of contention with a lot of empathy,

7  if in sympathy. But in any event it seems to me that's just

8  not called for here. There is no reason at all, as I think of

9  it, to be concerned as to whether furnishing the things

10  unedited to plaintiffs' counsel is going to create any kind of

11  danger, when it is on as I say a counsel's eyes only basis. So

12  that one you don't hit a responsive chord on.

13       MS. KELLY: Judge, I do bring it up as I feel it's my

14  obligation representing the City of Chicago. As I said, the

15  complainants come in with their complaints and they are

16  guaranteed confidentiality, Judge. And because we are talking

17  about redacting the specifics of the complainants, their names

18  and their identifiers, I feel that keeps up our obligation.

19       THE COURT: What do you think the defendants' lawyers

20  are going -- the plaintiffs' lawyers are going -- to do.

21       MS. KELLY: Judge, I can't look to their side. I

22  have to look at what my obligation is.

23       THE COURT: But I am posing poising a question to

24  you. Suppose that something were given to you on a counsel's

25  eyes only basis? Would you violate that confidence? Of course

27

1  not.  And I don't see any more reason for suggesting that the

2  plaintiffs lawyers are going to do that.

3         MS. KELLY:  Judge, I am not suggesting that.  I am

4  asking, since they have no interest in that information, why do

5  they need it?  I mean if they are not going to do anything with

6  it, why take out a couple of numbers that are arranged into a

7  social security number?

8         THE COURT:  They may in order for people to

9  evaluate -- listen.  Some years back I got a Freedom of

10 Information Act case against the CIA, brought by someone who

11 had been part of Operation Pedro Pan, which was an operation in

12 which children were flown into the United States from Cuba.  It

13 was a large program.  And a young woman who had been a child at

14 that time and had become a professor, I think it was at Loyola,

15 was writing a book about it.  So she proceeds to ask the CIA

16 for the their documentation.  They say, "This one was not a CIA

17 operation.  Go away.  Don't bother us."

18        So she brings a Freedom of Information Act case.  And

19 I found that they had not justified it in freedom of

20 information terms and therefore that they should search their

21 records again (they claimed to have done so), and provide

22 whatever documentation, even if it wasn't a CIA operation,

23 could would be provided.

24        So the order is entered.  The next thing that happens

25 is that a safe is flow in from Washington to my chamber that

28

1 contains these documents, you know. And so I get in touch with

2 defense counsel and say, "Well, how do we open the safe?" And

3 they said, "Well, we are flying somebody out from Washington to

4 do that."

5 So this person flies out on government expense, you

6 know, from Washington, and comes in. And this safe is a very

7 complicated one. It's not one-of these simple, you know "38 to

8 the right and two turns to the left," and so on. It's got a

9 couple of things. And so the person who has come out tries to

10 open the safe and is unsuccessful.

11 And I said, "Can I see the combination"? No, you

12 don't have security clearance for that." So I said, "Okay.

13 Why don't you call and see if I can get security clearance?

14 Maybe I can do better with the safe."

15 So he calls Washington and the answer comes back:

16 "Okay. We will make an exception. You can show this to the

17 Judge." So I look at the thing and twiddle the dials and I

18 open up the thing. And of course what's inside is one sheet of

19 paper. The one sheet of paper has a heading and then

20 everything else is black. Then there is a signature at the

21 bottom. This was their idea of you disclosure.

22 Now I am not suggesting any anything of the sort

23 here. But you know for me to have evaluated whether the

24 plaintiff was right, that they were really hiding the ball

25 someplace, I really had to see the documents. And it's much

29

1   the same way here.  Any time you really edit or redact a

2   document, who knows what the thing is.  I just do not see any

3   risks, frankly.

4           You know if I had the slightest concern on either

5   side of this litigation about the integrity of counsel, I would

6   be talking a different message.  But it doesn't seem to me that

7   that's appropriate here.

8           And the short answer is it's like the astronomical

9   black hole.  You know, the information comes in, nothing goes

10  out.  So the kind of order that I am prepared to enter here is

11  building in the things that you have talked about, the notice,

12  let's say the 14-day notice.  And it seems to me that's the

13  that extent of the modification that would be required --

14          Now I would expect that you people ought to be able

15  to get together and work out the form and tender it, because I

16  don't think there is any mystery about where we are going based

17  on what we have talked about today, unless somebody thinks

18  otherwise.

