RBF
FILED
APRIL 26, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DIANE BOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 C 2617 |
| | ) | |
| CHICAGO POLICE OFFICER EDWIN | ) | |
| UTRERAS, et al., | ) | Judge Lefkow |
| | ) | |
| Defendants. | ) | Magistrate Judge Keys |

**DEFENDANT CITY OF CHICAGO'S RESPONSE TO PETITION TO INTERVENE AND MOTION TO UNSEAL PUBLIC DOCUMENTS RELATING TO ALLEGATIONS OF POLICE MISCONDUCT**

Putative journalist Jamie Kalven as an intervenor has moved this court to unseal certain documents produced in discovery by defendants in this case pursuant to an agreed, court-approved protective order. For the reasons set out below, this court should deny petitioner's motion.

**Argument in Response**

Pursuant to Section 1983, Diane Bond sued five Chicago police officers, the former chief administrator of the Office of Professional Standards, the present and former superintendent of the Chicago Police Department, and the City of Chicago. Bond alleged that the individual defendants violated her constitutional rights on multiple occasions. Bond also alleged that the Chicago Police Department's early intervention systems and the City's practices of investigating and disciplining police misconduct are deficient, and, based on these allegations, sought to hold the remaining named defendants and the City of Chicago liable for these alleged constitutional violations on theories of supervisory liability and municipal liability, respectively.

At the outset of the litigation, the parties moved for entry of an agreed protective order to facilitate prompt discovery, and that order was approved and entered by this court. The protective order defined the "Confidential Matter" not to be disseminated to the public as, *inter alia*, "employment, disciplinary, investigatory . . . or other information that is of a sensitive or non-public nature regarding plaintiff, defendants, non-party witnesses and non-party employees of the City of Chicago that may be subject to discovery in this action." The protective order stated that Confidential Matter "also includes files generated by the investigation of complaints of misconduct by Chicago police officers (generally referred to as "Complaint Register" files) . . . ."

During the course of this litigation, defendants (and, in particular, the City of Chicago) responded to extensive written discovery propounded upon them, producing or referring plaintiff to tens of thousands of documents. These documents included, *inter alia*, (1) a list of police officers during a specified time period against whom more than ten complaint register files had been opened, identifying the officers by name and the CR files by number; (2) a list of those police officers identified in (1) who had been referred to CPD's early intervention programs; (3) a list of those officers identified in (1) who had been assigned to CPD's Public Housing South Unit; (4) the employee complaint histories of the defendant officers; (5) CR files against the defendant officers; and (6) CR investigative files initiated by complaints made by Bond. Some of these documents – the lists enumerated as (1) through (3) – are described in great detail in petitioner's motion. Because this motion was filed by the law firm of Loevy & Loevy on behalf of Kalven, and because Loevy & Loevy did not represent Bond in her lawsuit, the City questions how Kalven's attorneys know as much as they do about the documents they are seeking to obtain,

in light of the protective order that governed the production of these documents by the City to Bond.

When the City produced these documents to plaintiff, a label designating them as "confidential" and as produced pursuant to protective order properly was affixed to them, because these documents contained information specified as Confidential Matter by the precise terms of the protective order.  CR files were explicitly identified by the protective order as Confidential Matter, while the remaining documents described above plainly contained employment, disciplinary, and/or investigatory information.  Moreover, all of this information was unqualifiedly "non-public" in nature; other than by means of civil discovery, it was not available to Bond.  At no point during the pendency of this lawsuit did Bond's attorneys – who to date (presumably) are the only attorneys to review these documents – challenge the City's designation of these documents as "confidential" or as encompassed by the protective order in the case.

After defendants produced these documents to plaintiff, but before the completion of the discovery phase of the litigation, the parties reached a settlement agreement, rather than proceed to a disposition of the case on the merits.  One of the terms of the settlement agreement signed by the parties was that by settling the case, defendants did not admit or concede the truth of the allegations made against them in Bond's First Amended Complaint:

> The parties and their respective attorneys acknowledge that settlement of this claim is not an admission of liability, or of unconstitutional or illegal conduct by or on the part of any of the defendants and/or the City's future, current or former officers, agents and employees, and shall not serve as evidence or notice of any wrongdoing by or on the part of any of the defendants and/or the City's future, current or former officers, agents and employees.

