IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DIANE BOND, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 04 C 2617 |
| | ) | |
| CHICAGO POLICE OFFICERS EDWIN | ) | |
| UTRERAS, et al., | ) | Judge Lefkow |
| | ) | |
| Defendants | ) | Magistrate Judge Keys |

**Petitioner Jamie Kalven's Reply to the City of Chicago's Response to His
Motion to Unseal Public Documents Relating to Allegations of Police Misconduct**

The City of Chicago's response to journalist-Petitioner Jamie Kalven's motion for

public access to certain documents about allegations of police misconduct does not

adequately address the only legally relevant issue: whether good cause exists for those

documents to remain secret. Instead, the City devotes much of its response to irrelevant

arguments, including a number of *ad hominem* arguments. The City does not identify

any specific documents or information that require continued secrecy. To the extent that

the City suggests reasons for withholding the requested documents from the public, it

does so in a mostly non-specific and conclusory fashion. It therefore fails to meet its

burden to justify secrecy. The documents that Petitioner has requested be unsealed

should be released to the public. See Jepson Inc. v. Makita Elec. Works, 30 F.3d 854,

858 (7th Cir. 1994) ("if good cause is not shown, the discovery materials in question

should not receive judicial protection").

**The City's Argument That Defendants Are Prejudiced By Disclosure of the
Documents Outside a Courtroom Is Inconsistent with First Amendment Principles**

Once various *ad hominem* arguments are stripped away, the City's Response,

dckt. no. 260, reduces to a few basic propositions.[1] First, the City argues that "Kalven's

efforts to obtain the protected documents at issue - if successful - seriously would harm

defendants" because the Defendants would be

> deprived of the opportunity effectively to address and explain the
> information contained in these documents, and rebut the adverse inferences
> about the defendant officers and the Chicago Police Department that so
> readily would be drawn when this information is taken out of the
> adversarial context of litigation …

Response at 8.

This position has no apparent relation to the realities of civil discourse. Petitioner

has argued that the sealed documents relating to allegations of police misconduct that

were produced in this litigation (the "Documents") should be released in order to

facilitate public discussion of the important issue of police accountability. He fails to

understand the basis for the City's concern that such a discussion – *unless conducted at a*

---

[1] The City's slanderous characterization of Ms. Bond in its Response has been
addressed by her attorneys. Plaintiff's Motion to File Instanter Her Response, Dckt. No.
261-2. Petitioner would add only that the pretext for this unseemly attack is a willful
misreading of the plain language of Petitioner's Motion, which – contrary to the City's
claim - refers to Ms. Bond's allegations as just that, allegations.
  In addition to attacking Ms. Bond's reputation, the City implies in its Response
that her lawyers violated the Protective Order governing this case. Response at 2-3.
Putting aside the fact that the documents at issue are extensively described in public
records, it appears that the City takes the position that merely describing a document, as
distinguished from disclosing its contents, is a violation of the Protective Order.
Petitioner hopes that the City is not suggesting that the Protective Order justifies
withholding from the public knowledge of the very *existence* of certain documents.
Particularly in the context of a case involving government documents, such extreme
secrecy would be chilling, and the Petitioner believes that the City would be hard-pressed
to find a court willing to accept such a conclusion. (To be as clear as possible, Petitioner
and undersigned counsel's law firm have not seen any protected documents nor has the
Protective Order been violated in any respect.)

*trial* – will be "one-sided." The Defendants in this case include the City of Chicago and senior public officials. They have ample opportunity and means to participate in public debate in the public forum. Indeed, the City maintains and deploys massive publicity machinery for precisely this purpose. The essence of the First Amendment is to ensure that other voices besides that of government can get a hearing in the public forum.

In addition, the City makes no effort to identify what information in the Documents "purports to prove" negative conclusions about Chicago's police force, Response at 9, but rather implies that all of the information would harm the Defendants if released to the public. The argument that *all* materials concerning allegations of police misconduct should only be presented in the "adversarial context of litigation," [2] reflects an extraordinarily narrow view of the First Amendment. This position also contradicts the stated position of Mayor Daley, who just today promised to significantly increase the transparency of the City's investigations into allegations of police misconduct, including by making "public summary reports of each incident and quarterly reports of pending, completed and ongoing investigations." See Exhibit A, "Daley to Overhaul Police Oversight," Chicago Tribune, May 3, 2007.

