# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DIANE BOND,               )

             )

     Plaintiff,       )

             )    **No. 04 C 2617**

             )

     v.             )    **Judge Joan Humphrey Lefkow**

             )

CHICAGO POLICE OFFICER   )

EDWIN UTRERAS, et al.,     )

             )

     Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Diane Bond ("Bond"), filed suit against five Chicago police officers ("the defendant officers"), the former chief administrator of the Office of Professional Standards, the present and former superintendent of the Chicago Police Department ("CPD"), and the City of Chicago ("the City" ) (collectively, "defendants"), alleging that the defendant officers subjected her to sexual, physical and psychological abuse pursuant to a police department policy, custom and practice under 42 U.S.C. § 1983. Shortly before trial, the parties reached a settlement. On March 23, 2007, the court entered an Agreed Order of Dismissal and dismissed the case with prejudice.

Pursuant to the parties' agreed motion, at the outset of the litigation this court entered a protective order, which allowed the parties to designate certain discovery material as confidential. The protective order defined "Confidential Matter" not to be disseminated to the public as, *inter alia*, "employment, disciplinary, investigatory ... or other information that is of a sensitive or non-public nature regarding plaintiff, defendants, non-party witnesses and non-party



employees of the City of Chicago that may be subject to discovery in this action." The protective

order further provided, however, that "the designation of material as 'Confidential Matter' does

not create any presumption for or against that treatment" and explicitly noted that this court

would retain authority to potentially redesignate any material designated "confidential."

Prior to the parties' settlement, Bond requested and received extensive discovery

documents, which included, *inter alia*, 1) a list of police officers during a specified time period

against whom more than ten complaint register ("CR") files had been opened, identifying the

officers by name and the CR files by number; 2) a list of those police officers identified in (1)

who had been referred to CPD's early intervention programs; 3) a list of those officers identified

in (1) who had been assigned to CPD's Public Housing South Unit; 4) the employee complaint

histories of the defendant officers; 5) CR files against the defendant officers; and 6) CR

investigative files initiated by complaints made by Bond.

On March 15, 2007, Jamie Kalven ("Kalven"), a self-described professional writer and

journalist,[1] petitioned to intervene in this case[2] and moved the court to strike the confidential

---

[1] See. e.g., JAMIE KALVEN, WORKING WITH AVAILABLE LIGHT: A FAMILY'S WORLD AFTER VIOLENCE (W. W. Norton & Company, 1st ed., 1999); Jamie Kalven, *Healing Is a Matter of Small Acts of Attention and Care Sustained Over Time*, at http://www.slate.com/default.aspx?id=3944&qt=jamie+ kalven; Jamie Kalven, *Kicking the Pigeon*, at http://www.viewfromtheground.com/wp-content/media/ktp/ kicking_the_pigeon.pdf.

[2] "[I]ntervention is the procedurally appropriate course for third-party challenges to protective orders," with the press having "standing to challenge a protective order for abuse or impropriety." *Grove Fresh Distributors, Inc.* v. *Everfresh Juice Co.*, 24 F.3d 893, 896, 898 (7th Cir.1994). *See also Jessup* v. *Luther*, 227 F.3d 993, 997-98 (7th Cir. 2000) (discussing the press and general public's right to intervene to challenge confidentiality orders in the language of Rule 24, Fed. R. Civ. P). For that reason , and because defendants express no opposition to Kalven's intervention, concentrating instead solely on Kalven's motion to unseal the disputed documents, Kalven is given leave to intervene in this action for the limited purpose of challenging the protective order for abuse or impropriety.

2

designation of certain documents produced during discovery by defendants.[3] Kalven contends

that 1) certain documents are improperly designated as "Confidential Matter" under the

protective order;[4] and 2) in any event, now that the parties have settled, good cause no longer

exists to keep any of the disputed records confidential.

In response, defendants argue that public access to the requested documents should be

denied because 1) there is no presumption of access to documents that were produced during

discovery but were never presented to or considered by the court in resolving a motion; 2)

defendants would be unfairly prejudiced by the public dissemination of the disputed documents

outside of the adversarial process; and 3) the privacy interests of the defendant officers outweigh

the public's purported right to or interest in access to the documents.

To begin, it is important to recognize that Kalven has not claimed a common law or first

amendment right of access to the disputed documents but instead bases his claim on Rule 26(c)

---

[3]Specifically, Kalven seeks access to the following documents:

1) The list of all Chicago police officers who had more than ten official complaints lodged against them from 2001 to 2006; 2) The list of officers who had more than ten official complaints lodged against them from 2001 to 2006 and who were referred to one of Chicago's "early warning" programs; 3) The list of officers who had more than ten official complaints lodged against them from 2001 to 2006 and who worked in the Public Housing South Unit; 4) The defendant officers' Employee Complaint Histories; 5) The CR files opened against the individual defendant officers; and 6) The CR files directly related to plaintiff Diane Bond's complaints.

Petition to Intervene and Motion to Unseal Public Documents Relating to Allegations of Police Misconduct ("Motion to Unseal") at 15-16.

[4]Because the court finds below that the protective order previously entered in this case should be lifted, there is no reason to undertake a document-by-document review to assess Kalven's contention that the City improperly designated certain documents "confidential."

3

of the Federal Rules of Civil Procedure. Rule 26(c) permits a district court to issue protective orders covering discovery materials upon a showing of good cause:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ....

Fed. R. Civ. P. 26(c). While defendants acknowledge the "good cause" standard for protective orders under the federal rules, defendants attempt to avoid its application by asserting common law and constitutional arguments regarding whether the public has a presumptive right of access to pretrial discovery materials that were not presented to the court and made part of the judicial decision-making process. These arguments are unavailing, however, because of the applicability of Rule 26(c), which provides an independent basis to inspect discovery materials.

Rule 26(c) , unlike the common law and first amendment, *see Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984), embodies a presumption of public access to pretrial discovery materials, including those that are not part of the judicial record. "It is implicit in Rule 26(c)'s 'good cause' requirement that ordinarily (in the absence of good cause) a party receiving discovery materials might make them public." *Public Citizen* v. *Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988). Indeed, "[u]nless the public has a presumptive right of access to discovery materials, the party seeking to protect the materials would have no need for a judicial order since the public would not be allowed to examine the materials in any event." *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 145-46 (2nd Cir. 1987). Following the reasoning of the First and Second Circuits, the Seventh Circuit has concluded that while "pretrial discovery, unlike the trial itself, is usually conducted in private" "the public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding."

4

See *Citizens First Nat'l Bank of Princeton* v. *Cincinnati Ins. Co.*, 178 F.3d 943, 945-46 (7th Cir. 1999). As a consequence, "[a]s a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings.[5] *Am. Tel. & Tel. Co.* v. *Grady*, 594 F.2d 594, 596 (7th Cir. 1979).

In deciding whether good cause exists, the district court must balance the interests of the parties, taking into account the harm to the party seeking the protective order and the importance of the disclosure to the nonmoving party. *Wiggins* v. *Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997). When making a good cause determination, a district court may consider "privacy interests, whether the information is important to public health and safety and whether the party benefitting from the confidentiality of the protective order is a public official." *Citizens First Nat'l Bank of Princeton*, 178 F.3d at 944-45.

Defendants contend that "granting Kalven access to the protected documents he seeks to obtain is prejudicial to defendants because it would make public documents that cast defendants in an unfavorable light while depriving them of the ability and opportunity to effectively to respond to them." The fact that the allegations of police misconduct contained in the requested materials would bring unwanted, negative attention on defendants is not a basis for shielding the materials from public disclosure. The public has a significant interest in monitoring the conduct of its police officers and a right to know how allegations of misconduct are being investigated and handled. *See Doe* v. *Marsalis*, 202 F.R.D. 233, 238 (N.D. Ill. 2001). The court

---

[5]Defendants also assert that the public's interest in access to materials that form the basis of a judicial decision is greater than in other materials generated in the discovery process. There is certainly support for that proposition, *see Hobley* v. *Burge*, 225 F.R.D. 221, 224 (N.D. Ill. 2004), but it does not, as defendants suggest, defeat the presumption of public access to pretrial discovery materials.

acknowledges that some and perhaps even all of the allegations contained in the disputed

documents may not be true, but it trusts that "[t]he general public is sophisticated enough to

understand that a mere allegation of police [abuse], just like a lawsuit, does not constitute actual

proof of misconduct." *Wiggins*, 173 F.R.D. at 230. Moreover, to the extent that the allegations

are indeed unfounded, the court is unpersuaded by defendants' bare assertion that they will be

unable to demonstrate that to the public. The City has its own public relations department and

there are no doubt countless media outlets that would invite City officials to participate in an

open and frank discussion regarding these and other allegations of police misconduct.

Defendants' contention that the police officers' privacy interest outweighs the public's

interest in the disclosure of the disputed documents is similarly unpersuasive. While the

defendant officers have a valid privacy interest in the protection of private and sensitive

information such as their social security numbers, home addresses and telephone numbers, the

protective order already provides for and Kalven consents to the redaction of such information.

Defendants contend that the defendant officers' complaint and disciplinary histories, whether

summarized in list form or employee complaint histories, or in the investigative files in which the

officer is accused of misconduct, are also part of their employee personnel file and thus protected

from disclosure. That information, though personal, has a distinct public character, as it relates

to the defendant officers' performance of their official duties. Without such information, the

public would be unable to supervise the individuals and institutions it has entrusted with the

extraordinary authority to arrest and detain persons against their will. With so much at stake,

defendants simply cannot be permitted to operate in secrecy.

6

Dbt f !2;15.dw 13728!!!!!Epdvn f ou379!!!!!!Gjrhe!180 303118!!!!!Qbhf !8!pg:

Finally, defendants contend that the Illinois Freedom of Information Act, 5 Ill. Comp. Stat. 140/1 *et seq.*, and the Illinois Personnel Records Review Act, 820 Ill. Comp. Stat. 40/0.01, both prohibit the disclosure of the disputed documents. In another case, this court already rejected defendants' attempt to use the Illinois FOIA to justify the confidentiality of the type of documents at issue in this case:

> Not only have defendants not convinced the court that the CR files or matters of police discipline are covered by the provisions they cite, but, to the contrary, [the Illinois FOIA] specifically states "disclosure of information that bears on the public duties of public employees and officials shall not be considered an invasion of personal privacy." See 5 ILCS 140/7(1)(b). This sentiment is in line with the policy favoring the public's right to be informed of the conduct of public servants.

*Doe* v. *White*, 2001 WL 649536, at * 1 (N.D. Ill. June 8, 2001). Defendants' reliance on the Illinois Personnel Records Review Act is also unavailing. Section 7 of that statute, the only section that has any conceivable connection to the issue before the court,[6] merely provides that an employer must give an employee written notice before disclosing "a disciplinary report, letter of reprimand, or other disciplinary action to a third party." 820 Ill. Comp. Stat. 40/7(1). Thus, the Illinois Personnel Records Review Act does not prohibit the disclosure of the disputed documents; rather it merely prescribes the procedures the CPD, as the defendant officers' employer, must follow before disclosing them. Since those procedures are hardly onerous, the Illinois Personnel Records Review Act does not provide good cause for maintaining the protective order. Even if the procedures were overly burdensome, defendants concede that Kalven is likely to obtain the documents from Bond's counsel, and since they are not subject to

---

[6]Defendants do not cite a specific section of the statute nor explain how the statute prohibits disclosure of the disputed documents, so the court has reviewed the statute on its own in an effort to ascertain whether any basis exists for defendants' reliance on the statute.

Dbt f !2;15.dw 13728!!!!!Epdvn f ou379!!!!!!Gjrhe!180l3ß118!!!!!Qbhf !9!pg:

the Illinois Personnel Records Review Act, defendants' reliance on that statute would remain unfruitful.