19          MS. KASZUBINSKI:  Judge, want to just discuss a

20  little something that the Court brought up earlier, and it's

21  regarding the amount of defendants that are in this case, the

22  28 defendants.  Previously when you mentioned that, you know,

23  it may be plaintiffs' intent to some of those, I looked at

24  plaintiff's counsel, and he's nodding his head "yes."

25          So I think that there is that plan.  Plaintiffs'

30

1    counsel has been tendered all of the underlying CRs that are

2    relevant to this litigation.  The CRs --

3              THE COURT:  That's not before me now.  I expect

4    that --

5              MS. KASZUBINSKI:  Right.

6              THE COURT:  -- is the way in which they are going to

7    conduct themselves.  I haven't as you know been monitoring the

8    ongoing progress.  But I expect that in good time, and I would

9    hope that means shorter rather than longer, that kind of

10   cutting down of the litigation is going to take place.

11             MS. KASZUBINSKI:  The defendants, I guess, would

12   request that that be initiated prior to all of this work and

13   time being given to tender CRs of defendants who plaintiffs

14   might may have already dismissed but just have not done it yet.

15             THE COURT:  Well, no, no.  Because I think that

16   misses the point that the CRs are not just those limited to the

17   parties litigant.  It is entirely possible, for example, that a

18   CR as to a present defendant that's going to get dismissed out

19   may be relevant in the total picture.  I don't know that.

20             MS. KASZUBINSKI:  Okay.

21             THE COURT:  That's the reason that you know I don't

22   think that's appropriate.

23             Okay.  Anyway, I will look forward to getting what I

24   hope is the revised version.  I suppose -- I don't know.  Sandy

25   how does this motion get reflected on our motion list?  It's a

31

1 motion for entry of a protective order.

2           We will grant it in accordance with the oral

3 statement of the Court, with a draft then to be submitted to

4 the Court.

5           Okay?

6           MS. ROSEN:  Thank you, your Honor.

7           MS. KELLY:  Thank you, your Honor.

8           MS. KASZUBINSKI:  Thank you, your Honor.

9           MR. PLATT:  Thank you, your Honor.

10          MR. REYES:  Thank you, your Honor.

11          THE COURT:  Thank you all.

12          MR. REYES:  Judge, this was also up for status too --

13          THE COURT:  Yes, tell me.

14          MR. REYES:  -- if the Court wants to hear me.

15          Judge, we have been taking depositions.  One of the

16 plaintiffs has been deposed, another one is going to be deposed

17 tomorrow.  We are moving forward.  I don't think that we have

18 any current glitches, though we may soon, and then we will come

19 back before the Court.

20          THE COURT:  I am glad that you reminded me what do

21 you think would be -- because there is a lot of know ground

22 that you've got to cover, -- what would be a sensible next

23 status date that doesn't create an undue burden for you, but at

24 the time is simply a kind of reporting.

25          MR. PLATT:  There is a May status date right now,

32

1  Judge.  May 3d, I think it is.

2        THE COURT:  It sounds as though that may be early

3  under the circumstance.  Why don't we vacate the May 3d and

4  replace it instead with something maybe about the middle or

5  latter part of June?

6        MR. PLATT:  That's fine.

7        THE COURT:  And for that purpose, the last two weeks

8  in June, the week of June 19th and the week of June 26th,

9  9 o'clock is open any of those ten days.  So if anybody has any

10  particular preferenc --

11        MR. REYES:  Judge, I have a week-long trial starting

12  the 19th, but the following week should be fine.

13        THE COURT:  All right.  That would be the week of the

14  26th through the 30th.  Now in that week I think the only

15  unavailable date is Thursday, June 29th.

16        MS. ROSEN:  If you could do it earlier in the week,

17  it would be better for me.

18        THE COURT:  Is that okay?  The 26th, that Monday?

19        MR. REYES:  Sure.

20        THE COURT:  That we vacate -- is that okay for you,

21  Mr. Platt?

22        MR. PLATT:  Yes, Judge.

23        THE COURT:  Okay.  We are vacating then the May date

24  and replacing it with 9 o'clock Monday, June 26th.

25        MS. ROSEN:  Thank you, your Honor.

33

1       THE COURT:   Thank you all.

2       (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
        THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

3

4

5

6

7

8              C E R T I F I C A T E

9

I HEREBY CERTIFY that the foregoing is a true and correct
10 transcript from the report of proceedings in the above-entitled
cause.
11

12 JESSE ANDREWS, CSR
OFFICIAL COURT REPORTER
13 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
14 EASTERN DIVISION
DATED: April 12, 2006
15

16

17

18

19

20

21

22

23

24

25