> The parties and their respective attorneys further acknowledge that settlement is made to avoid the uncertainty of the outcome of litigation and the expense in time and money of further litigation and for the purpose of judicial economy.

In the aftermath of this settlement, Kalven now asks this court to lift the protective order as to the non-public employment, disciplinary, and investigative information discussed above. This court should deny Kalven's motion.

**GOOD CAUSE EXISTED AND CONTINUES TO EXIST FOR PROHIBITING THE PUBLIC DISSEMINATION OF THE PROTECTED DOCUMENTS SOUGHT BY PETITIONER**

Although a presumption of public access generally applies to judicial proceedings and documents,[1] that presumption varies according to the role the protected documents play in the proceedings. The claim of public access is strongest when the documents play a substantial role "in determining litigants' substantive rights."[2] Such documents prototypically are "documents that served as the principal basis for a summary judgment motion; were introduced at trial; or were material and important to a decision to approve a consent decree."[3] Falling outside the definition are documents produced by the parties in discovery:

> Documents that play no role in the performance of Article III functions, *such as those passed between the parties in discovery*, lie entirely beyond the presumption's reach, and stand on a different footing than a motion filed by a party seeking action by

---

[1] *See In re NBC Universal, Inc.*, 426 F.Supp.2d 49, 51 (E.D.N.Y. 2006).

[2] *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

[3] *In re NBC*, 426 F.Supp.2d at 53 (quoting *Amodeo*) (quotation marks omitted).

> the court or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions.[4]

The rationale for the distinction as to what does or does not fall within the ambit of the claim of public access is based on the unique character of the discovery process. The permissible scope of discovery in the federal courts is very broad. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."[5] Much of the material produced in discovery is neither incorporated in motions made to the court nor admissible at trial. Hence, as civil discovery rules became more expansive, the role of the courts in protecting producing parties from undue invasions of privacy has correspondingly increased:

> The adoption of the Federal Rules of Civil Procedure in 1939 fundamentally changed . . . American procedure. In particular, the discovery system in Rules 26 through 37 revolutionized pretrial preparation. The prior system had limited a litigant's ability to acquire information largely to what was admissible at trial; since 1938, a litigant has been able to secure the production of information on a vastly broadened scale–essentially, any information that conceivably could be of help in preparing the case . . . . The goals underlying the expansion of the discovery process were to facilitate preparation, to avoid surprise at trial, and to promote the resolution of cases on their merits–*not to enlarge the public's access to information*. Nonetheless, the expanded scope of discovery under the Federal Rules and the increased amounts of information they generated created side effects outside the adjudicatory system–it posed a threat to privacy and confidentiality. To meet this new problem, the discovery rules

---

[4] *Amodeo*, 71 F.3d at 1050 (emphasis added). *See also S.E.C. v. TheStreet.com*, 273 F.3d 222, 232-33 (2d Cir. 2001); *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 409 (1st Cir. 1987) ("Those documents which play no role in the adjudication process . . . such as those used only in discovery, lie beyond reach [of the presumption of access]."); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986) ("There is no tradition of public access to discovery, and requiring a trial court to scrutinize carefully public claims of access would be incongrous with the goals of the discovery process."); *Acuna v. Rudzinski*, 2001 WL 1467529 (N.D.Ill. 2001).

[5] Fed.R.Civ.P. 26(b)(1).

> contain provisions, such as the authorization for protective orders in Rule 26 (c), to limit the discovering party's use of information beyond the litigation process.[6]

It is not disputed that Rule 26 (c) places the burden to establish good cause for protecting designated information on the party seeking protection.[7] To determine whether good cause exists, courts balance "the need for information against the injury that might result if uncontrolled disclosure is compelled."[8] Balancing requires taking into account litigants' privacy rights as well as the general public's interest in the information.[9] The balance struck should incorporate consideration of the overarching purpose of the discovery process: "Discovery involves the use of compulsory process to facilitate orderly preparation for trial, *not to educate or titillate the public*."[10]

Here, the documents that Kalven seeks to obtain consist entirely of materials that were produced by defendants in the discovery phase of this litigation, and that played no role in the

---

[6] Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L.Rev. 427, 447 (1991) (emphasis added); *see also* 8 Charles Alan Wright & Arthur R. Miller, federal Practice and Procedure § 2036 (2d ed. 1994) ("Rule 26 (c) was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by Rule 26(b)(1).")