### The City Has Not Met Its Burden to Show That Good Cause Exists for Prohibiting Public Access to the Documents

The City asserts that there is no "presumption of public access" to discovery materials, citing cases from the First and Second Circuits. An enormous amount of discovery produced in federal litigation is private information about private people and

---

[2] This argument is ironic, given the City's recent success in keeping CR files and other documents relating to its monitoring of its officers *outside* of the "adversarial context of litigation," through motions to "moot" or bifurcate away the claims against it.

corporations. A distinction must be made – and is often made by courts – between such discovery material and the kinds of quintessentially public documents at issue here.[3] As described in Petitioner's Motion, dckt. no. 242, any "presumption" that courts may work under has repeatedly been overcome in this Circuit, as courts have granted intervenors' motions for discovery materials relating to matters of public importance, including documents about the police force.

Moreover, the legally operative question in response to Petitioner's request for documents is not whether a presumption of access exists; rather, the Federal Rules of Civil Procedure explicitly define the legal framework under which the Motion must be analyzed. Under that framework the City, as the party seeking to justify protection, must show this Court that there is good cause for the Documents to remain secret. The City itself confirms this. Response at 6 ("It is not disputed that Rule 26(c) places the burden to establish good cause for protecting designated information on the party seeking protection"). Yet, in its brief engagement with the concept of "good cause," the City fails to meet its legal burden.

---

[3] In fact, cases cited by the City, see Response at 5, actually support Petitioner's argument that any attempts to conceal documents relating to public matters deserve heightened scrutiny. F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 412 (1st Cir. 1987) (upholding release of financial statements; "[I]t cannot be ignored that this litigation involves a government agency and an alleged series of deceptive trade practices culminating (it is said) in widespread consumer losses. These are patently matters of significant public concern. The threshold showing required for impoundment of the materials is correspondingly elevated"); United States v. Amodeo, 71 F.3d 1044, 1053 (2d Cir. 1995) (releasing court officer's report; "[t]he expectation of privacy concerning such matters is diminished because the clients are representative institutions with legal and ethical obligations to the membership at large").

First, the City states that "Chicago police officers do not relinquish their individual privacy rights merely by dedicating their professional careers to public service." Of course they do not. There is certain information that should remain private about people, regardless of their position, and that is why Petitioner is willing to have any personal information about the police officers redacted, along with the identities of any civilian complainants and witnesses that appear in the Documents. The information remaining after such redactions is not private: it relates directly to the public officers' commission of their public duties. Officers do not cease to be public officials accountable to the public for how they behave on the job because they happen to possess individual privacy rights.

Yet the City, in contrast to Petitioner's acknowledgement of the privacy interests of individuals, refuses to recognize that any of the Documents contain public matter, asserting that *any* information about *any* complaints made against *any* of its officers should be kept from the public:

> Section 7 of the Illinois Freedom of Information Act exempts personnel files and documents appropriately contained in these files from disclosure. This reasonably would include any information about any Chicago police officer regarding his complaint and disciplinary history (whether summarized in list form or employee complaint histories, or in the investigative files themselves in which the officer is accused of misconduct), or his participation in employee programs designed to intervene when problematic behavior affecting or relating to job performance is identified - precisely the kind of information to which Kalven seeks access.

Response at 9.

It is surprising that the City would construe the Illinois FOIA to mandate such blanket confidentiality in view of the fact, noted in Petitioner's Motion at 9, that this

Court previously rejected the City's attempt to use the Illinois FOIA to justify confidentiality of police materials:

> Not only have defendants not convinced the court that the CR files or matters of police discipline are covered by the provisions they cite, but, to the contrary, [the Illinois FOIA] specifically states "disclosure of information that bears on the public duties of public employees and officials shall not be considered an invasion of personal privacy." See 5 ILCS 140/7(1)(b). This sentiment is in line with the policy favoring the public's right to be informed of the conduct of public servants.

Doe v. White, 2001 WL 649536, at *1 (N.D. Ill. June 8, 2001).[4]

Nor does the Illinois Personnel Records Review Act lend support to the City's position, as it applies only to personnel files and contains numerous exceptions allowing for disclosure of the files, including if "the disclosure is ordered to a party in a legal action or arbitration." 820 IICS 40/7. See also Motion, Exhibit G (J. Shadur), at 16 (rejecting argument that the Illinois Personnel Records Review Act should restrict dissemination of CR files).