## CONCLUSION

Court related documents, even those not part of the judicial record, are presumed to be accessible to the public. The documents at issue in this case involve allegations of police misconduct, including the harassment and abuse of public housing residents, a particularly vulnerable group of citizens, and thus touch upon matters of grave public concern. The privacy interests of the defendant officers are diminished because of their status as public officials, and those interests that remain are served by the redaction of certain information from the requested documents. Balancing these interests, good cause no longer exists for shielding the requested materials from public inspection.[7] *See Marsalis*, 202 F.R.D. at 239 (authorizing the public disclosure of discovery documents produced by the City following its settlement of a civil rights lawsuit against its officers); *Wiggins*, 173 F.R.D. at 230 (same).

Accordingly, Kalven's motion to intervene and to unseal public documents relating to alleged police misconduct [#242] is granted. In their briefing on this motion, the parties did not distinguish between an order unsealing the record and an order ordering the disclosure of the disputed documents. To be clear, the court orders only that the protective order previously entered in this case be lifted to permit either party to disseminate the documents exchanged during the underlying litigation, as the court's authority to order dissemination of the documents

---

[7]Neither party discusses the potential impact of the public disclosure of these documents on unrelated third parties. Since, however, Kalven consents to the redaction of the names and contact information of any unrelated third party identified in the requested documents, the privacy interests of those individuals are not seriously implicated and thus do not provide good cause for continuing the protective order.

Dbt f !2;15.dw.13728!!!!!Epdvn f ou379!!!!!!Gjrhe!180l3Œ3118!!!!!Qbhf !: !pg:

has not been shown.  To the extent that either Bond or defendants agree to disclose the

documents, any documents still bearing private and personal information regarding the defendant

officers, including but not limited to, social security numbers, home addresses, telephone

numbers, salaries, rates of pay, medical information and employee numbers, shall be redacted

before being turned over to a third party.  Additionally, consistent with Kalven's stipulation, the

name and contact information of any unrelated third party shall also be redacted prior to

disclosure.

Date: July 2, 2007                          Enter: _____

                                            JOAN HUMPHREY LEFKOW
                                            United States District Judge

No. _____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| DIANE BOND, | ) Appeal from the United States |
| | ) District Court for the Northern |
| Plaintiff, | ) District of Illinois, Eastern Division. |
| | ) |
| v. | ) |
| | ) |
| CHICAGO POLICE OFFICERS EDWIN | ) |
| UTRERAS, ANDREW SCHOEFF, | ) |
| CHRIST SAVICKAS, ROBERT | ) |
| STEGMILLER, JOSEPH SEINITZ, | ) |
| ROBERT SCHULTZ, NICHOLAS | ) |
| CORTESI, JOHN CANNON, ROBERT | ) |
| FRANKS, WAYNE NOVY, and JOHN | ) |
| DOES ONE through FIVE, in their | ) |
| individual capacities; PHILLIP CLINE, | ) No. 04 C 2617 |
| Superintendent of the Chicago Police | ) |
| Department, TERRY HILLARD, Former | ) |
| Superintendent of the Chicago Police | ) |
| Department, and LORI LIGHTFOOT, | ) |
| Former Chief Administrator of the Office | ) |
| of Professional Standards, in their official | ) |
| capacities; and CITY OF CHICAGO, | ) |
| | ) |
| Defendants-Appellants. | ) |
| | ) |
| | ) |
| JAMIE KALVEN, | ) The Honorable |
| | ) Joan Humphrey Lefkow, |
| Intervenor-Appellee. | ) Judge Presiding. |

U.S.C.A. — 7th Circuit
RECEIVED
JUL 1 8 2007 COD
GINO J. AGNELLO
CLERK

**EMERGENCY MOTION FOR STAY PENDING APPEAL**

EXHIBIT
B

The defendants-appellants, several Chicago Police Department ("CPD")

officials and officers, and the City of Chicago, by their attorney, Mara S. Georges,

Corporation Counsel of the City of Chicago, hereby move this court to stay pending

appeal the July 2, 2007 order of the district court, which granted the petition of Jamie Kalven ("Kalven") to intervene in this case and lifted an agreed protective order. The defendants state as follows in support of this motion.

## BACKGROUND

Diane Bond ("Bond") filed a complaint in the district court under 42 U.S.C. § 1983 (2000) on April 12, 2004, claiming that her constitutional rights were violated because CPD officers sexually, physically, and psychologically abused her, and the policies, customs, and practices of CPD officials and the City for investigating and disciplining police misconduct were inadequate. R. 1. The district court entered a protective order on February 2, 2005, which was agreed to by the parties in order to facilitate the discovery process. R. 33. The protective order specifically defined which discovery materials the parties could designate as "Confidential Matter," and thus could not be disseminated by them to the public. Id. at 2-3. The definition of "Confidential Matter" included, among other things, "employment, disciplinary, investigatory . . . or other information of a sensitive or non-public nature," such as "files generated by the investigation of complaints of misconduct by Chicago police officers (generally referred to as 'Complaint Register' [("CR")] files) . . . ." Id. at 2.

In response to Bond's discovery requests, the defendants produced thousands of pages of documents, including: (1) a list of officers who had more than ten CR files opened during a set time frame, identifying them by name and the CR files by number; (2) a list of officers identified in (1) who had been referred to CPD's early

2

intervention programs; (3) a list of officers identified in (1) assigned to CPD's Public Housing South Unit; (4) the employee complaint histories of the defendant officers; and (5) the defendant officers' CR files [hereafter "confidential documents"]. See R. 260 at 2.[1]

Before discovery closed, the parties settled the case, and the district court entered an agreed order to dismiss the matter with prejudice on March 23, 2007. R. 247-50. On March 15, 2007, just before the case was dismissed, Kalven, who was not a party and is a self-styled journalist, filed a petition to intervene in the case and to lift the agreed protective order. R. 242. In this petition, Kalven asserted that no "good cause" existed under Fed. R. Civ. P. 26(c) for the parties to have secured a protective order for the confidential documents and that, in any event, there was no "good cause" to maintain the protective order. Id. The defendants responded to Kalven's petition, explaining that, while there is a presumption of public access to materials filed with the court, no such presumption exists for discovery materials that are never filed with the court; and that, absent such a presumption, there was no "good cause" shown by Kalven to justify lifting the protective order. R. 260.[2] In reply, Kalven reiterated that no "good cause" existed for the protective order. R. 263.

---

[1] Kalven's motion to lift the protective order included a sixth category, "CR files opened based on complaints made by Bond." At this stage, it appears that those documents were not labeled as "Confidential Matter," and thus do not appear to have been covered by the protective order.

[2] Bond filed a response limited to the defendants' reference to a videotape showing Bond engaged in activity believed by the defendants' expert witness to be drug transactions. Bond disputed that the videotape depicted her engaging in illegal activity. R. 265.

3

The district court entered an order on July 2, 2007, allowing Kalven to intervene and lifting the agreed protective order. R. 268 (attached as Ex. 1). In lifting the protective order, the district court concluded that Rule 26(c), unlike the common law or First Amendment, creates a presumption of public access not only to materials filed with the court, but also to unfiled discovery materials. Id. at 4-5, 8. Beginning with this presumption, the district court went on to decide whether there was "good cause," as defined by Rule 26(c), to maintain the protective order. Id. at 5-8. The district court cited the parties' interests in maintaining the protective order, the harm to the parties of modifying it, and the interests of the public. Id. The district court decided that there is a significant public interest in the conduct of police officers, id. at 5-6, 8; that, although some of the discovery materials were part of CPD officers' personnel files, the need to maintain the privacy of the information was diminished because it "has a distinct public character" and "relates to the performance of their official duties," id. at 6; and that the discovery materials would not be exempt from public access under the Illinois Freedom of Information Act ("Illinois FOIA"), 5 ILCS 140/7 (2000), id. at 7-8. Based on the presumption in favor of public access and these factors, the district court concluded there was no "good cause" to maintain the protective order and lifted it. Id. at 8.[3]

---

[3] The district court did require redaction of certain information about CPD officers, such as their "social security numbers, home addresses, telephone numbers, salaries, rates of pay, medical information and employee numbers," and about any unrelated third-parties, if a party chose to disseminate the discovery materials. R. 268 at 8-9 & n.7 (Ex. 1).

4

The defendants then moved the district court to stay the July 2, 2007 order until July 19, 2007, so that they could decide whether to move for reconsideration or to appeal. R. 269. During the hearing on the motion, the defendants indicated they would seek a further stay if they decided to appeal, but the district court made clear that it would not grant a stay pending appeal. R. 270 (attached as Ex. 2). On July 9, 2007, the district court entered an order staying the July 2, 2007 order until July 16, 2007 at 5:00 p.m. R. 271 (attached as Ex. 3). In the order, the district court also stated that if the defendants decided to appeal, "then the motion to stay pending appeal is hereby denied." Id. The defendants filed a notice of appeal on July 13, 2007, to challenge the district court's decision to lift the agreed protective order, and now ask this court for a stay to maintain the confidentiality of the documents until this court has the opportunity to consider the appeal's merits.

## ARGUMENT

### THIS COURT SHOULD STAY THE DISTRICT COURT'S JULY 2, 2007 ORDER PENDING APPEAL.

This court has the power to stay an "order of the district court pending appeal." Fed. R. App. P. 8(a)(1)(A). A party "must ordinarily move first in the district court" for a stay. Fed. R. App. P. 8(a)(1). The defendants sought a limited stay of the July 2, 2007 order from the district court, and indicated that if they decided to appeal, they would seek a stay pending appeal. While the district court granted a limited stay, essentially to allow the defendants time to decide whether to appeal and seek a stay from this court, the district court preemptively denied a stay

5

pending appeal. See R. 271 (Ex. 3). Accordingly, a request to the district court for a further stay is futile, and the defendants now seek a stay pending appeal from this court.

To obtain a stay pending appeal, the defendants must demonstrate that they have a likelihood of success on the merits; that they will experience irreparable harm absent a stay; that the harm to them outweighs any harm a stay would cause the opposing party, here Kalven; and that a stay will serve the public interest. See, e.g., Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Hinrichs v. Bosma, 440 F.3d 393, 396 (7th Cir. 2006). Even under these demanding standards, the defendants are entitled to a stay from this court.

A.     The Defendants Are Likely To Succeed On The Merits.

Although the district court's decision on a discovery matter, like whether to modify a protective order, is reviewed for an abuse of discretion, see, e.g., Sims v. GC Services LP, 445 F.3d 959, 963 (7th Cir. 2007); Gambale v. Deutsche Bank AG, 377 F.3d 133, 139 (2d Cir. 2004), this deferential standard presents no hurdle to the defendants here. This is because "a district court by definition abuses its discretion when it makes an error of law." Maynard v. Nygren, 332 F.3d 462, 467 (7th Cir. 2003). In this case, the district court, in deciding to lift the protective order, made at least three legal errors. Indeed, the main issues to be raised by the defendants' appeal are: (1) whether there is a presumption of public access to discovery materials never filed with the court; (2) without any presumption, whether an

6

intervenor seeking, for his own reasons, to lift a protective order agreed to by the parties bears the burden of showing that no "good cause" exists to maintain the protective order; and (3) whether the discovery materials at issue here would be exempt from public access under Illinois FOIA. These legal issues are likely to be decided in the defendants' favor, and if they are, the district court's decision cannot stand because it will necessarily reflect an abuse of discretion.

> **1. There is no presumption of public access to discovery materials never filed with the court.**

To begin, the district court made two critical legal errors when it declared that Rule 26(c) creates a presumption of public access to discovery materials never filed with the court. See R. 268 at 4-5, 8 (Ex. 1). By design, the scope of the civil discovery process created under Rule 26 is broad. See, e.g., Fed. R. Civ. P. 26; Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34 (1984). Indeed, parties "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party," and moreover, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b). Due to the vast scope of discovery that Rule 26(b) permits, the Supreme Court has recognized the district courts need "to have the authority to issue protective orders" under Rule 26(c). Seattle Times, 467 U.S. at 34. Rule 26(c) allows the district court to enter a protective order "for good cause shown," including to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).