[7] *See* 8 Wright & Miller at § 2035.

[8] *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994) (*quoting* Miller, *Confidentiality*).

[9] *See TheStreet.com*, 273 F.3d at 234.

[10] *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) (emphasis added); *see also* Richard L. Marcus, *Myth and Reality in Protective Order Litigation*, 69 Cornell L.Rev. 1, 57 (1983) ("The speculative possibility that in some cases the public would benefit from dissemination of information garnered through discovery hardly warrants the conversion of the process into an investigatory tool for inquisitive litigants.").

adjudication process. These confidential documents were produced solely by use of the tools of written discovery embodied in the Rules of Civil Procedure. Hence, the sealed documents that Kalven seeks to disseminate were provided to Bond in accordance with Rule 26(b)(1)'s relatively low threshold of relevance to any claim or defense. For this reason, they are not entitled to any presumption to public access.

Moreover, granting Kalven access to the protected documents he seeks to obtain is prejudicial to defendants because it would make public documents that cast defendants in an unfavorable light while depriving them of the ability and opportunity effectively to respond to them. In his motion to unseal the documents discussed above, Kalven presents as true the allegations Bond makes against the individual defendant officers and the other defendants as a partial basis for the public's purported right to the information contained in these documents.[11] As with any lawsuit, however, there is a version of events other than, and contradictory to, that of plaintiff. The evidentiary record in this case includes a police surveillance videotape that appears to depict Bond engaging in illegal drug transactions in public near her residence. This evidence undermines both Bond's substantive damage claims of having suffered severe psychological trauma as a result of the alleged constitutional violations she suffered at the hands of the defendant officers and her credibility as to whether Chicago police officers ever did anything at all to traumatize her. It also suggests a motive for Bond making false allegations against Chicago police officers who routinely patrol public housing sites (among the most dangerous criminal enclaves in the City) in their efforts to eradicate gang and drug-related activity at these locations

[11] According to petitioner, Bond's alleged encounter with the police comprises "a horrific tale of police misconduct." Jamie Kalven's Petition to Intervene and Motion to Unseal Public Documents Relating to Allegations of Police Misconduct ("Motion") at 2.

– namely, to deter the defendant officers and their colleagues in the Public Housing South unit from being in the vicinity of plaintiff so as to avoid allegations that they are mistreating her, thereby creating a police-free zone in which Bond and others can engage in crime without fear of being detected and arrested. Regarding the allegations of systemic failings within the CPD, the City and the supervisory defendants equally were prepared to defend the adequacy of CPD's early intervention systems and investigatory and disciplinary practices, by the testimony of these defendants , the testimony of other high-level CPD and City personnel, the testimony of expert witnesses, and documentary evidence that collectively would constitute a defense to whatever negative conclusions plaintiff would ask a jury to draw from the protected documents that Kalven seeks to obtain.  As long as the parties continued to litigate Bond's claims in her lawsuit, defendants had the opportunity and the forum to contest and refute Bond's allegations.

    Now that this lawsuit has settled, however, Kalven's efforts to obtain the protected documents at issue – if successful – seriously would harm defendants.  At that point, dissemination of this information would be entirely one-sided.  Kalven, members of the media, and (inevitably) the law firm of Loevy & Loevy representing Kalven in this matter would publicize information that under the liberal rules of civil discovery defendants had virtually no choice but to produce to Bond.  Meanwhile, the defendants in this litigation would be deprived of the opportunity effectively to address and explain the information contained in these documents, and rebut the adverse inferences about the defendant officers and the Chicago Police Department that so readily would be drawn when this information is taken out of the adversarial context of litigation, in which Bond's use of this information at trial would be constrained by the rules of civil procedure and evidence, and defendants would be able to put on a full-scale defense against

the allegations of individual police misconduct and systemic, department-wide operational failings that the information contained in the protected documents purports to prove. In choosing settlement over trial, Bond's attorneys – the attorneys with knowledge both of the content of the documents produced in discovery and the attorneys best situated to evaluate its probative value if they attempted to introduce it as evidence at trial – made a strategic decision not to proceed to trial, when that information found in the contested documents would be available for public scrutiny, but also subject to challenge and interpretation by defense counsel. Defendants should not be penalized for producing these documents or for agreeing to a settlement of this case – precisely the outcome if Kalven's motion to unseal these protected documents is granted.