The City also argues against disclosure of the Documents on the basis that allegations of misconduct, no matter the official finding, can imply guilt, "thereby tainting the reputation of the officer." Last month Judge Guzman, in denying the City's request for a Protective Order defining CR files as confidential, rejected that very argument:

> [T]o the extent that the mechanisms and procedures of OPS and Internal Affairs Division are thorough and objective and efficient, thereby producing confidence in their results, an unfounded result ought to be just that, an unfounded result. And no prejudice ought to inure to anyone from the fact that these agencies found the reports were unfounded.

---

[4] In addition, the single case cited by the City in support of its FOIA argument provides no actual support, as it is silent on the applicability of the Illinois FOIA to the documents at issue here. Response at 9, citing Lieber v. Board of Trustees of Southern Illinois University, 680 N.E.2d 374, 408 (1997).

Exhibit B, <u>Petrovic v. City of Chicago</u>, No. 06 C 6111, Transcript of April 12, 2007

Proceedings. (To the extent that the investigative process is *not* "thorough and objective

and efficient," this would be a matter of utmost public concern.) Nor is it even

established that a fear of "reputation tainting" establishes good cause for the protection of

documents. See <u>Culinary Foods, Inc. v. Raychem Corp.</u>, 151 F.R.D. 297, 301 (N.D. Ill.

1993) ("A claim that public disclosure of information will be harmful to defendant's

reputation is not 'good cause' for a protective order.")

Even assuming that some members of the public will think less well of an officer

upon learning of allegations against her, it is well established that public servants must

endure a significant amount of public scrutiny. See <u>Pansy v. Borough of Stroudsburg</u>, 23

F.3d 772, 787 (3d Cir. 1994); Motion, Exhibit G (J. Shadur), at 12 ("A litigant just filed a

motion … saying that I really shouldn't be hearing the case. And you know that's a

public document. And it [is] perfectly proper for it to be a public document. And the

public is entitled to make its own judgment about my conduct..."). It is an axiom of our

democracy that public officials invested with substantial powers must be accountable to

the public. As Mayor Daley put it today in announcing reforms of the Office of

Professional Standards, "When you give someone a badge and a gun, that's bigger than

anyone - that's bigger than myself." Press Conference of Mayor Daley, May 3, 2007, as

viewed on CLTV, provided on the <u>Chicago Tribune</u> website.

The City writes that "good cause exists to regard as confidential the specific

information contained in the protected documents at issue." Response at 9. And yet, the

City fails to identify *what* specific information should be regarded as confidential. Its

arguments against disclosure are general, apparently applying to all categories of the

documents for which Petitioner seeks release and all information contained therein. The City does not raise any specific privacy interests in the lists of officers who had more than ten official complaints lodged against them from 2001 to 2006, or in the list of these same "repeaters" who were assigned to the Public Housing South police unit.

The City does make the specific argument that to disclose the names of officers who have been enrolled in the police department's early intervention programs may "jeopardize the success of these programs if police officers learn that their participation in these programs is a matter of public knowledge." Response at 10. But the list requested is limited to the names of officers who amassed over ten complaints against them in a five-year period; Petitioner is not seeking documents about officers who voluntarily sought counseling. In the context of the public debate about police accountability and the City's claims of Departmental reform, see Exhibit C, Chicago Tribune, "Department is Better Now, Police Chief Says," the public's right to assess the efficacy of the "intervention" programs trumps the participants' discomfort about the disclosure of their names.

With its conclusory approach to its "good cause" arguments, the City falls far short of its legal burden. See Doe, 2001 WL 649536, at *2 ("defendants assert a "privacy" interest of complainants in the potentially embarrassing information that may be contained in the CRs. Defendants have not provided the court with any specific examples from the CRs ... Without a specific demonstration of fact, these 'conclusory statements are not sufficient") (citation omitted). To allow the Documents to remain under seal even after the City has failed to show good cause would be to ignore the dictates of the Federal Rules. Public Citizen v. Liggett, 858 F.2d 775, 789 (1st Cir. 1988)

("Liggett and *amici* would have us turn these cases on their heads by holding that privacy

… ought to work independently of the federal rules, actually limiting a district court's

ability to *deny* protection under Rule 26(c), even when no good cause is shown. That we

are not willing to do.") The City's largely non-specific arguments utterly fail to rebut

Petitioner's essential argument that the Documents contain information about important

public topics about which the public has a right to learn. In re Alexander Grant & Co.

Litig., 820 F.2d 352, 356 (11th Cir. 1987) ("In deciding whether good cause exists, the

district court must balance the involved interests: the harm to the party seeking the

protective order and importance of disclosure to the public").