7

Because the discovery process is so broad, parties in the district court often agree to protective orders, and they are entered by the court in an effort to facilitate the discovery process. This practice makes sense because without protective orders, discovery objections would impose significant burdens on the district courts and magistrate judges. Indeed, given the great expanse of discoverable material, it is scarcely possible to contemplate discovery without them. The mutual benefits afforded by protective orders – the plaintiff gets the discovery she seeks; the defendant need not insist on a judicial determination that the material must be produced; and the court can avoid micromanaging the discovery process – avoid what would otherwise be a far more complicated, time-consuming, and expensive process. These concerns are particularly true for discovery that ultimately has little or no bearing on the legal issues and will never be presented to the court. No doubt most of the materials generated in discovery fall in this category, and it makes no sense to require the district court to involve itself in that process.

As the district court pointed out, see R. 268 at 4 (Ex. 1), when the public seeks access to discovery materials under the common law or First Amendment, a distinction has been drawn between discovery materials filed with the court and those that are not filed. See, e.g., Seattle Times, 467 U.S. at 33; United States v. Amodeo, 71 F 3d 1044, 1048 (2d Cir. 1995). Indeed, as we noted in the district court, see R. 260 at 4-5, although there is a right of public access to discovery materials once used in court, under the common law and First Amendment, no such

right exists to discovery materials never filed with the court, see, e.g., Seattle Times, 467 U.S. at 33; Grove Fresh Distributors. Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994)

Some courts, though, have concluded, based on a prior version of Rule 5(d), that there is a statutory right of public access to discovery materials, and that based on that right, there is a presumption in favor of public access in deciding whether "good cause" exists to enter a protective order concerning those materials under Rule 26(c). See, e.g., Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 780, 788-90 (1st Cir. 1988); In re "Agent Orange" Product Litigation, 821 F.2d 139, 145-46 (2d Cir. 1988). See also Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157, 165 (3d Cir. 1993); Banco Popular de Puerto Rico v. Greenblatt, 964 F.2d 1227, 1233 n.5 (1st Cir. 1992). Before 2000, Rule 5(d) required that all discovery materials "be filed with the court," but it allowed courts to adopt local rules not requiring such materials to be filed unless or until they were used in court. And, the 1980 Committee Note for Rule 5(d) observed that requiring the filing of these materials was important because they "are sometimes of interest to those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally." Although as a matter of practice most courts only required discovery materials to be filed when used, there are cases that rely heavily on the theoretical filing requirement in the prior version of Rule 5(d) to conclude that a statutory presumption of public

9

access to discovery materials exists. <u>See</u>, <u>e.g.</u>, <u>Public Citizen</u>, 858 F.2d at 788-90; <u>In re "Agent Orange"</u>, 821 F.2d at 145-46.

In 2000, Rule 5(d) was amended to reflect the standard practice of not filing discovery materials with the court. This current version of Rule 5(d) bars the filing of discovery materials, indicating that they "must not be filed until they are used in the proceeding or the court orders" them to be filed. Fed. R. Civ. P. 5(d). After the 2000 amendment, some courts have concluded that the statutory presumption of public access to unfiled discovery materials no longer exists. <u>See</u>, <u>e.g.</u>, <u>Securities & Exchange Commission v. TheStreet.com</u>, 273 F.3d 222, 233 n.11 (2d Cir. 2001); <u>New York v. Microsoft Corp.</u>, 206 F.R.D. 19, 24 (D.D.C. 2002); <u>Smithkline Beecham Corp. v. Synthon Pharmaceuticals, Ltd.</u>, 210 F.R.D. 163, 167 (M.D.N.C. 2002).

No case of which we are aware from this court has addressed whether there is a statutory right of public access to unfiled discovery materials. Nevertheless, there are hints that the court would side with the modern cases if the issue were presented. For instance, in <u>Baxter International, Inc. v. Abbott Laboratories</u>, 297 F.3d 544 (7th Cir. 2002), this court recognized the distinction between filed and unfiled discovery materials in deciding the right of public access. This court stated, "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record. . . . But those documents, usually a small subset of discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fine long-term confidentiality."

10

Id. at 545 (internal citation omitted). The court went on to explain that the "strong presumption of public disclosure applies only to the materials that formed the basis of the parties' dispute and the district court's resolution." Id. at 548.

And the court's decision in Citizens First National Bank of Princeton v. Cincinnati Insurance Co., 178 F.3d 943 (7th Cir. 1999), does not support any right of public access to unfiled discovery materials under the current rule. First, that case was decided in 1999, before the 2000 amendment to Rule 5(d); it therefore does not address the rule that now governs. Second, while the court in Citizens First acknowledged that the line of cases under the prior rule "endorse a presumption of public access to discovery materials," id. at 946, even then, the court had no occasion to adopt that presumption in this Circuit because the materials at issue in that case had been filed with the court, see id. at 945.

In light of Baxter and the modern view by other courts, we believe this court is likely to conclude that the current Rule 5(d) does not create a statutory right of public access to unfiled discovery materials. That conclusion would reveal two legal errors in the district court's decision, which therefore would constitute an abuse of discretion. The district court relied on a public right of access to unfiled discovery materials. See R. 268 at 4-5, 8 (Ex. 1). Compounding that problem, the district court then relied on a presumption of public access to require the defendants to show "good cause" to maintain the protective order. See id. at 5-8. Yet, if there is no statutory right of public access to discovery materials never filed with the court,

11

and thus no presumption of public access, the burden of convincing the court to modify a protective order should lie with the person who wants to challenge it. While the burden of showing "good cause" for keeping materials under a protective order normally lies with the party who wants the protective order, see Fed. R. Civ. P. 26(c), it should be clear that this merely reflects the presumption of a right of access. For materials generated in the discovery process that are never used in court, to which there is no right of public access, the party challenging the order should bear the burden of showing why there is "good cause" to modify it. See, e.g., Securities & Exchange Commission, 273 F.3d at 229. This only makes sense, given that the moving party usually bears the burden on a motion anyway.

All in all, in this case, the defendants are likely to prevail in showing that the district court abused its discretion. Not only was one thumb placed on the scale against keeping the protective order in place when the district court started with a presumption of public access, but the other thumb was placed on that same side of the scale because it became the defendants' burden to show there was "good cause" to maintain the protective order, instead of requiring Kalven to show no "good cause." When the presumption is taken away and the burden is placed on the intervenor, as it should be, the outcome of this case would likely be different. At a minimum, the determination whether there is "good cause" to keep the documents under a protective order pursuant to Rule 26(c) would proceed entirely differently than the district court proceeded in this case. That alone would justify reversal.

12

## 2. The discovery materials here would be exempt from public access under Illinois FOIA.

The district court made a third legal error in concluding that the documents

here would not be exempt from public access under Illinois FOIA, 5 ILCS 140/1 et

seq. (2004). That statute provides, in relevant part, that certain government

information "shall be exempt" from public access, including:

> (b) Information that, if disclosed, would constitute a clearly
> unwarranted invasion of personal privacy, unless the disclosure is
> consented to in writing by the individual subjects of the information.
> The disclosure of information that bears on the public duties of public
> employees and officials shall not be considered an invasion of personal
> privacy. Information exempted under this subsection (b) shall include
> but is not limited to:
>
> * * *
>
> (ii) personnel files and personal information maintained with
> respect to employees, appointees or elected officials of any public
> body or applicants for those positions . . . .

Id. 140/7(b), (b)(ii). Many of the documents at issue, for example, the fourth and

fifth categories, as well as columns on the list in the first category, revealing the

officer's name and CRs identified by investigative file number, contain information

found in personnel files, which are exempt from disclosure. In the July 2, 2007

order, the district court erroneously interpreted Illinois FOIA to conclude that the

documents here would not be exempt from public access. See R. 268 at 7 (Ex. 1).

While Illinois FOIA does state generally that information that "bears on the public

duties of public employees and officials shall not be considered an invasion of

personal privacy," it specifically provides that personnel files will be exempt. In

construing the state statute, the court proceeds the way Illinois courts would, which is to give effect to the legislature's intent by given the statute's terms their "plain" and "ordinary" meaning, and when a "general statutory provision and a more specific provision relate to the same subject," the courts "presume that the legislature intended the more specific provision to govern." In re Jaime P., 223 Ill. 2d 526, 537 (Ill. 2006) (internal citation omitted). Given the plain, specific language of Illinois FOIA, it is clear that the documents here would not be available to the public.

Indeed, it would be remarkable if the personnel files of all public employees could be obtained under Illinois FOIA, despite the specific exemption for personnel files, just because the information in those files might "bear on" their public duties. Tellingly, the statute does not say the information "bearing on" the performance of public duties shall not constitute an invasion of privacy. For this reason, the closest Illinois case on point holds that performance evaluations of a superintendent and a letter sent by the school board explaining the reasons for terminating the superintendent's contract were exempt under section 7(b)(ii). See Copley Press, Inc. v. Board of Education for Peoria School District No. 150, 834 N.E.2d 558, 560-61 (Ill. App. Ct. 2005). The court rejected the general language in section (b) on which the district court relied, on the basis that it simply did not apply to information that was per se exempt. See id. at 561. In short, on this basis as well, the district court abused its discretion in weighing this factor in favor of lifting the protective order.

14

**B.    The Equities Favor Granting A Stay Pending Appeal.**

In addition, the equitable considerations weigh heavily in favor of granting a stay pending appeal.  First, the defendants will suffer irreparable harm absent a stay.  Without a stay, Bond will be free to turn confidential documents over to Kalven, no doubt to be used by him for his journalistic endeavors, and they may be viewed and used by others.  The very question presented by the appeal is whether the confidential documents should be available for public consumption.  Release of these documents before a decision by this court on whether they should be released will therefore inflict precisely the harm the defendants seek to avoid through this appeal.  Nor will there be any other remedy for that harm.  Once the documents are released, a decision by this court that the public has no right of access to unfiled discovery materials, like those here, will come too late.  This court is quite familiar with this type of claimed harm – it is the same regardless of the nature of materials kept under a protective order, be it trade secrets or privileged information (such as materials covered by the attorney-client privilege).  Indeed, the decision might not come at all, since the defendants' appeal would face a serious mootness problem.

Second, the harm to the defendants if no stay is granted far outweighs any harm to Kalven if a stay is granted.  As a self-described journalist, Kalven should have other investigative means available to him, especially given Bond's claim that the alleged abuses in this case are widespread.  Kalven, of course, is free to work as an investigative reporter to pursue his story or write his blog until this court

15

decides the appeal. If Kalven had an urgent need for the material, he could have pursued his request long ago. At this point, while having the information now may make his job easier, that is not a compelling reason to weigh against the harm that would result to the defendants.

Third, and finally, the public interest will be served by granting a stay. The district court indicated that information about the conduct of police is a matter of public concern, see R. 268 at 5-6, 8 (Ex. 1), but in Illinois, when information about the conduct of the police is in the nature of performance evaluations, the General Assembly has decided that the public interest is not served by access to such information, which it has exempted from release under Illinois FOIA. While we submit that the confidential documents are also not properly obtained by a third party through the expediency of a motion to intervene and lift the protective order in a private lawsuit, at worst there would be a conflict between the public access that might otherwise be available under the federal discovery rules and lack of public access under Illinois FOIA. This court should not elevate whatever federal interest it might perceive in disclosure without carefully considering the state's interest in protecting the privacy of government employees in Illinois. This tension can be avoided by waiting to allow release of the confidential materials after it is certain they should be released.

Beyond that obvious concern, members of the public are themselves litigants at times, and they have an interest in knowing if and when confidential information

they may produce in discovery pursuant to a protective order will no longer be considered private if a journalist becomes interested in their case. In addition, the public has an interest in ensuring that the discovery process is properly used, and that litigants will not be allowed to agree to a protective order to obtain discovery and be released from obligations freely undertaken when they no longer see a need for confidentiality. The protective order in this case was not novel. Such orders are extremely common in the Northern District of Illinois, precisely because they are so very useful to the parties and the court. If this court disapproves of the practice, the City and all others will be aware on a going-forward basis that it should not rely on the protection such orders provide, but should make all appropriate objections to discovery of confidential documents, obtain a finding of "good cause" from the district court, and take an appeal if it cannot. But we urge the court to protect the defendants' reasonable reliance interests by entering a stay pending appeal until it makes that determination.