Finally, contrary to Kalven's assertions, good cause exists to regard as confidential the specific information contained in the protected documents at issue. Chicago police officers do not relinquish their individual privacy rights merely by dedicating their professional careers to public service. Section 7 of the Illinois Freedom of Information Act exempts personnel files and documents appropriately contained in these files from disclosure.[12] This reasonably would include any information about any Chicago police officer regarding his complaint and disciplinary history (whether summarized in list form or employee complaint histories, or in the investigative files themselves in which the officer is accused of misconduct), or his participation in employee programs designed to intervene when problematic behavior affecting or related to job performance is identified – precisely the kind of information to which Kalven seeks access. The Illinois Personnel Records Review Act also protects the disclosure of employee personnel

---

[12] *See* 5 ILCS 140/1 *et seq.* *See also Lieber v. Board of Trustees of Southern Illinois University*, 680 N.E.2d 374, 408 (1997)

files, disciplinary histories, and related information.[13] In addition, the information contained in CR files, which are initiated automatically any time a citizen alleges misconduct on the part of a police officer, or the fact that an officer is enrolled in one of CPD's early intervention programs, is a source of undue annoyance and embarrassment to that officer. As to the former, allegations of misconduct are often without merit, even frivolous, yet public disclosure that a police officer was wrongly accused of misconduct can be abused so that these facts are submerged from view.[14] Indeed, the mere existence of a CR file can be used unfairly or interpreted incorrectly to imply guilt (even if there is no finding of misconduct), thereby tainting the reputation of police officers. And as to the latter, CPD's early intervention programs are designed to assist police officers address often sensitive personal and job performance issues, and their participation depends on the cooperation and good will of the involved officers. Dissemination of information as to the identity of police officers who stand to benefit from enrollment in these programs may jeopardize the success of these programs if police officers learn that their participation in these programs is a matter of public knowledge. Accordingly, strong principles of privacy are associated with these records, and provide good cause for the information contained in the protected documents to remain protected.

## Conclusion

To the extent that the City agrees with anything stated in Kalven's motion, it agrees that there is great public interest in police matters among the citizenry. "Public interest," however,

---

[13] *See* 820 ILCS 40/0.01.

[14] *See Sasu v. Yoshimura*, 147 F.R.D. 173, 175-76 (N.D.Ill. 1993) (holding that police officer personnel records and investigative files are confidential records entitled to protection).

does not translate into a public *right* to access to the information in the protected documents at issue. For reasons explained above, the fact that this information was disclosed to Bond exclusively as part of pretrial discovery, and never became part of the public record of this litigation, removes any presumption of a public right of access to this information. Moreover, defendants retain good cause to maintain the protected status of this information, under the relevant statutory and case law. Finally, public dissemination of this information outside the context of the litigation severely compromises defendants' ability to counter the use of this information in the public domain.

In addition, the City notes that it is no coincidence that Kalven is represented in this matter by the law firm that presently has brought the most section 1983 lawsuits against the City of Chicago, and that brings *Monell* claims in almost every such lawsuit. Consequently, the City posits that this motion is also intended to allow Loevy & Loevy to obtain information and records to which it otherwise is not entitled, in order to buttress claims they bring in other litigation with the City.

For all of these reasons, this court should deny Kalven's motion to unseal the protected documents to which he seeks to gain access.

                                                        MARA S. GEORGES
                                                        Corporation Counsel of the City of Chicago

                                By:    /s/ George J. Yamin, Jr.
                                            Senior Counsel

30 North LaSalle Street
Suite 900
Chicago, Illinois 60602
(312) 744-0454
Attorney No. 06217483