### Conclusion

In rejecting Chicago's position that documents relating to an officer accused of

repeated sexual assault on civilians should remain confidential, Judge Castillo noted a

Newsweek article about such abuse and wrote: "Clearly, if Defendants' confidentiality

position were adopted by this Court, these types of articles could never be written and

public debate would suffer." Doe v. Marsalis, 202 F.R.D. 233, 238 (N.D. Ill. 2001).

Without the ability to view raw data about police conduct in Chicago, and about the way

complaints about officers' conduct are handled by the City, civilians here are left with

only a partial picture of their police force. To accept the City's extreme position that no

part of any of the sealed documents in this case should be released is to accept a

permanently limited public debate on issues of police misconduct.

For all of the reasons put forth in this Reply and in his Motion, Petitioner requests

that the Documents described in his Motion, at 15-16, be released to the public.

RESPECTFULLY SUBMITTED,


S/ Samantha Liskow
ATTORNEY FOR JAMIE KALVEN


Jon Loevy
Samantha Liskow
LOEVY & LOEVY
312 N. May Street
Suite 100
Chicago, IL 60607
(312) 243-5900


## **CERTIFICATE OF SERVICE**

I, Samantha Liskow, an attorney, certify that on May 3, 2007, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.


S/ Samantha Liskow



**Chicago Tribune**
— O N L I N E  E D I T I O N —

http://www.chicagotribune.com/news/local/chi-070503daley-ops,1,2582328.story?coll=chi-news-hed

# Daley to overhaul police oversight

By Mary Owen
Tribune staff reporter

May 3, 2007, 2:06 PM CDT

Mayor Richard Daley today announced plans for a "total restructuring" of the office that investigates police officers, removing it from control of the Chicago Police Department.

The office would report directly to the mayor and have subpoena power, something the current office does not have, Daley said.

Daley's action follows a series of highly publicized cases of apparent brutality in which investigations by the Office of Professional Standards have been delayed or otherwise mishandled.

The ordinance will be introduced at next Wednesday's City Council meeting, and would take effect as soon as it is approved.

"We must assure every Chicagoan that we are doing everything to prevent abuse by police," Daley said during a news conference at City Hall.

The ordinance would give the OPS six months to complete investigations. Currently, there is no deadline.

The police superintendent would then have 90 days to act on the office's recommendations, or explain in writing why he or she did not, Daley said.

The changes will make the office and its actions more transparent, Daley said, and help it "earn the trust of all Chicagoans."

The office would be required to make public summary reports of each incident and quarterly reports of pending, completed and ongoing investigations.

Daley said he expected no opposition from the police union.

Retired police Supt. Terry Hillard, who heads the committee looking for a new head of the OPS, said it has received 80 applications from across the country. The committee will recommend three candidates to Daley, who will choose from among them.

EXHIBIT
A

Case: 1:04-cv-02617 Document #: 263 Filed: 05/03/07 Page 12 of 21 PageID #:2671

OPS currently is staffed by civilian investigators and administrators, but they report to the superintendent of police—an arrangement that has been under scrutiny in recent months following the airing of two videotaped incidents involving off-duty police officers beating up civilians in bars.

In one case, complaints that six officers had beaten four businessmen at the Jefferson Tap & Grille on Dec. 15 languished with OPS for three months before the tapes were made public, and Supt. Philip Cline stripped the officers of their badges.

Cline announced his retirement last month.

Earlier, as speculation grew about Daley's announcement, critics of the department welcomed change.

"The concept of an agency that is completely independent from the Police Department is a long overdue remedy, and I fully support that," said Craig Futterman, a law professor at the University of Chicago and the Mandel Legal Aid Clinic.

*Copyright © 2007, Chicago Tribune*

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
    ROBIN PETROVIC,                      )
 4                                       )
                     Plaintiff,          )
 5                                       )
                                         )
 6  -vs-                                 )  Case No. 06 C 6111
                                         )
 7                                       )  Chicago, Illinois
    CITY OF CHICAGO, PHILIP CLINE,       )  April 12, 2007
 8  FORMER SUPERINTENDENT OF THE         )  9:30 a.m.
    CHICAGO POLICE DEPARTMENT,           )
 9  TISA MORRIS, FORMER CHIEF            )
    ADMINISTRATOR OF THE OFFICE OF       )
10  PROFESSIONAL STANDARDS,              )
    OFFICER JAMES CHEVAS, OFFICER        )
11  MARGARET BIRKENMAYER, OFFICER        )
    AXEL VELAZQUEZ, OFFICER JOHN         )
12  CRUZ, OFFICER THEODORE MAGNO,        )
    SERGEANT LAWRENCE SPRANDEL AND       )
13  UNKNOWN CHICAGO POLICE               )
    OFFICERS,                            )
14                                       )
                     Defendants.         )
15