In an effort to resolve this dispute without an appeal, we approached Craig Futterman, Bond's counsel, and offered to withdraw any objection to the list described in the first category of confidential documents, if it were redacted to remove the officers' names. We believed this would serve both Kalven's interests and CPD's, at least as to that category. Kalven still would have access to a list showing the number of officers with multiple complaints against them, as well as the disposition of those complaints. The name of the officer involved adds little or

nothing to the import of that information. By contrast, the release of the names of officers with multiple complaints against them effectively will compromise their ability to do their jobs. Law-abiding residents, on whom CPD's community policing strategy so heavily depends, will lose trust in officers and stop cooperating with these officers simply because allegations have been made repeatedly against them. Similarly, when these officers are called to testify in court, they may be subject to loss of credibility based on unproven allegations. And they may be more vulnerable to baseless lawsuits simply because they will be perceived as easy targets.

These concerns are not undermined by Bond's claim in this case that the City did not properly investigate complaints against police officers. Whether or not, as Bond claimed, complaints are not properly investigated, that does not make all of the complaints true. The list was compiled as Bond requested it – those officers with ten or more CRs against them during a set amount of time and the CR number identifying the investigative file. Such a skeletal list absent any details about the nature of the allegations or the investigation risks creating a public perception about the conduct of officers that is not substantiated. Indeed, the list does not reflect sustained or proved allegations – not when it was compiled and not if it is freed from the protective order. Moreover, an officer who knows his history is open to unprecedented public scrutiny will have a disincentive to enforce the laws for fear of having complaints used against him in retaliation for his efforts.

18

We are aware that one reason Bond wants to be freed from the commitment she and her counsel undertook in agreeing to the protective order is to provide the material to members of the Chicago City Council before a vote on Wednesday, July 18, 2007, on an ordinance to overhaul CPD's Office of Professional Standards, which investigates allegations of police misconduct. See R. 270 (Ex. 2 at 7-9). That motivation should not bear on deciding this motion. The Aldermen do not need to sue CPD or the Law Department to obtain this information, nor do they have to obtain access to the materials from Futterman or Kalven. We have agreed to make the confidential documents available to any City Council member who requests them. See R. 270 (Ex. 2 at 7-9). In any event, neither Bond's nor Kalven's counsel represents any member of the City Council in this case.

In short, there is no reason to allow release of the confidential documents pending appeal in this case, and every reason not to.

## CONCLUSION

For these reasons, the defendants ask this court to stay pending appeal the

July 2, 2007 order of the district court, which lifted the agreed protective order.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel
of the City of Chicago

BY: _____

NADINE J. WICHERN
Assistant Corporation Counsel
BENNA RUTH SOLOMON
Deputy Corporation Counsel
30 North LaSalle Street
Suite 800
Chicago, Illinois 60602
(312) 744-0468/7764

20

1

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3

DIANE BOND,                    )   No. 04 C 2617
4                              )
        Plaintiff,             )
5                              )
        vs.                    )
6                              )
EDWIN UTRERAS, etc., et al.,   )   Chicago, Illinois
7                              )   July 9, 2007
        Defendants.            )   11:00 A.M.
8
        TRANSCRIPT OF PROCEEDINGS - Emergency Motion
9       BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW

10  APPEARANCES:

11  For the Plaintiff:      MANDEL LEGAL AID CLINIC
                            6020 South University Avenue
12                          Chicago, Illinois  60637
                            BY:  MR. CRAIG BENSON FUTTERMAN
13

    For the Defendant       CITY OF CHICAGO DEPARTMENT OF LAW
14  Officers:               Individual Defense Litigation
                            30 North LaSalle Street
15                          Suite 1400
                            Chicago, Illinois  60602
16                          BY:  MS. GERI LYNN YANOW

17  For Defendant City:     CITY OF CHICAGO, DEPARTMENT OF LAW
                            30 North LaSalle Street
18                          Suite 900
                            Chicago, Illinois  60602
19                          BY:  MR. GEORGE JOHN YAMIN, JR.

20

21           PAMELA S. WARREN, CSR, RPR
                Official Court Reporter
22             219 South Dearborn Street
                    Room 1928
23             Chicago, Illinois   60604
                  (312) 294-8907
24

25

**EXHIBIT**

C

2

1   APPEARANCES:   Continued

2

3   For the Petitioner:        LOEVY & LOEVY
                               312 North May Street
4                              Suite 100
                               Chicago, Illinois  60607
5                              BY:  MR. JONATHAN I. LOEVY
                                    MS. SAMANTHA ANNE LISKOW
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1 (Proceedings had in open court.)

2   THE CLERK: 04 C 2617, Bond versus Utreras.

3   THE COURT: Good morning.

4   MR. YAMIN: Good morning, your Honor. George Yamin on

5 behalf of the defendants, City of Chicago, Cline, Hillard, and

6 Lightfoot.

7   THE COURT: Good morning.

8   MS. YANOW: Good morning, your Honor. Geri Lynn Yanow

9 on behalf of the individual Chicago police defendants.

10   THE COURT: Good morning.

11   MR. LOEVY: Good morning, your Honor. Jon Loevy for

12 the intervenor Jamie Kalven.

13   THE COURT: Good morning.

14   MS. LISKOW: Samantha Liskow with Jamie Kalven,

15 intervenor.

16   THE COURT: Good morning.

17   MR. FUTTERMAN: Craig Futterman for plaintiff.

18   THE COURT: Good morning. I see we were on the front

19 page of the Law Bulletin this morning.

20   Okay. So what's the response to the motion?

21   And then we'll give you the opportunity to reply.

22   MR. LOEVY: Well, it is hard to respond, your Honor,

23 because they haven't really, you know, put any reasons why your

24 Honor made a mistake of law. And you certainly didn't make a

25 mistake of fact.

4

1    And time really becomes the issue.  And we were struck

2  by them asking for ten days to decide what they are going to

3  decide to do because that puts us beyond the public hearing

4  that is scheduled for July 19th.

5    And, you know, we filed this motion  I think our side

6  was fully briefed, Sam told me, this March.  Then there was a

7  number of extensions and time works to the city's advantage

8  because it moots the issue.  And we're worried that by the time

9  that a full Seventh Circuit appeal got resolved, nobody is

10  going to care what this information was.  And the balance then,

11  the balance of the equity, is this stuff is already becoming

12  stale.  It should be released now if it is to have any

13  meaning.

14    Mr. Kalven, our client, wants to participate in the

15  public hearing.  And this is public information.  And we

16  believe that the reasoning and analysis in your opinion is

17  sound.  And they haven't identified any reason why you should

18  reconsider it so that there is no grounds for stay on the

19  balance of the equities.

20    THE COURT:  Okay.  Yes, I know this did sit in my

21  office too long too, so --

22    MR. YAMIN:  May I respond to that, your Honor?  You

23  know, I don't think the issue before the Court today is the

24  merits of what the defendants could say in response to your

25  Honor's opinion.  The issue is timing as it affects the

5

1  defendants.  And we have procedural opportunities, to use the

2  word loosely, appeal the decision.

3        THE COURT:  Uh-huh.

4        MR. YAMIN:  We have a route within -- before this

5  Court, by way of a motion for reconsideration.  And we have a

6  route by way of going to the Seventh Circuit.

7        We did not see the opinion.  I did not see it until

8  Friday for reasons I set out in the -- in the motion.

9        And we have -- in order to be able to determine

10  whether it is reasonable and practicable to ask for some review

11  of this decision, you know, given our office, the way our

12  office is structured, we need to consult with multiple

13  supervisors and the appeals division.  You know, it is not like

14  plaintiff's counsel -- petitioner's counsel who can get up and

15  speak to you about their decisions, we can't do it that way in

16  our office.

17        And for that reason we think we are entitled -- what

18  we are asking for is some reasonable time to be able to

19  determine whether to exercise our appeal rights.

20        And in the meantime dissemination of the documents in

21  question -- or those documents were disseminated in the

22  meantime, exercise of any kind of appeal would be -- there

23  would be no point in that because we would be deprived of any

24  meaningful review once the documents were put out there.

25        So we disagree with Mr. Loevy in terms of the

6

1  viability of this motion. And I have -- I really disagree that

2  any plaintiff's counsel, standing to my left, regards any of

3  these documents as stale in terms of when they would be -- if

4  and when they would be disseminated to -- either to Mr. Kalven

5  particularly or to the media in general.

6          THE COURT: So what --

7          MR. YAMIN: I see no harm done to the plaintiffs.

8          THE COURT: What is happening on the 19th? I'm not

9  aware.

10         MR. LOEVY: There is a --

11         MR. FUTTERMAN: I'm sorry, if I may.

12         MR. LOEVY: Sure.

13         MR. FUTTERMAN: Just also to make plaintiff's position

14  clear too, we also do oppose the stay.

15         THE COURT: Go to the microphone.

16         MR. FUTTERMAN: We also do oppose a stay, your Honor.

17         But to respond to your Honor's question, right now the

18  future of police oversight in Chicago is a matter of deep

19  public concern. There is an ordinance that is before city

20  council and scheduled to be voted on on July the 19th. And the

21  ordinance goes to whether there ought to be a new agency, an

22  independent agency created to oversee and investigate police

23  abuse in Chicago.

24         I participated in hearings before the city council

25  with Mara Georges, as well corporation counsel for the city,

7

1    and a number of aldermen asked me about this very information

2    and asked me about which units and which names, et cetera.  And

3    of course I said, I'd like to tell you, but your lawyer, your

4    lawyer is actually fighting this, ironically.

5         So even alderfolk were asking for this information as

6    they were thinking about what to do and whether or not to pass

7    and what ordinance and what the ordinance ought to look like.

8    And that's scheduled, I believe Mr. Loevy said, to be voted on

9    ten days from now, July the 19th.  So this is a matter of deep

10   public concern now.

11        And even information that their clients would like to

12   or some of their clients would like to see and know about as

13   they decide this.

14        MS. YANOW:  Judge, if I may speak for the individual

15   defendants.  Regardless of what is taking place in the city

16   council or not, these documents concern this particular case

17   and the protective order that was entered in this particular

18   case.

19        And I would ask -- I would suggest that the time we're

20   asking for is a short period of time so that we can determine

21   how best next to respond to the motion, regardless of all those

22   other things are extraneous to this case

23        THE COURT:  Well, it may or may not be extraneous.  I

24   mean, I don't know that I would say extraneous is the right

25   word.  Your clients's interests are, of course, separate from,

8

1  to some extent, that of the city and the city council and the

2  aldermen.

3          I do -- I do hear -- I do find it persuasive on the

4  plaintiff's side or on the intervenor's side that aldermen of

5  the city are interested in this information because it seems to

6  me as our elected representatives they, of anyone, have an

7  interest in this, a very legitimate interest.

8          So what's your response to that?

9          MR. YAMIN:  Your Honor, I can't speak to -- I don't

10  know what conversations have been had between any aldermen and

11  any attorneys standing here or elsewhere.  I don't doubt that

12  the city council -- because I know generally what's at stake in

13  terms of the ordinance involving the revisions to OPS -- I

14  don't doubt that there is an interest generally in these

15  concerns.

16          But we had -- we had, in terms of the city and the

17  defendants that were -- on whose behalf we're litigating, we do

18  have strong interests in, at least within the context of this

19  litigation, of preserving the protective order that governed

20  the publication of those documents  And we would at least like

21  the opportunity to consult with the aldermen.  There are

22  aldermen who we have worked with in the past on these cases and

23  we can identify as ones who would be interested.

24          THE COURT:  Well, I can certainly lift the protective

25  order as related to you and any aldermen.  That is, you have

9

1  the information so do these intervenors, so I don't see any

2  reason why these documents should not be communicated to them.

3       Now whether they -- you know, I mean they would

4  certainly be under the same restrictions I said in my July 2

5  decision in terms of making public the names. So that's, you

6  know, Threshold A.