16             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE RONALD A. GUZMAN
17

18

19

20

21

22  Court Reporter:

23          NANCY C. LaBELLA, CSR, RMR, CRR
               Official Court Reporter
24          United States District Court
        219 South Dearborn Street, Suite 1222
25           Chicago, Illinois  60604
             Telephone:  (312) 435-6890
        email:  labellaseppi@yahoo.com
</pre>

EXHIBIT

B

2

1   APPEARANCES:

2   For the Plaintiff:          MR. JONATHAN I. LOEVY
                                MR. RUSSELL R. AINSWORTH
3                               LOEVY & LOEVY
                                312 North May Street
4                               Chicago, Illinois 60607
                                (312) 243-5900
5
    For the Defendants:         MR. JOHN M. BRODERICK
6                               PUGH, JONES, JOHNSON &
                                QUANDT, P.C.
7                               180 North LaSalle Street
                                Suite 3400
8                               Chicago, Illinois 60601
                                (312) 551-1002
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  But why don't you answer from the point
2    of view of your case development, which is what I'm interested
3    in here.  You're not here litigating for the public.  You're
4    here litigating for a client.  For your client, what does it
5    help or harm to have the officer's name redacted from, say,
6    the public version of such a document that is filed with the
7    Court?

8          MR. LOEVY:  We would -- our position is, your Honor,
9    that -- and you don't want to hear institutional, but that the
10   public -- the courts are open to the public.  I'm going to
11   talk to you about principles.  This is the people's court, and
12   I don't see any reason why the officers -- they haven't
13   articulated -- they haven't met their burden of showing good
14   cause why their names should come off those documents.  The
15   burden is on them, your Honor.

16         And if I could add, your Honor, this is not an
17   example of just a random police officer.  This is a police
18   officer who the City of Chicago has allowed in our case to
19   violate many people's rights before our client.

20         THE COURT:  Well, I mean, maybe.  And maybe you're
21   completely wrong, and it's a totally innocent officer whose
22   reputation may be slandered by a bunch of complaints that were
23   never -- ought never to have been filed in the first place.  I
24   have no idea which of those is true or somewhere in between,
25   which is the most likely.

1       Well, I guess my gut tells me that as unfair as it
2  sometimes is, there's a certain burden that comes with being a
3  public employee; and I think all of us who are know how unfair
4  that can oftentimes be.  But I don't think it's a great risk
5  to any particular officer to have the fact that unfounded
6  complaints have been filed against him or her be determined
7  through the ordinary course of litigation by looking at court
8  documents.

9       First, to the extent that the mechanisms and
10  procedures of OPS and Internal Affairs Division are thorough
11  and objective and efficient, thereby producing confidence in
12  their results, an unfounded result ought to be just that, an
13  unfounded result.  And no prejudice ought to inure to anyone
14  from the fact that these agencies found the reports were
15  unfounded.

16       And, second, this is a large public institution, the
17  Chicago Police Department.  Taxpayers' money in the tens of
18  millions of dollars goes into it.  And I don't think that it's
19  unwarranted, to the extent that it happens as a matter of
20  course through litigation, for information about this
21  institution to come out to this extent.

22       So my ruling is essentially this, and you folks put
23  it into an order:  The investigatory files will be cleansed of
24  all personal information, which includes stuff like Social
25  Security numbers, medical records, treatment of any kind,

1   family history, that sort of thing. The civilian names will
2   be redacted. Police officers named will remain. I think that
3   covers all the concerns.

4           Is there anything else?

5           MR. BRODERICK: On the medical records issue,
6   plaintiff's medical records, plaintiff wants to limit our
7   discovery of her prior medical history. Let me just back up.

8           This incident occurred in July of '05. She's
9   claiming physical injuries and mental and emotional damages.
10  And they want to limit our discovery of her past medical
11  history prior to the incident to three years.

12          THE COURT: Why?

13          MR. LOEVY: Well, just by filing a lawsuit, obviously
14  you don't open up your entire life. There has to be some
15  limits.