7       And then really the question is how much time. I

8  think you ought to have some reasonable amount of time to file

9  an appeal. I would discourage you from seeking

10 reconsideration.

11      MR. YAMIN: I don't think we will do that, your

12 Honor. That's needed -- I think that was to preserve the

13 record, to make note of that.

14      And, your Honor, just to be clear, in terms of talking

15 to the aldermen, I wasn't intending -- I wasn't suggesting that

16 I would go to the aldermen with documents or information, just

17 to see what their position was as to disclosure of these

18 documents.

19      THE COURT: Well, let me try to be clear here. What I

20 am hearing from the intervenor, that Mr. Loevy here is for, is

21 that some aldermen have approached them about getting this

22 information or they have approached some alderman with their

23 issues about it, and the alderman will say, well, what do you

24 have? And if these alderman ask you for the information, you

25 have it, you should give it to them. That's my view. I mean,

1   I think the protective order is lifted to that extent.

2        Or the intervenors can give it to them, either way,

3   subject to the restrictions that I have already set.

4        MR. YAMIN: Well, your Honor, then I would ask to

5   modify the -- I think we asked for -- I wasn't aware of the

6   date of the hearing when I filed this motion. I think we asked

7   for ten business days, which takes us to July 9.

8        I would amend the request that the order be stayed as

9   to all parties for five business days. So that gets us to next

10   Monday, which is still several days in advance of the hearing.

11        That gives me an opportunity to consult with

12   Ms. Georges, the corporation counsel, who Mr. Loevy has --

13   whose name he's mentioned as someone who may have an interest

14   in these. I have not spoken to her directly prior to filing

15   this motion. And give us a chance to assess the issue

16   internally in terms an appeal.

17        That way we have a chance to preserve our procedural

18   rights. And if when we come back the Court thinks that --

19   well, then we'd have more information to present to the Court

20   in a week.

21        THE COURT: Well, I'll give you five days. But you

22   have known this since Friday. I'll give you till Friday, the

23   19th. I'll stay the order till Friday -- or Friday, the 13th,

24   I'm sorry. That is an ominous date. Okay. Friday the 13th.

25   That should give you time to lodge an appeal.

11

1          And I guess you would -- at that point the stay would

2    be lifted unless you got some kind of stay from the Court of

3    Appeals.

4          MS. YANOW:  Judge, just -- I'm sorry.  Just could we

5    have until the following Monday just because today is already

6    one day?  That would give us four days.  Could we have until

7    Monday, the -- I believe it is the --

8          MR. YAMIN:  16th.

9          MS. YANOW:  -- 16th?

10         MR. LOEVY:  Your Honor, in light of your order --

11         THE COURT:  Well, is Ms. Georges out of town?  I mean,

12   how long does it take to --

13         MR. YAMIN:  Ms. Georges --

14         THE COURT:  -- prepare to get a meeting with her?

15         MR. YAMIN:  We just don't know who is available in the

16   law department during this week.  We need to consult with the

17   appeals division, Ms. Georges, and potentially some aldermen.

18   So it is -- that is our -- I can't speak to their schedules

19   right now.

20         MR. LOEVY:  Your Honor, in light of the order that the

21   stay is going to be lifted, unless they get relief by then, we

22   don't object to doing it until the following Monday.

23         THE COURT:  Monday?  Okay.  Then that is fine.

24   Monday, the 16th.

25         MR. YAMIN:  And could that be at 5:00 o'clock, your

12

1  Honor.

2     (Laughter.)

3        THE COURT: Okay.

4        MR. YAMIN: We just have a bureaucracy we are dealing

5  with.

6        THE COURT: So the order will be the motion is

7  granted. Motion to stay is granted to 7-16, to close of

8  business on 7-16 or 5:00 o'clock.

9        Okay. And then any -- it needs to be clear, if you do

10  file an appeal, then motion for stay pending appeal is denied.

11  So that way you will only have one forum to go to get a stay

12  pending appeal. Okay?

13        MR. LOEVY: Your Honor, so we understand your Honor's

14  order. We on the plaintiff/intervenor side, we can talk to

15  aldermen subject to the terms of the protective order without

16  complainants's names and addresses?

17        THE COURT: Yes. And that's --

18        MR. YAMIN: Your Honor, I'm sorry, but that's not my

19  --

20        THE COURT: Oh, you're asking for that to be included

21  within the stay?

22        MR. YAMIN: Well, our -- the motion for stay was that

23  no -- there would be no dissemination of this information. And

24  that's what we are asking for, there be no dissemination of

25  this information until the date your Honor just stated, at

13

1   which point either there will be an appeal filed and the

2   appropriate relief requested from the Seventh Circuit regarding

3   us -- a continued stay from that forum, as you said, or the

4   stay lifts by virtue of the order entered today.

5          THE COURT:  Okay.  Well, let me hear from the

6   opposition on that, and I'll give you a reply because I think

7   that is an important issue.

8          Mr. Loevy.

9          MR. LOEVY:  Your Honor, I think your Honor correctly

10  before noted that the aldermen are the client, you know.  Why

11  would the aldermen -- why would they be covered by the

12  protective order at all?  They could see it within this

13  protective order.  They are the City of Chicago.  So there

14  wouldn't seem to be any -- I mean, that's a sub category that

15  doesn't apply, it seems to me.

16         MR. FUTTERMAN:  The question is whether, since

17  intervenor doesn't have access to this during the pendency of

18  the stay --

19         MR. LOEVY:  Mr. Kalven literally doesn't have it.

20         THE COURT:  They can't do it.

21         MR. FUTTERMAN:  Right.  So the issue is whether

22  plaintiff's counsel would be allowed to give to the aldermen

23  who have requested or not.

24         THE COURT:  Okay.

25         MS. YANOW:  Just --

14

1      THE COURT:  Ms. Yanow?

2      MS. YANOW:  I know that Mr. Yamin wants to speak on

3  behalf of the city.  But on behalf of the individual defendants

4  who are parties to this lawsuit, I think that an extra five

5  days in which this information, which is covered under the

6  protective order, is totally covered until the end of -- close

7  of business on the 16th is the proper way so that we can

8  determine what we're going to do.

9      If the information is disseminated, then the ideas of

10  the appeal or other actions we might wish to take would be

11  irrelevant at that point.

12      MR. LOEVY:  I have a solution to that problem, your

13  Honor.  We won't disseminate anything related to the individual

14  defendants, so that should moot Ms. Yanow's concern.

15      And as far as speaking about mooting the appeal and

16  dissemination, we are not going to disseminate -- disseminate

17  to the city council, to the client itself, to the City of

18  Chicago.

19      MS. YANOW:  And it seems -- oh.

20      THE COURT:  Go ahead.

21      MS. YANOW:  And it seems to me that because we

22  represent the City of Chicago that it should be our burden and

23  not the intervenor's burden to talk with the aldermen and

24  decide what information they may or may not have.  We -- we're

25  just operating on what information has been said here, and we

1    don't -- we have not had an opportunity to talk to any aldermen

2    to find out what it is that they may want or not want.

3         MR. YAMIN:  Your Honor, and I disagree with

4    Mr. Loevy's compromise position.  You know, to represent the

5    City of Chicago it is very ambiguous to say who are -- you

6    know, who wants -- who our actual clients are.  And I think it

7    should be -- we have -- the relief we have asked for is not

8    unreasonable.

9         The time frame as modified allows, as long as a stay

10   is not entered by the Seventh Circuit, I guess, there is time

11   and opportunity for plaintiffs -- for intervenor to get

12   documents or information to whatever aldermen are -- are being

13   referred to and to have that information disseminated to anyone

14   without, at least for a five-day period, the City of Chicago as

15   it stands before you today, with the clients that are -- have

16   been sued -- I mean essentially undermines any attempt we're

17   trying to make before you today to preserve procedural options,

18   and that we're entitled to as a matter of how the system

19   works.

20        So I think, you know, to let anybody talk to anyone

21   else about this -- the documents and information at issue,

22   until we have had a chance to look at this carefully and

23   reasonably and in a fair amount of time, it totally defeats the

24   purpose of our coming before you today

25        THE COURT:  Well --

16

1      MR. FUTTERMAN:  May I just?

2      THE COURT:  I don't know about totally, but it does

3  affect.

4      Mr. Futterman.

5      MR. FUTTERMAN:  Thank you, your Honor.

6      The time issue is again -- or one of the time

7  issues -- July 18th is when the city council, full city council

8  is scheduled to vote on this ordinance.

9      THE COURT:  18th or 19th?

10     MR. LOEVY:  19th.

11     MR. FUTTERMAN:  19th.  I'm sorry.  I apologize.  The

12  19th.

13     And for the city council itself to be informed and to

14  be able to disseminate it amongst one another and to have an

15  informed vote; there are -- the hearings that I have alluded to

16  today were public hearings in which corporation counsel's

17  office, the head of corporation counsel's office and myself and

18  others participated in in which various -- various aldermen

19  made a specific request for this very information.

20     And with Mara Georges sitting right next to me, I

21  explained that this is information that is covered by a court

22  protective order that can't be released, but you should talk

23  to your lawyers who have access to it.

24     Since then alder -- various aldermen have called my

25  office and asked for this, and I have given the same response

1   And all have said, if there is any relief that is given, please

2   give it to us -- please give us access to this before we need

3   to vote on this. So that is the time sensitivity on the other

4   side.

5        And as Mr. Loevy pointed out, these are people who are

6   policymakers for the City of Chicago itself.

7        THE COURT: Okay. Well, let me say this. I'll lift

8   the protective order as to the city and the individual

9   defendants.

10        Now then it becomes more or less a political issue.

11   That is, you deal with these aldermen yourself. But you can't

12   -- you or Ms. Georges or whoever they speak to can't say this

13   is subject of a protective order because it isn't.

14        I'll keep it in place for the five days for Mr. Loevy

15   to the 16th.

16        All right. So I think that resolves that issue

17        MR. YAMIN: Thank you.

18        MR. LOEVY: Thank you, your Honor.

19        MR. FUTTERMAN: Thank you.

20        MS. YANOW: Thank you.

21   (Which concluded the proceedings in the above-entitled

22   matter.)
               C E R T I F I C A T E

23        I hereby certify that the foregoing is a transcript of
   proceedings before the Honorable Joan Humphrey Lefkow on

24   July 9, 2007.

25   DATED: July 10, 2007



1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF ILLINOIS<br>EASTERN DIVISION |

DIANE BOND,                          )

    3         Plaintiff,            )

    4    vs.                        )    No. 04 C 2617

    5                               )

EDWIN UTRERAS, Chicago police officer,  )

    6  Star No. 19901, et al.,      )    Chicago, Illinois
                                    )    July 16, 2007
    7         Defendants.           )    9:00 o'clock a.m.

    8         TRANSCRIPT OF PROCEEDINGS - Emergency Motion
             BEFORE THE HONORABLE REBECCA R. PALLMEYER

    9

APPEARANCES:

    10  For the Plaintiff:          MANDEL LEGAL AID CLINIC
                                    BY:  MR. CRAIG B. FUTTERMAN
    11                              6020 South University Avenue
                                    Chicago, Illinois  60637
    12                              (312) 702-9611

    13  For the Petitioner:         LOEVY & LOEVY
                                    BY:  MR. JONATHAN I. LOEVY
    14                                   MS. SAMANTHA A. LISKOW
                                    312 North May Street, #100
    15                              Chicago, Illinois  60607
                                    (312) 243-5900

    16

    17  For Defendant City:         CITY OF CHICAGO, DEPT. OF LAW
                                    BY:  MR. GEORGE J. YAMIN, JR.
    18                              30 North LaSalle Street, #900
                                    Chicago, Illinois  60602
    19                              (312) 744-9010

    20  For Defendant Officers:     CITY OF CHICAGO, DEPT. OF LAW
                                    INDIVIDUAL DEFENSE LITIGATION
    21                              BY:  MS. GERI LYNN YANOW
                                    30 North LaSalle Street, #1400
    22                              Chicago, Illinois  60602
                                    (312) 744-2837

    23         COLLEEN M. CONWAY, CSR, CRR
                   Official Court Reporter
    24      219 South Dearborn Street, Room 2524-A
                   Chicago, Illinois  60604
    25             (312) 435-5594
           colleen_conway@ilnd.uscourts.gov

**EXHIBIT**

D

Colleen M. Conway, Official Court Reporter

2

1      (Proceedings in open court.)