16          THE COURT: Why is three years appropriate for
17  possible mental illness issues?

18          MR. LOEVY: We've looked at the case law, and we
19  believe that the weight of the authority is a limitation
20  between three and five years. You can't go back farther than
21  that. We propose three. There's --

22          THE COURT: I disagree with that. I mean, my
23  experience with mental illness is that it tends to be a
24  long-term thing. I mean, paranoid schizophrenics are usually
25  that way their entire lives. And the extent to which a person

1                                CERTIFICATE

2      I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   _____        _____
    Nancy C. LaBella                Date    4/16/07
6   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



—ONLINE EDITION—

http://www.chicagotribune.com/news/nationworld/chi-0607200265jul20,1,671410.story

CHICAGO POLICE TORTURE REPORT

# Department is better now, police chief says

By David Heinzmann
Tribune staff reporter

July 20, 2006

When the Chicago Police Board fired Jon Burge in 1993 for torturing suspects, its members recommended that detectives start recording confessions to protect the integrity of criminal investigations.

But it would be a dozen years before fallout from the Burge scandal pushed that practice into place--and it happened only after a state law went into effect in 2005 that required confessions to be recorded.

In the intervening years, police officials say their department had changed dramatically, leaving behind the sometimes-brutal practices of what veterans refer to as the "old days" and entering a new era of professionalism and accountability.

"The Chicago Police Department is a very different department today since that period of time," Supt. Philip Cline said Wednesday after a special prosecutor's report on torture allegations was released. "We have been taking very aggressive steps over the years to build upon the public trust."

Cline pointed to the video recordings of all formal interrogations in murder and sex-crime cases as the department's most important safeguard against repeating the sins of the past.

Technological advances and databases also are helping the department track and analyze its performance, Cline said.

The special prosecutors said Wednesday that they believe the abuses that occurred under Burge could not take place today. Cline echoed that assessment in his remarks.

"The fact that they said this couldn't happen today speaks volumes about the Chicago Police Department," he said.

EXHIBIT
C

Those reforms have improved the public's perception of police here and nationwide that had been tarnished by brutality scandals, experts say, but improvements such as videotaped interrogations

shouldn't be seen as a panacea.

Current perceptions of Chicago police in mostly minority neighborhoods with high crimes rates are mixed, said Rev. Robin Hood, a staff community organizer with ACORN, the Association of Community Organizations for Reform Now. Hood works with ACORN in the North Lawndale neighborhood, and he also works for the anti-violence program CeaseFire in the Englewood neighborhood.

"You'll get two answers from people in the community. One answer would be that it hasn't much changed since Burge, because the police are more aggressive now [fighting street crime] ... and they have more leeway to violate people's civil rights," Hood said. "The second answer you would get is that the police now have tried to build relationships with the community, and it's succeeded somewhat, but they need to do more."

Since the Burge scandal, most big-city police departments have implemented systems to prevent systemic police brutality, said Allyson Collins, deputy director of the Police Assessment Resource Center in Los Angeles and co-author of a 1998 study on police brutality.

"But even with tracking systems, video and other mechanisms intended to thwart these kinds of abuses, the challenge for any police leader is to create an overall climate of accountability," Collins said. "The systems in place now can still be bypassed if the leaders at all levels aren't insisting on transparency and accountability."

The lack of strong leadership was the biggest reason why the Burge scandal developed, the special prosecutor's report found.

The report lays much of the blame for allowing Burge to remain on the force throughout the 1980s at the feet of former Supt. Richard Brzeczek, who it said was guilty of "dereliction of duty" in the Burge case.

Instead of finding out what happened during the interrogation in 1982 of accused cop-killer Andrew Wilson, the report suggests that Brzeczek gave lip service to an internal investigation before he resigned in 1983.

Brzeczek, who believes he's been unfairly singled out for blame, said Wednesday that some of his subordinates had more direct responsibility for supervising Burge. That group, he said, included LeRoy Martin, who became superintendent in 1987 and promoted Burge to commander.

Brzeczek, now a criminal defense lawyer in Chicago, called the report a sham. He also said special prosecutor Robert Boyle's assertion that torture could not happen in today's Police Department was laughable.

"There's a lot more now than there was then," he said, saying clients tell him frequently that they have been abused. And officers could find ways to intimidate and coerce suspects before the formal interrogations begin, he said.

"They don't turn those recordings on before they start the formal process, so what happens before that?"

Reports of police brutality have declined in recent years, according to department statistics. Cline also insists that the safeguards against brutality are part of an ongoing conversation with community leaders.

"I hold forums with the community on a regular basis. We bring in the faith-based leaders on a regular

basis," he said. "So if there was something going on in the community, they'd bring it to our attention, and we would act on it."

----------

dheinzmann@tribune.com

*Copyright © 2006, Chicago Tribune*