2          THE CLERK:  04 C 2617, Bond versus Chicago Police

3  Officer Edwin Utreras, on an emergency motion.

4          MR. YAMIN:  Good morning, Your Honor.

5          George Yamin on behalf of Defendant City of

6  Chicago.

7          THE COURT:  Good morning.

8          MS. YANOW:  Good morning, Your Honor.

9          Geri Lynn Yanow on behalf of the individual Chicago

10  police officers.

11          THE COURT:  Good morning.

12          MR. FUTTERMAN:  Good morning.

13          Craig Futterman on behalf of the plaintiff.

14          MR. LOEVY:  Good morning, Your Honor.

15          Jon Loevy for the intervenor.

16          MS. LISKOW:  Good morning.

17          Samantha Liskow on behalf of the intervenor.

18          MR. YAMIN:  Your Honor, to explain why we're here,

19  as I think we're taking you by surprise --

20          THE COURT:  Well, I mean, I know about the case

21  from the press, but I don't think I know about the case

22  otherwise, so --

23          MR. YAMIN:  Well, the reason why we're here now and

24  you are seeing -- and you are learning about this motion for

25  the first time is the defendants were under the

3

1   impression that -- this is an emergency motion filed by the

2   defendants.

3             THE COURT:  Uh-huh.

4             MR. YAMIN:  We noticed it up for presentment today.

5   We thought we were going before Magistrate Judge Keys.  He's

6   the magistrate judge on the case.

7             The case has settled.  This is a post-settlement

8   issue.

9             THE COURT:  Uh-huh.

10            MR. YAMIN:  And we learned this morning that, in

11  Magistrate Judge Keys' view, he no longer has jurisdiction

12  over the matter, although the reason we thought he did, or at

13  least the reason we thought we needed to go before him is we

14  contacted Judge Lefkow's courtroom deputy mid-afternoon on

15  Friday --

16            THE COURT:  Uh-huh.

17            MR. YAMIN:  -- and we also spoke to Ms. Castillo,

18  Magistrate Judge Keys' courtroom deputy --

19            THE COURT:  Right.

20            MR. YAMIN:  -- and there probably was some

21  misunderstanding about, you know, the nature of the motion

22  and the circumstances.

23            In any event, when we went to Magistrate Judge Keys

24  this morning, we were referred to you in your capacity as, I

25  guess, the sitting emergency judge for the day or whatever

4

1   the time period is.

2           THE COURT:  Okay.  Back up for just a second.

3           The one name you haven't mentioned is Judge Lefkow.

4   Is she not around?

5           MR. YAMIN:  That's correct.  I'm sorry.  That's the

6   predicate of all of this.

7           THE COURT:  All right, all right.

8           MR. YAMIN:  I don't know how you want to handle

9   this, since you -- not -- I don't believe you have seen the

10  filing, but --

11          THE COURT:  Well, how much longer are you looking

12  to stay Judge Lefkow's order?

13          MR. YAMIN:  I don't think very long, Your Honor.

14          But just so you know, just briefly, the background

15  and the timing issues, the order was entered July 2nd, we

16  went before Judge Lefkow on July 9, and the net result of all

17  of that in terms of a stay was that Judge Lefkow, who we had

18  informed the Court that it appeared that the defendants

19  were -- well, the defendants were contemplating an appeal to

20  the Seventh Circuit --

21          THE COURT:  Uh-huh.

22          MR. YAMIN:  -- and we asked for time sufficient

23  to -- for our office to consider that decision.

24          Judge Lefkow gave -- extended the -- or, sorry, she

25  stayed her order, her July 2 order.  That was stayed until

5

1   today by close of business.

2         In the meantime, the defendants have filed a notice

3   of appeal with the Seventh Circuit. That was done on Friday.

4         Accompanying the notice of appeal was an emergency

5   motion that was -- that's brought before the Seventh Circuit

6   to stay the District Court's order pending the -- pending

7   appeal.

8         When we were before Judge Lefkow, she indicated she

9   would not stay her order pending appeal because she wanted

10   the issue of the stay to be just addressed by one forum,

11   which she felt more appropriately was the Seventh Circuit

12   rather than her court, which we did not challenge or have a

13   problem with, except that at this point, the -- despite the

14   fact the filings have been timely with the Seventh Circuit,

15   we haven't had a ruling from the Seventh Circuit as to

16   whether the stay should be continued, and, therefore, we're

17   here today not asking for the Court to stay the order pending

18   appeal, but merely to stay the order pending the Seventh

19   Circuit's ruling on an emergency motion to stay, which is --

20         THE COURT: Okay.

21         MR. YAMIN: -- could possibly be heard or ruled on

22   today and don't know how to -- I don't know timing issues in

23   the Seventh Circuit, but it was filed Friday and it was

24   styled as an emergency motion.

25         MR. LOEVY: If I may, Your Honor?

6

1          THE COURT:  Sure.

2          MR. LOEVY:  We represent the intervenor, and we

3  petitioned to get access to this particular information.

4          Judge Lefkow agreed with us.  She entered her order

5  on July 2nd.

6          THE COURT:  Uh-huh.

7          MR. LOEVY:  The city asked Judge Lefkow to stay the

8  order, and we opposed it strongly, arguing that there is a

9  city council meeting coming up this Thursday and we want to

10  participate in that public debate.

11          At the prior city council meeting, we tried to

12  participate, Mr. Futterman, but because of the protective

13  order, we weren't allowed to use that data.

14          Judge Lefkow, on July 9th, heard the argument back

15  and forth, and she made a ruling.  She said, "You get a stay

16  for one week, Mr. Yamin, but it expires on Monday."

17          And the transcript is attached to his motion.  She

18  said, "I am" -- "If you ask for another stay, I am denying it

19  in advance."  That's pages 10 and 11.  And she said that, "I

20  would discourage you from seeking a motion for

21  reconsideration."

22          The city then on July 9th had a choice, Your Honor,

23  and they chose to do nothing.  They didn't file their appeal.

24          Mr. Yamin alludes to it as timely, but they didn't

25  file that appeal till 5:00 o'clock or 4:45 on Friday.

Colleen M. Conway, Official Court Reporter

7

1    So if they failed to leave the Seventh Circuit with
2  enough time to decide, that's something Judge Lefkow warned
3  them about.  She said, "You're not getting an extension.
4  Move as you see fit."
5    And the point I'd like to add here, Your Honor, is
6  that if in their motion to the Seventh Circuit they -- which
7  I don't think you have a copy of, Your Honor --
8    MR. YAMIN:  It's attached to the filing, Your
9  Honor.
10    MR. LOEVY:  I will provide one, Your Honor.
11    Have you found the transcript?
12    THE COURT:  I have.  I am reading pages 11 and 12.
13    The stay, as I understand it --
14    MR. LOEVY:  No, it's --
15    THE COURT:  -- expires at 5:00 o'clock today.
16    MR. LOEVY:  Right.  And on page -- at the bottom of
17  page 10 and the top of page 11, she says, "The stay is going
18  to be lifted unless you get relief from the Seventh Circuit
19  by then."
20    THE COURT:  Right.
21    MR. LOEVY:  And they didn't file for relief.  They
22  waited all week, Your Honor, until Friday afternoon.
23    And there's a chance the Seventh Circuit will give
24  them their relief, but they have put themselves in the boat
25  that they want you now to relieve them of.

Colleen M. Conway, Official Court Reporter

8

1          And Judge Lefkow said on page 12, "You're only

2  going to get one forum. So if you file the motion that Mr.

3  Yamin just filed, it's going to be denied." It says right

4  there on -- you know, about a third of the way down on page

5  12. And here they are filing the motion that Judge Lefkow

6  told them not to file that's going to be denied.

7          And I think, more importantly, Your Honor, and this

8  is maybe the most important point of all, in their motion to

9  the Seventh Circuit, they argued as follows, and I quote --

10  this is page 5 -- "While the District Court granted a limited

11  stay essentially to allow the defendants time to decide

12  whether to appeal and seek a stay from this court," the

13  Seventh Circuit, "the District Court preemptively denied a

14  stay pending appeal. Accordingly, a request to the District

15  Court for a further stay is futile."

16          So that's what they're doing, asking the District

17  Court for a further stay, which they already told the Seventh

18  Circuit would be futile in light of what Judge Lefkow already

19  said.

20          So this Court, as Mr. Yamin amply said, Judge

21  Lefkow said, "Pick your forum." They picked the Seventh

22  Circuit. They waited till the absolute last minute, and now

23  they're like, "Well, maybe the Seventh Circuit won't have

24  time to give us the relief we seek." That was their choice,

25  Your Honor.

9

1     MR. YAMIN:  Now I'd like to address that.

2     I think that misstates what Mr. Loevy -- or

3  misstates what was the issue before this -- Judge Lefkow and

4  what she's -- in her comments to the parties when we were

5  before her about a week ago to the day.

6     The issue that Judge Lefkow -- the stay that Judge

7  Lefkow was -- well, told us she was not -- would not grant

8  was a stay pending the -- a stay of her order pending the --

9  during the pendency of the appeal of this case to the

10  Seventh -- this issue to the Seventh Circuit.

11     But that's not what we're asking for here today.

12  We're not asking this Court to stay the order pending the

13  appeal.  The request is to stay the order pending the Seventh

14  Circuit's ability to hear the defendants' motion to -- the

15  defendants' emergency motion to stay that, that order.

16     THE COURT:  Yes, I --

17     MR. YAMIN:  And --

18     THE COURT:  -- understand the distinction.  I guess

19  my question is this.

20     You know, I haven't practiced before the Seventh

21  Circuit in years and years.  What's the practice?  If you

22  need a stay pending appeal or if you need an emergency stay

23  of some kind, do they have some judge that's like an

24  emergency judge sitting like I am sitting here before you who

25  you could go to and say, "Your Honor, we have an emergency.

10

1   Please stay Judge Lefkow's order"?

2          Because if so, I don't see any reason I need to do

3   anything.  Just go on upstairs and talk to those folks and

4   they'll either say "Yes" or "No," and that's the end of it.

5          MR. YAMIN:  Well, Your Honor, our concern is

6   that -- I don't mean -- I don't know, because I'm not an

7   appellate attorney, I don't know whether there will be a

8   ruling before 5:00 o'clock today.

9          THE COURT:  Why don't you find out and come back

10  here.

11         MS. LISKOW:  If I may, Your Honor?

12         I have a -- I know someone in the Clerk's Office in

13  the Seventh Circuit, and I spoke with her this weekend, and

14  she told me that there is a judge sitting who will be able to

15  consider their motion for a stay today.

16         THE COURT:  Well, you know what?  I am going to

17  enter and continue this emergency motion.

18         Come back at noon if you feel like you need a

19  ruling.  I suspect your -- my experience with the people

20  upstairs on emergencies is they spring into action.

21         MR. LOEVY:  Your Honor, but here's the problem

22  here.

23         THE COURT:  I suspect they will rule on this.

24         MR. LOEVY:  We haven't filed our response yet.

25  They filed at 5:00 o'clock on Friday.  We have a 20-page

Colleen M. Conway, Official Court Reporter

11

1    response that, you know, I'd like to be filing as we speak.

2         The Seventh Circuit may or may not have time to

3    resolve a 20-page motion and a 20-page response, but the fact

4    is the city had all week to seek emergency relief.  Now

5    they're saying, "The Seventh Circuit can't spring fast

6    enough.  You should overrule Judge Lefkow," and there's

7    nothing --

8         THE COURT:  I am not going to be interested in

9    overruling her, but I think, I really think that this is a

10   matter that the people upstairs will deal with promptly.

11        If you want to file something, Mr. Loevy -- my

12   experience is that you can do something promptly as well --

13   go right ahead and do it.

14        Come back at noon if you think you need any further

15   relief from me.

16        MR. LOEVY:  Thank you, Your Honor.

17        MS. YANOW:  Thank you, Judge.

18        MR. YAMIN:  Thanks, Your Honor.

19     (Adjournment of proceedings until 12:45 p.m.)

20

21

22

23

24

25

Colleen M. Conway, Official Court Reporter

12

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
    DIANE BOND,                          )
 3                                       )
              Plaintiff,                 )
 4                                       )
         vs.                             )  No. 04 C 2617
 5                                       )
    EDWIN UTRERAS, Chicago police officer,)
 6   Star No. 19901, et al.,             )  Chicago, Illinois
                                         )  July 16, 2007
 7              Defendants.              )  12:45 o'clock p.m.
          TRANSCRIPT OF PROCEEDINGS - Emergency Motion
 8      BEFORE THE HONORABLE REBECCA R. PALLMEYER
    APPEARANCES:
 9   For the Plaintiff:        MANDEL LEGAL AID CLINIC
                               BY:  MR. CRAIG B. FUTTERMAN
10                             6020 South University Avenue
                               Chicago, Illinois  60637
11                             (312) 702-9611

12   For the Petitioner:       LOEVY & LOEVY
                               BY:  MR. JONATHAN I. LOEVY
13                                  MS. SAMANTHA A. LISKOW
                               312 North May Street, Ste. 100
14                             Chicago, Illinois  60607
                               (312) 243-5900
15
    For Defendant City:        CITY OF CHICAGO, DEPT. OF LAW
16                             BY:  MR. GEORGE J. YAMIN, JR.
                               30 North LaSalle Street, #900
17                             Chicago, Illinois  60602
                               (312) 744-9010
18
    For Defendant Officers:    CITY OF CHICAGO, DEPT. OF LAW
19                             INDIVIDUAL DEFENSE LITIGATION
                               BY:  MS. GERI LYNN YANOW
20                             30 North LaSalle Street, #1400
                               Chicago, Illinois  60602
21                             (312) 744-2837

22   Also Present:             Jamie Kalven, Intervenor

23           COLLEEN M. CONWAY, CSR, CRR
                Official Court Reporter
24       219 South Dearborn Street, Room 2524-A
                Chicago, Illinois  60604
25                   (312) 435-5594
            colleen_conway@ilnd.uscourts.gov
```

13

1          (Proceedings in open court.)

2          THE CLERK:  04 C 2617, Bond versus Utreras, on a

3   continued motion.

4          MR. LOEVY:  After you, George.

5          MR. YAMIN:  Good morning, Your Honor.  George

6   Yamin -- or good afternoon.

7          George Yamin on behalf of Defendant City of

8   Chicago.

9          MS. YANOW:  Good afternoon, Judge.

10          Geri Lynn Yanow on behalf of the individual Chicago

11   police officers.

12          MR. LOEVY:  Hello, Your Honor.

13          Jon Loevy for the intervenor.

14          MR. FUTTERMAN:  Good morning -- good afternoon,

15   Your Honor.

16          Craig Futterman on behalf of plaintiff.

17          MS. LISKOW:  Good morning.

18          Samantha Liskow on behalf of Intervenor Jamie

19   Kalven, who is here with me.

20          THE COURT:  Good afternoon.

21          What's the word from the Court of appeals?

22          MR. LOEVY:  Well --

23          MR. YAMIN:  We have -- I have no word yet, Your

24   Honor, so I'm assuming it's --

25          THE COURT:  Right.  But, I mean, I can -- I didn't

**14**

1    assume they would rule.  I just thought you were going to be

2    able to find out whether they had an idea whether they would

3    be ruling today.

4              MR. YAMIN:  We have no word about whether they will

5    be ruling today or not.

6              THE COURT:  Did you check with them?

7              MR. YAMIN:  I checked with my -- with the appeals

8    division, yes.

9              THE COURT:  Did you check with the Court of

10   Appeals?

11             MR. YAMIN:  We didn't -- I have not checked

12   directly with the Court of Appeals.

13             THE COURT:  That's what I thought you were coming

14   back to tell me about right now.

15             MR. YAMIN:  Well, Your Honor, maybe there was some

16   confusion, then, about that.

17             I checked with the appeals division to see -- ask

18   them to tell me if -- or to contact me if they heard --

19   they -- I was told by our appeals division that they do not

20   know when there would be a ruling, and that they would

21   contact me if they learned that there would be a ruling.

22             They do not anticipate one before noon today, so --

23   I checked back with your courtroom deputy to see what made

24   sense about when we should come back, and we were told that

25   we should come back at noon as opposed to later in the day.

1        THE COURT:  Well, the only reason -- she did tell

2  me that you thought about coming back later in the day.  I

3  could have given you a half an hour or 15 minutes.  I just

4  thought you were going to be able to check with the Court of

5  Appeals and see whether they anticipated a ruling today.

6        My thought being if they are going to be issuing a

7  ruling today, there is really no reason for me to do

8  anything.  The order you have right now stays this until 5:00

9  this afternoon.

10        MR. LOEVY:  If we could be heard on that, Your

11  Honor?

12        THE COURT:  Sure.

13        MR. LOEVY:  In our view, it really doesn't matter

14  whether the Seventh Circuit does or does not tell us that

15  they are going to rule.

16        And, Your Honor, I respect that this morning your

17  instinct was while it makes a lot of sense to stay it until

18  the Seventh Circuit even tells us if they're going to stay

19  it, with due respect, Judge, they made that argument to Judge

20  Lefkow and she rejected it.

21        She -- there's a time urgency on this information.

22  The battle we won is to get the information out this week,

23  because this week, the city is debating the OPS ordinance.

24        They said to Judge Lefkow, "Keep it in place till

25  the Seventh Circuit decides," the same question they brought

16

1    to you.   Judge Lefkow said, "No."  She said, "5:00 o'clock
2    Monday.  No extensions.  If you bring the motion that Mr.
3    Yamin brought, I am going to deny it.  I'm denying it in
4    advance.  It's up to you to get relief from the Seventh
5    Circuit by 5:00 o'clock Monday or this expires."
6             And what they -- they summarized that to the
7    Seventh Circuit.  They're -- on the brief -- I mean, I saw
8    it, and it might look like you might even have it in front of
9    you.
10            THE COURT:  I have seen it, right.
11            MR. LOEVY:  And on page 5 and 6, at the bottom of 5
12   and top of 6, they say:  "A request to the District Court for
13   further stay is futile in light of what the District Court
14   said," and they're asking you to overrule Judge Lefkow, Your
15   Honor.
16            And they could have asked Judge Lefkow to overrule
17   Judge Lefkow.  They would have had to bring it to her on
18   Friday.  But, as Mr. Futterman pointed out to me, her website
19   said she is going to be gone this week.  They waited till
20   Monday.  And they thought they were going to bring it to
21   Judge Keys, who is the magistrate.  But they are seeking
22   another bite at the apple that Judge Lefkow has already told
23   them is not going to happen.
24            This is not the usual situation.  Judge Lefkow
25   ruled that, "In light of the time urgency, you are not

Colleen M. Conway, Official Court Reporter

17

1    getting anything past Monday at 5:00," so -- and then I

2    forgot the final part, Your Honor, is knowing Judge Lefkow

3    told them that, they waited till Friday at 5:00 to file their

4    appeal.

5                THE COURT:  When did she --

6                MR. YAMIN:  Your Honor --

7                THE COURT:  When did she rule?

8                MR. LOEVY:  This was Monday, a week ago.

9                MR. FUTTERMAN:  Right.

10               MR. LOEVY:  And they waited till the end of the

11   week.  "So if the Seventh Circuit is squeezed," she told

12   them, "you're not getting relief unless the Seventh Circuit

13   bails you out."

14               MR. YAMIN:  Your Honor, I'd like to address those

15   various representations.

16               THE COURT:  Sure.

17               MR. YAMIN:  First, I apologize.  I misunderstood

18   what our directive was when we left court.

19               I do not -- I wish I could tell you the answer to

20   your question.

21               But as to what Mr. Loevy said, a couple things.

22   First, there is no harm to anyone but the defendants if this

23   stay is not continued for whatever time it takes for the

24   Seventh Circuit to rule on the defendants' emergency motion.

25   There's no harm to the intervenor.

Colleen M. Conway, Official Court Reporter

18

1          And in terms of what Mr. Loevy is saying about time

2     urgency, that issue was addressed by Judge Lefkow and

3     addressed to the satisfaction of any -- of the individuals

4     that the petitioner claims have an issue in terms of the stay

5     being lifted or continued, namely, public officials who would

6     be participating in the city council when the city council

7     addresses the issue of whether -- what to do with the Office

8     of Professional Standards, whether to -- when it addresses

9     the ordinance that's before the council.

10          Excuse me.  The order that Judge Lefkow entered a

11     week ago lifted the stay as to the defendants.  So if there's

12     any public official who has an interest in the documents that

13     are in question, any aldermen -- I think we all know who

14     we're talking about -- they can contact the city, the city

15     attorneys, and the city attorneys can provide them with that

16     information.

17          I have not been contacted.  I don't know if Ms.

18     Georges has been contacted.  Mr. Loevy has represented last

19     time that aldermen have contacted him about this issue.

20          I assume if they have addressed -- if they have

21     gone to him and said, "What's up with these documents?" and

22     "What's up with the Court order?" he would have referred them

23     to the order of July 9, which said that you can go to the

24     city and the city can provide you with whatever information

25     you think is pertinent and timely to vote as you need to or

19

1    as you see fit on July 19 when the ordinance is presented.

2          So there's absolutely no -- this issue of time

3    urgency on anybody's side other than the defendants' is a

4    false issue.

5          The harm that -- but there is potential harm if the

6    stay is not continued until the Seventh Circuit has a chance

7    to rule on the emergency motion that is before it, which is

8    all we are asking you to rule on.

9          THE COURT:  But you know what?  Mr. Yamin, that

10   motion is before the Court of Appeals.

11         Your motion, what you are asking me to do is the

12   very same thing you are asking the Court of Appeals to do,

13   the very same thing.  You are asking the Court of Appeals to

14   stay the release of this material until they have ruled on

15   the substance of your appeal, and that's exactly what you are

16   asking me to do.

17         MR. YAMIN:  Actually, Your Honor, I have to

18   disagree with that.

19         We're not asking this Court to stay Judge Lefkow's

20   order pending the appeal.  We are asking this Court to stay

21   Judge Lefkow's order pending the Seventh Circuit's ruling on

22   an emergency motion.  Those are two different actions on the

23   Appellate Court level.

24         THE COURT:  But isn't that emergency motion that

25   you've got filed with the Court of Appeals --

20

1          MR. YAMIN:  Yes, Your Honor.

2          THE COURT:  -- an emergency motion relating to the

3     release of this data?

4          MR. LOEVY:  Yes.

5          MR. YAMIN:  Yes, Your Honor.

6          THE COURT:  Mr. Yamin, I understand the concern.

7     This motion is denied.

8          MR. LOEVY:  Thank you, Your Honor.

9          MS. LISKOW:  Thank you.

10          THE COURT:  Thank you.

11          MR. YAMIN:  Thank you, Your Honor.

12          MS. YANOW:  Thank you.

13      (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Colleen M. Conway, Official Court Reporter

1                C E R T I F I C A T E

2

3

4

5        I, Colleen M. Conway, do hereby certify that

6 the foregoing is a complete, true, and accurate transcript of

7 the proceedings had in the above-entitled case before the

8 Honorable REBECCA R. PALLMEYER, one of the Judges of said

9 Court, at Chicago, Illinois, on July 16, 2007.

10

11

12                                       8/7/07

        Official Court Reporter             Date

13     United States District Court

     Northern District of Illinois

14         Eastern Division

15

16

17

18

19

20

21

22

23

24

25

Colleen M. Conway, Official Court Reporter



## CITY COUNCIL
### CITY OF CHICAGO

## COUNCIL CHAMBER
CITY HALL   Room 200
121 NORTH LaSALLE STREET
CHICAGO, ILLINOIS 00002
TELEPHONE 312-744-2090

**COMMITTEE MEMBERSHIPS**

**TONI PRECKWINKLE**
ALDERMAN 4th WARD
4649 South Cottage Grove Avenue
Suite 105
Chicago, Illinois 60653
TELEPHONE 772-536-8105
FAX 773-536-7296

August 23, 2007

Mara Georges
Corporation Council
121 North LaSalle Street, Room 600
Chicago, IL 60602

Dear Ms. Georges:

Thank you for distributing the lists of police officers with more than ten civilian complaints in a five year period after Judge Lefkow's ruling that these documents are public information. We are writing to request a fresh copy of the lists without the names of the officers redacted as well as a copy of the complaint register files that were too voluminous to include in the original package provided to us on July 17th.

Thank you for your prompt attention to this matter.

Sincerely,

Toni Preckwinkle
Alderman, 4th Ward

**EXHIBIT**

E

10/09/2007 09:30 FAX 773 702 2063     Mandel Legal Aid Clinic          ☑003
SEP.26.2007 16:31 1312 427 6130       COMMUNITY RENEWAL SOCIETY      #5787 P.003/003

Sep 26 2007 0:44       4th Ward                        773 536-7296        P.3



City of Chicago
Richard M. Daley, Mayor

Department of Law

Mara S. Georges
Corporation Counsel

City Hall, Room 600
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-6900
(312) 744-8538 (FAX)
(312) 744-2963 (TTY)

http://www.ci.chi.il.us

September 11, 2007

The Honorable Toni Preckwinkle
Alderman, 4th Ward
121 North LaSalle Street, Room 209
Chicago, Illinois 60602

Dear Alderman Preckwinkle:

I have received your August 30, 2007 letter requesting unredacted copies of the list of police officers with more than ten civilian complaints in a five-year period, as well as copies of the complaint register files. These documents are the subject of a pending appeal that seeks to maintain their confidentiality, and we wish to avoid any possibility that allowing them to be reviewed would affect that appeal. I hope you understand that I will, therefore, be unable to fulfill your request.

Sincerely,

Mara S. Georges
Corporation Counsel

MSG:md





EXHIBIT
F



www.chicagotribune.com/services/newspaper/printedition/thursday/chi-finnigan_27sep27,0,4096903.story

# chicagotribune.com

## Cop held in murder plot

### U.S. says fellow officer wore wire

By David Heinzmann and Todd Lighty

Tribune staff reporters

September 27, 2007



Win 1 of 3 Trips to London   ENTER HERE
DO LONDON LIKE A LOCAL
TOTALLY LONDON
LONDON'S OFFICIAL WEBSITE

When Chicago Police Officer Jerome Finnigan talked to a fellow indicted cop about killing another officer providing information against them in a corruption probe, he worried about leaving fingerprints on a photo of the target, according to charges filed Wednesday.

But he didn't worry about the cop sitting next to him. He believed they were in the plot together, federal prosecutors said, and that both would benefit from hiring someone to kill their former fellow officer.

Authorities involved in the investigation said Finnigan had good reason to feel comfortable; they could not recall a Chicago police officer ever wearing a wire to gather evidence on another city cop.

Until now. The other officer talking to Finnigan about whether to hire a gang member or a professional hit man for the slaying was secretly recording the conversations, and the FBI and federal prosecutors were listening in.

Finnigan, 44, already at the center of a widening probe of corruption, kidnapping and robbery in the Police Department's Special Operations Section, was charged Wednesday with plotting the murder-for-hire of a former police officer. The unit polices high-crime areas and focuses on making gang and drug arrests.

"The complaint charges that in the face of serious pending state charges and a federal investigation that could result in additional charges, the defendant solicited the murder of a fellow police officer who he believed would be a witness against him," U.S. Atty. Patrick Fitzgerald said. "The gravity of this conduct speaks for itself."

The police officer who wore the wire began cooperating recently and immediately told investigators of the plot to kill another former SOS team member, authorities said. The man is no longer a police officer, but he has been named in several civil lawsuits that claimed he was part of Finnigan's team that robbed, kidnapped and falsely arrested people over several years.

Finnigan was arrested between 6:30 and 7 a.m. Wednesday outside his house in the 5200 block of South Sayre Avenue, Fitzgerald said.

Shackled at the feet and dressed in jeans and a faded green sweat shirt turned inside out, Finnigan appeared briefly in court Wednesday afternoon. U.S. Magistrate Judge Jeffrey Cole ordered him held until a bond hearing Monday morning.

In asking that the hearing be set for Monday instead of sooner, prosecutors said they planned to present new evidence and possibly new charges.

In telephone recordings made last week, Finnigan and the officer discussed whether they should hire a member of a Hispanic street gang or a "professional hit man" to kill the officer, referring to the planned hit as a "paint job," authorities said.

The recordings also captured the officers talking about the possibility of killing an additional officer, who they believed was also cooperating with authorities, according to the charges.

Authorities said Finnigan and the other officer discussed killing up to four fellow cops.

Attorney Joseph Lopez said that a client, Frank Villareal, was one of the targets. Villareal was one of two police officers charged months after the original arrests in the case that netted Finnigan and Officers Keith Herrera, Carl Suchocki and Tom Sherry.

Finnigan is alleged to have had multiple meetings and phone conversations with the cooperating police officer over the last week.

In a recorded conversation last week at Finnigan's home, he said he "wished he had kept a silencer he had for a weapon," according to an FBI affidavit filed in court Wednesday.

Finnigan also allegedly showed the undercover witness a photo of the officer he wanted to kill that "he had cut from a larger photo containing other members of their SOS team," according to the affidavit. He allegedly planned to give the photo to a gang member to help identify the target.

According to the criminal complaint, the officer whom Finnigan allegedly wanted killed had moved to a new address, but he said that would not be a problem.

"I got the brand-new one," Finnigan said, according to charges. "You know why? [He] sent me a card to his son's graduation party. He sent me the brand-new address. Oh, yeah, dude. I got the new address."

The complaint alleges that Finnigan had been planning to kill the former officer since at least July and that he told the cooperating witness after an Aug. 7 court hearing that the "paint job" was "all taken care of."

Finnigan's lawyer, Michael Ficaro, declined to comment.

A family member who asked not to be named said Finnigan grew up in various Chicago neighborhoods, attended high school in Las Vegas and worked as a carpenter before becoming a police officer. His father was a painting contractor who moved the family often, the relative said.

He is married and has a teenage son, the relative said.

Campaign disclosure records show Finnigan has made $2,500 in donations to the campaign fund of DuPage County State's Atty. Joseph Birkett between 2004 and 2006. Birkett couldn't be reached for comment.

Finnigan, who joined the Police Department in 1988, was given the department's award for valor for heroism in the line of duty in 1999.

Since at least 2002, Finnigan and other SOS officers allegedly robbed and, in some cases, kidnapped suspected drug dealers and citizens with no criminal background.

In one case, four SOS officers drew their guns to clear out a Southwest Side bar and then forced the owner to take them to his suburban home, where he was robbed of thousands of dollars, the initial state charges alleged.

In another, the officers allegedly ransacked a man's safe, stealing cash and a 1952 Mickey Mantle baseball card worth as much as $20,000. They also allegedly handcuffed a pregnant woman after she tried to call for help when she found them in her South Side home.

Prosecutors alleged they took hundreds of thousands of dollars, if not more. Cook County State's Atty. Richard Devine said Wednesday that investigators are still working to account for all the money they believe may have been stolen from people. Internal Revenue Service investigators are involved in the case, attempting to trace money allegedly stolen.

The Tribune reported in August that federal prosecutors were joining the Cook County state's attorney's investigation of SOS. Investigators are also looking into the Chicago Police Department's internal affairs division, which was aware of the allegations against Finnigan and several other officers for at least four years but took no action.

Sources familiar with the investigation said that internal affairs "did very little" to investigate the claims from people who said they were robbed by SOS officers. But a spokeswoman for the Chicago Police Department said Wednesday that the department fully investigated claims against SOS and had tried to get the state's attorney's office to prosecute them earlier.

- - -

Case history

SEPTEMBER '06

Four Chicago police officers, including Jerome Finnigan, are charged in alleged robbery ring.

AUGUST '07

Federal prosecutors join probe of elite police squad.

SEPTEMBER '07

Finnigan charged in murder-for-hire plot against former fellow police officer.

----------

dheinzmann@tribune.com

tlighty@tribune.com

Copyright © 2007, Chicago Tribune

Back to regular view      Print this page

**Among the worst**

**POLICE | Officer in elite unit may have benefitted from 'circle-the-wagons mentality': expert**

October 7, 2007
BY FRANK MAIN Staff Reporter/fmain@suntimes.com

Jerome Finnigan, the Chicago cop charged with spearheading a home-invasion crew and plotting to kill a former officer, was third in the city in the number of complaints lodged against him, records show.

Finnigan, 44, generated 52 complaints between 2001 and 2005. He and six other officers were charged by the Cook County state's attorney last year in a major corruption investigation. Finnigan also was charged recently with trying to arrange the murder of an ex-officer prepared to testify against him.

The city -- citing privacy concerns and other issues -- is fighting in court to keep secret the names of officers with 10 or more complaints over that period. It has provided aldermen with a list of complaints against those officers, but their names were blacked out.

The Sun-Times was able to confirm Finnigan was No. 3 by analyzing the complaint numbers.

Other officers from Finnigan's unit -- the Special Operations Section -- were No. 1 and No. 2 on the list. And the former officer he allegedly plotted to kill also was on the list with 36 complaints against him, according to the Sun-Times analysis.

**Top brass now reviewing list**

The department has been evaluating the operational structure of SOS, said Monique Bond, spokeswoman for the Chicago Police Department.

She said interim Supt. Dana Starks has begun holding weekly meetings with top staff members to study potential problems posed by officers with repeated complaints.

The meetings are intended to identify patterns of misbehavior before they become severe problems, Bond said.

Most of the complaints against Finnigan, which were not specified in the documents the Sun-Times analyzed, were deemed by Police Department investigators to be unfounded or not sustained.

Prosecutors later found some of those same complaints to be valid and charged Finnigan and six fellow officers, including a sergeant, with crimes such as home invasion, robbery and kidnapping.

**3 more cops stripped of power**

On Friday, the department moved to strip the police powers of three additional SOS officers suspected of misconduct in a bar search in March 2004 on the Southwest Side, Bond said.

A videotape raised questions about the constitutionality of the search and whether the arrest report was falsified, officials say. Charges were dropped against two men arrested on drug charges after prosecutors saw the tape.

Bond said police did not know about the tape until recently, adding that no official complaints were filed against the officers at the time.



Case: 1:04-cv-02617 Document #: 285-2 Filed: 10/22/07 Page 75 of 75 PageID #:3052

Tom Nolan, a former Boston police lieutenant and a professor of criminal justice at Boston University, said the latest Chicago scandal is similar to one in Los Angeles involving an elite citywide unit.

"Part of the culture is a circle-the-wagons mentality," Nolan said. "The tendency is to sweep this stuff under the rug initially."

Some officers initially considered good street cops -- like Finnigan was, according to colleagues -- cross a line and start violating constitutional rights to make arrests, Nolan said.

"This starts with petty rule violations," he said. "Before you know it, officers become frustrated and want to take matters into their own hands."

Eventually, they can rationalize taking money from a drug dealer, Nolan said

Finnigan had been a member of the Special Operations Section since 1993.

"You leave people in a specialized unit that long, that's a recipe for trouble," Nolan said.

Nolan said the Chicago Police Department should take a hard look at disbanding the SOS unit and reconfiguring its duties into another entity to send the public a message that such behavior is not tolerated

Still, the Chicago Police Department enjoys a good reputation for fighting crime, which is down this year, and is seen as a leader in community policing, Nolan said.

"The baby does not need to be thrown out with the bath water," he said.

JEROME FINNIGAN -- COMPLAINTS BY THE NUMBERS

3 52

Where he ranks in the number of complaints filed against him

Number of complaints filed against him between 2001 and 2005