

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 07-2651

DIANE BOND,

*Plaintiff,*

*v.*

EDWIN UTRERAS, ANDREW SCHOEFF, CHRIST SAVICKAS,
ROBERT STEGMILLER, and JOSEPH SEINITZ, in their
individual capacities; PHILLIP CLINE, Superintendent
of the Chicago Police Department, TERRY HILLARD,
Former Superintendent of the Chicago Police Department,
and LORI LIGHTFOOT, Former Chief Administrator of the
Office of Professional Standards, in their official capacities;
and CITY OF CHICAGO,

*Defendants-Appellants,*

*v.*

JAMIE KALVEN,

*Intervenor-Appellee,*

*and*

TONI PRECKWINKLE, et al.,

*Intervening Appellees.*

———————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2617—**Joan Humphrey Lefkow**, *Judge.*

———————————

No. 07-2651

Argued June 3, 2008—Decided November 10, 2009

———————

Before Kanne, Sykes, and Tinder, *Circuit Judges*.

Sykes, *Circuit Judge.*  Diane Bond sued the City of Chicago and several members of its police department, claiming that the officers violated her constitutional rights while performing official duties. During discovery, the City turned over voluminous material relating to citizen complaints against its police officers; the information was subject to a protective order that prohibited public disclosure of these confidential records. The documents produced during discovery were never filed with the court nor used in any judicial proceeding.

Bond eventually settled with the City and its officers (collectively "the City"), and the parties submitted a stipulation and order for dismissal to the district court. Just before the court entered the order, however, independent journalist Jamie Kalven petitioned for permission to intervene so he could challenge the protective order. Kalven claimed that under Rule 26(c) of the *Federal Rules of Civil Procedure*, there was no "good cause" to maintain the protective order and asked that it be modified to allow him access to some of the documents pertaining to citizen complaints against Chicago police officers. (Kalven is joined on appeal by 28 Chicago aldermen who also want access to these police department records.) The district judge dismissed the case with prejudice pursuant to the parties' stipulation but

said she would keep the case "open" for purposes of entertaining Kalven's intervention petition.

Bond did not join Kalven's request to modify the protective order. The City objected to any modification, arguing that the order should be left in place given the department's interest in keeping these records confidential. A few months after dismissing the case, the district judge entered an order simultaneously granting Kalven's request to intervene and lifting the protective order in its entirety. The City appealed, and we stayed the district court's order.

We now vacate that order; Kalven's petition should have been dismissed for lack of standing. The controversy originally supporting the court's jurisdiction no longer existed at the time the court acted on Kalven's petition; the parties had settled, the case was dismissed with prejudice, and neither Bond nor the City asked the court to revisit and modify the terms of the protective order postjudgment. With no live controversy ongoing, Kalven was required to demonstrate his standing to intervene and resuscitate the case—that is, he was required to establish that he met the requirements of Article III by showing an actual or imminent invasion of a legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Although no one challenged his standing below or on appeal and the district court did not independently address it, we are required to satisfy ourselves that jurisdictional prerequisites are met. We conclude they are not.

Kalven claims no constitutional or common-law right to challenge the protective order—rightly so, because

there is no constitutional or common-law right of public
access to discovery materials exchanged by the parties
but not filed with the court. Unfiled discovery is private,
not public. Furthermore, Bond has not asserted an
interest in disseminating the documents (she agreed to
the protective order and did not ask that it be modified),
so Kalven cannot, and does not, claim a derivative
First Amendment right to receive them. Instead, Kalven
based his intervention petition on a supposed "presump-
tion" of public access emanating from Rule 26(c)'s "good
cause" requirement. There is no such presumption
for discovery that is not part of the court file and
therefore no "right" or legally protected interest to
support Kalven's standing to intervene. The district court
lacked any alternative jurisdictional basis to revisit and
revoke the protective order sua sponte. Accordingly,
we vacate the court's order permitting intervention and
lifting the protective order, and remand with instruc-
tions to dismiss Kalven's petition for lack of standing.

## I. Background

This appeal arises out of a § 1983 action Diane Bond
filed in 2004 against eight Chicago police officers and
supervisors and the City of Chicago. Bond alleged that
the police officers had subjected her to various forms of
physical and mental abuse while performing their
official duties. During pretrial discovery, the parties
agreed to a protective order that prohibited public disclo-
sure of certain confidential materials. The order covered
"employment, disciplinary, [and] investigatory" informa-

tion; "other information that is of a sensitive or non-public nature" about Chicago police officers; and "files generated by the investigation of complaints of misconduct by Chicago police officers" (what the City calls "Complaint Register files" or "CR files"), including information that could be used to identify the officers. In response to Bond's discovery requests, the City produced thousands of pages of documents; some of those documents were categorized as confidential under the protective order and therefore are subject to the nondisclosure requirement. None of the discovery was filed with the court.

The parties eventually settled Bond's claims, and in March 2007 they submitted an agreed order of dismissal to the district court. On March 23, 2007, the court signed and entered the order dismissing the case with prejudice. A week before, however, on March 15, 2007, Jamie Kalven, an independent journalist, filed a "Petition to Intervene and Motion to Unseal Public Documents Relating to Allegations of Police Misconduct." This phrasing was odd. The court had never been asked to seal any documents in the court record; as such, there were no "sealed public documents" to "unseal." It was clear from the petition, however, that Kalven sought modification of the protective order and access to certain categories of documents the City had produced during discovery. He later narrowed the list of documents he seeks, but all involve the police department's confidential records of citizen complaints filed against its officers. A docket entry recording the entry of the dismissal order noted that the case was dismissed with prejudice but also stated that "[t]he case remains open for the purpose of the

Court retaining jurisdiction over the pending petition of Jamie Kalven to intervene and motion to unseal public documents relating to allegations of police misconduct."

The City did not oppose Kalven's intervention but strongly objected to his challenge to the protective order, arguing that "good cause" continued to support keeping the documents confidential. *See* FED. R. CIV. P. 26(c)(1). Bond did not join Kalven's request to modify the protective order and made no substantive response to his petition. On July 2, 2007, the district court entered an order allowing Kalven to intervene and rescinding the protective order in its entirety. The court reevaluated whether "good cause" existed to keep the documents confidential, and in so doing applied a "presumption" of public access to discovery materials. The court further concluded that the public interest in information about police misconduct outweighed the interest of the City and its officers in keeping the records confidential. The district court did not affirmatively order that the documents be provided to Kalven; rather, the court lifted the protective order, thereby permitting either party to disclose the discovery documents.[1] The City appealed the district court's order and moved for a stay pending appeal. A motions panel of this court granted that motion.

While the City's appeal was pending, 28 Chicago aldermen attempted to intervene in the district court to

---

[1] Bond all but disappeared from this case after she settled her claims with the City. As we have noted, she filed only an inconsequential nonsubstantive response and has not otherwise supported or opposed lifting the protective order.

obtain access to the police department's confidential documents. The aldermen wanted the records to help them decide whether to adopt a proposal to separate the police department's oversight board from the police department itself. The district court concluded that it lacked jurisdiction because of the pending appeal, *see Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *United States v. McHugh*, 528 F.3d 538, 540 (7th Cir. 2008), and the aldermen appealed the district court's jurisdictional ruling. A motions panel dismissed that appeal but allowed the aldermen to intervene in this one. Thus, as this case comes to us, the aldermen and Kalven have identical positions; they defend the district court's decision to lift the protective order.[2]

## II. Discussion

The *Federal Rules of Civil Procedure* broadly permit parties in litigation to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). Given the "extensive intrusion into the affairs of both litigants and third parties" that is both permissible and common in modern discovery, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30 (1984), the rules provide for the use of protective orders, entered "for good cause," to protect litigants and third parties from the "annoyance, embarrassment, oppres-

---

[2] Because their positions are essentially identical, we omit repetitious reference to the aldermen and generally refer only to Kalven as the proponent of the district court's order.

sion, or undue burden or expense" that may attend the discovery process, FED. R. CIV. P. 26(c)(1). Protective orders are often entered by stipulation when discovery commences. That was the procedure used here.

In addition to prohibiting the public disclosure of certain categories of confidential discovery material, the agreed protective order provided that upon request at the termination of the proceeding, the documents designated as confidential would be returned to the producing party. The protective order also provided, however, that before a party could submit documents otherwise subject to the protective order to the court under seal, the party would have to file a separate motion and obtain a court order permitting the documents to be filed under seal. This provision was consistent with the requirements explained in *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544 (7th Cir. 2002), and *Citizens First National Bank of Princeton v. Cincinnati Insurance Co.*, 178 F.3d 943 (7th Cir. 1999), for submitting documents to the court under seal.

It never came to that. None of the discovery material—not that which was covered by the protective order nor any other discovery—ever found its way into the court file. Bond settled with the City, and the case was dismissed with prejudice.[3] Nevertheless, the district court, postjudgment, entertained Kalven's petition to intervene. Without addressing the matter of Kalven's standing,

---

[3] It is not clear whether the City ever asked Bond to return the confidential material it produced during discovery, as contemplated by the agreed protective order.

the district court permitted the intervention and rescinded the protective order.

That was a mistake. Although we have previously held that permissive intervention is a procedurally appropriate device for bringing a third-party challenge to a protective order, *see Jessup v. Luther*, 227 F.3d 993, 996-97 (7th Cir. 2000); *In re Associated Press*, 162 F.3d 503, 507 (7th Cir. 1998); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 896 (7th Cir. 1994), that was in the context of requests for access to sealed records in the court file (*Jessup, Associated Press*) and requests for intervention made during ongoing litigation (*Grove Fresh*).[4] Here, in

---

[4] *Grove Fresh* involved two sets of intervenors: (1) plaintiffs in collateral litigation against the same defendants, seeking access to the discovery in the *Grove Fresh* litigation as a shortcut to discovery in their own cases; and (2) a coalition of media representatives. Regarding the first group of intervenors, this court held that the request was governed by *Wilk v. American Medical Ass'n*, 635 F.2d 1295 (7th Cir. 1981), which authorized collateral litigants to obtain access to discovery on the same terms as the litigants in the case before the court. *Grove Fresh*, 24 F.3d at 896. *Wilk* did not address either the intervenors' standing *or* the standards for intervention under Rule 24 but instead skipped directly to the merits of the collateral litigants' request for access to discovery. This aspect of the *Grove Fresh* opinion, *Wilk*, and other cases addressing the issue of collateral litigants' access to discovery in parallel litigation have little relevance here. To the extent, however, that these cases are premised upon a principle that "'pre-trial discovery must take place in . . . public unless compelling reasons exist

(continued...)

contrast, the litigation was over, the case was dismissed, and Kalven wanted to intervene in order to press a claimed right of access to *unfiled* discovery material; as such, the question of his standing should have been addressed. Although the parties and the district court omitted this threshold inquiry, and the City did not raise the issue on appeal, we have an independent obligation to address it. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 230-31 (1990) (federal courts "are under an independent obligation to examine their own jurisdiction"); *Craig v. Ont. Corp.* 543 F.3d 872, 877 (7th Cir. 2008).

## A. The Relationship Between Article III and Rule 24(b)

The exercise of federal judicial power is legitimate only in live "cases" or "controversies," and "'one of the controlling elements in the definition of a case or controversy under Article III' is standing." *Hein v. Freedom From Religion Found., Inc.*, 127 S. Ct. 2553, 2562 (2007) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (plurality opinion)) (internal alteration omitted). The Supreme Court has described standing as "perhaps the most important . . . [Article III] doctrine[]." *Allen v. Wright*, 468 U.S. 737, 750 (1984). "In essence the question of standing is

---

[4]  (...continued)
for denying the public access to the proceedings,'" *Wilk,* 635 F.2d at 1299 (quoting *Am. Tel. & Tel. Co. v. Grady,* 594 F.2d 594, 596 (7th Cir. 1978)), they have been superseded by the 2000 amendment to Rule 5 of the *Federal Rules of Civil Procedure. See infra* pp. 25-26.

No. 07-2651                                                11

whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "To qualify as a case fit for federal-court adjudication," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997), there must be "an actual controversy [in existence] at all stages of review, not merely at the time the complaint is filed," *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974). "If a dispute is not a proper case or controversy, the courts have no business deciding it . . . ." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

The standing issue that arises here is complex because it involves the relationship between the requirements of Article III and the rules for permissive intervention under Rule 24(b) of the *Federal Rules of Civil Procedure*. There is some confusion as to whether permissive intervenors must, as a general matter, independently demonstrate standing before they can be allowed to enter a lawsuit. The Supreme Court has said generally that Rule 24(b) "plainly dispenses with any require-ment that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation," *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940), but has also observed that "an intervenor's right to *continue* a suit in the absence of the party on whose side inter-vention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of [Article] III," *Diamond v. Charles*, 476 U.S. 54, 68 (1986) (emphasis added). Some circuits have concluded that permissive intervenors do not need to show standing "*so*

*long as* another party with constitutional standing on the same side as the intervenor remains in the case." *San Juan County, Utah v. United States*, 420 F.3d 1197, 1206 (10th Cir. 2005), *aff'd*, 503 F.3d 1163 (10th Cir. 2007) (en banc) (emphasis added); *see also Shaw v. Hunt*, 154 F.3d 161, 165-66 (4th Cir. 1998) (intervenors do not need to show standing to obtain attorney's fees under 42 U.S.C. § 1988).

This circuit has not directly addressed the relationship between Article III and Rule 24(b).[5] Although we

---

[5] *Jessup* and *Associated Press* do not address standing at all. *Grove Fresh* refers only summarily to the question of the intervenors' standing. At one point, addressing the collateral litigants' request for access to discovery, the opinion collapses the jurisdictional question into a question of the procedural propriety of intervention. *Grove Fresh,* 24 F.3d at 896 ("It is apparent . . . that intervention is the procedurally appropriate course for third-party challenges to protective orders. . . . Hence, [the defendants'] jurisdictional challenges are unavailing."). But the procedural propriety of using Rule 24(b) does not answer the separate question of whether the requirements of Article III must be or have been satisfied. At another point *Grove Fresh* broadly states without analysis that "the press does have standing to challenge a protective order for abuse or impropriety." *Id.* at 898. Following this statement are citations to a case from this circuit regarding access to sealed documents in court files, *In re Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir. 1984), and an Eleventh Circuit case regarding intervention for purposes of challenging a protective order in an ongoing suit, *In re Alexander Grant & Co. Litigation,*
(continued...)

have held that standing is necessarily a component of intervention as of right under Rule 24(a), *see Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996), we have also noted that it is an "open question in this circuit . . . whether Article III standing is required for permissive intervention under Rule 24(b)," *Transamerica Ins. Co. v. South*, 125 F.3d 392 (7th Cir. 1997); *but see Flying J, Inc. v. J.B. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009) (stating without discussion that a permissive intervenor must establish Article III standing). Regarding intervention in general, we have recognized that "at some fundamental level the proposed intervenor must have a stake in the litigation" in order to satisfy Article III. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000).

In the typical permissive-intervention case, a third party wants to join a lawsuit to advocate for the same outcome as one of the existing parties. *See Horne v. Flores*, 129 S. Ct. 2579, 2591 (2009) (group of legislators intervened to argue a contempt order should be lifted—the same relief that one of the parties to the case sought). In this typical case, the permissive intervenor may not need to show standing for the same reason that not every plaintiff in a lawsuit is required to show standing: As long as there

---

[5]  (...continued)
820 F.2d 352 (11th Cir. 1987). Here, the documents Kalven seeks are not in the court file, and the lawsuit had been settled and dismissed at the time the district court permitted him to intervene.

is "at least one individual plaintiff who has demon-
strated standing to assert these rights as his own," a court
"need not consider whether the other . . . plaintiffs have
standing to maintain the suit." *Vill. of Arlington Heights v.
Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). In
this situation, "[t]he case will proceed and the concrete
dispute must be resolved whether the intervenor is there
or not," and therefore the intervenor's standing is irrele-
vant to the court's power to decide the case. *Bethune
Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 531 (7th Cir. 1988);
*accord Ruiz v. Estelle*, 161 F.3d 814, 828-34 (5th Cir. 1998).

Intervention for purposes of challenging a protective
order is an unusual species of permissive intervention
that triggers its own unique standing issues. Rule 24(b)
allows intervenors to join as parties to a lawsuit when
they raise a "claim" or a "defense" that "shares with the
main action a common question of law or fact."[6] FED. R.
CIV. P. 24(b)(1)(B). We have held that this language is
broad enough to encompass a third-party challenge to a
protective order even though it is not a neat fit: The
"interest" being asserted by such an intervenor is not
really a "claim" or "defense." *See Jessup*, 227 F.3d at 998;
*Grove Fresh*, 24 F.3d at 896; *see also EEOC v. Nat'l Children's
Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) ("On its

---

[6] The rule also authorizes permissive intervention in other
circumstances not relevant here. *See* FED. R. CIV. P. 24(b)(1)(A)
(authorizing intervention where the intervenor "is given a
conditional right to intervene by a federal statute"), and FED. R.
CIV. P. 24(b)(2) (authorizing intervention by a government
officer or agency).

face, Rule 24(b) would appear to be a questionable pro-
cedural basis for a third-party challenge to a confiden-
tiality order.").

Also, when a third party intervenes to challenge a
protective order, it cannot be said to have intervened on
an existing party's "side" unless that party *also* opposes
the protective order. Where, as in many cases and in this
case, the protective order is entered by stipulation of the
parties, "the extra litigant . . . is not simply along for
the ride" but rather shifts the progress of the lawsuit in
a new direction to obtain relief that neither the plaintiff
nor the defendant may want. *Bethune Plaza*, 863 F.2d at
531. Intervention to challenge a protective order after a
case has been dismissed interferes even more fundamen-
tally: It revives a concluded case for the purpose of enter-
taining an outsider's claim of interest in the proceeds of
the parties' discovery process. Rule 24(b) specifically
provides that in deciding whether to permit intervention,
"the court *must* consider whether the intervention will
unduly delay or prejudice the adjudication of the orig-
inal parties' rights." FED. R. CIV. P. 24(b)(3) (emphasis
added). This language suggests that intervention
postjudgment—which necessarily disturbs the final
adjudication of the parties' rights—should generally be
disfavored.

For our purposes here, we may set to one side the
question whether a permissive intervenor must establish
standing to challenge a protective order in an ongoing

case.[7] The question for us is whether an intervenor must establish standing to challenge a protective order after the case has been dismissed. The answer is "yes."

This conclusion flows from the established general principle, noted above, that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed" in order "[t]o qualify as a case fit for federal-court adjudication." *Arizonans for Official English*, 520 U.S. at 67 (internal quotation marks omitted). The Supreme Court has also suggested, if not directly held, that permissive intervenors must show standing if there is otherwise no live case or controversy in existence. For example, in *Arizonans for Official English*, the Court expressed "grave doubts" about the standing of a group of intervenors that had been permitted to enter the

---

[7] Accordingly, we do not decide whether a permissive intervenor needs independent standing to intervene in a live controversy for the purpose of challenging a protective order. We note, however, that most cases addressing third-party challenges to protective orders in ongoing lawsuits overlook the standing question, and those that do address it are conflicting. *Compare, e.g., Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006) (an intervenor may enter an ongoing lawsuit to challenge a protective order without independent standing); *with Okla. Hosp. Ass'n v. Okla. Publ'g Co.*, 748 F.2d 1421 (10th Cir. 1984) (third party lacked standing to intervene prejudgment to challenge protective order). As we have explained above, to date our circuit's consideration of the question has been conclusory. *See supra* n.5.

lawsuit as defendants-appellants to challenge an adverse decision of the district court; under the unusual procedural circumstances of the case, the original defendants had not challenged the adverse decision and were no longer considered parties to the case. *Id.* at 66-67. In the end, however, the Court did not need to resolve the question of the intervenors' standing; based on a change in the plaintiff's circumstances, the Court declared the case moot, vacated the lower-court decision, and remanded with instructions to dismiss. *Id.* at 72-74. That the Court raised the intervenor-standing issue at all, however, suggests that had the case *not* been moot, the Court would have required the intervenors to demonstrate their independent standing to keep the controversy alive.

More recently in *Horne v. Flores*, 129 S. Ct. 2579, the Court raised but again did not need to resolve an intervenor-standing issue. *Horne* involved a request to lift a contempt order that imposed fines on the State of Arizona for every day that it failed to comply with a court order requiring it to adequately fund an English-language educational program. The request was brought by the State Superintendent of Public Instruction, a defendant in the underlying litigation, but two state legislators also intervened under Rule 24(b) arguing for the same relief. The Court said that because the intervening legislators were aligned with the superintendent and the superintendent plainly had standing, the question of the intervening legislators' standing need not be addressed. 129 S. Ct. at 2592-93. As in *Arizonans for Official English,* however, the Court's reference to the intervenors' standing suggests that had the superintendent not requested

relief from the contempt order, the intervening legislators would have been required to establish their independent standing to do so.

Our conclusion is also consistent with the approach followed by other circuits in cases involving postjudgment intervention for the purpose of challenging a protective order. For example, the Fifth Circuit has concluded that a third party seeking to intervene to challenge a protective order after the main controversy has been disposed of must demonstrate standing. *See Deus v. Allstate Ins. Co.*, 15 F.3d 506, 526 (5th Cir. 1994). In the Fifth Circuit's view, while "there is no Article III requirement that [such] intervenors have standing in a *pending* case," *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006), a third-party challenge to a protective order *after* the plaintiff's claims have been dismissed cannot be maintained if the third party "ha[s] no personal interest affording . . . standing to intervene," *Deus*, 15 F.3d at 526; *see also Newby*, 443 F.3d at 422 ("In the absence of a live controversy in a pending case, an intervenor would need standing to intervene."); *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 777-78 (3d Cir. 1994) (requiring newspaper intervenors to establish standing to challenge protective order postjudgment and concluding that they had done so); *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 787 (1st Cir. 1988) (addressing standing in the context of postjudgment request by third-party public-interest group for access to discovery documents covered by protective order).

Accordingly, we hold that when a third party seeks intervention under Rule 24(b) for the purpose of chal-

No. 07-2651                                                        19

lenging a protective order in a case or controversy that
is no longer live—as when the case has been dismissed
and none of the original parties has sought this relief
postjudgment—the intervenor must meet the standing
requirements of Article III in addition to Rule 24(b)'s
requirements for permissive intervention. Here, the
litigation between Bond and the City had been settled
and the case was about to be dismissed with prejudice
when Kalven filed his petition to intervene. At that
point, and certainly thereafter, when the case was in
fact dismissed, a live Article III case or controversy be-
tween the parties no longer existed. As such, Kalven was
required to independently establish his standing before
being permitted to intervene. *See Flying J,* 578 F.3d at 571
(in another context, noting without discussion that a
permissive intervenor must have Article III standing to
intervene for purposes of appealing an adverse decision
that the original losing defendant did not want to appeal).

## B. Third-party Standing to Challenge a Protective Order to Access Unfiled Discovery

Article III standing requires an injury-in-fact capable of
being redressed by a favorable decision of the court. *Lujan
v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). An
injury-in-fact is "a 'concrete and particularized' invasion
of a 'legally protected interest,' " *Spring Commc'ns Co. v.
APCC Servs., Inc.,* 128 S. Ct. 2531, 2535 (2008) (quoting
*Lujan,* 504 U.S. at 560), and must be "actual or imminent,
not conjectural or hypothetical," *Lujan,* 504 U.S. at
560 (internal quotation marks omitted). Furthermore,

standing exists only if it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

"Although standing in no way depends on the merits of the plaintiff's contention," standing *does* turn on "the nature and source of the claim asserted." *Warth*, 422 U.S. at 500; *see also McConnell v. FEC*, 540 U.S. 93, 227 (2003) (standing requires a "claim of injury . . . to a legally cognizable right"). We have noted that the Supreme Court's standing doctrine requires litigants to establish an injury to an interest "that the law protects when it is *wrongfully* invaded," and this is "quite different from requiring them to establish a *meritorious* legal claim." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006); s*ee also DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005); *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 878 (7th Cir. 1996). However, while a litigant need not definitively "establish that a right of his has been infringed," he "must have a colorable *claim* to such a right" to satisfy Article III. *Aurora Loan*, 442 F.3d at 1024; *see also DH2*, 422 F.3d at 597.

Many of our decisions—as well as decisions from other circuits—speak broadly about a "presumption of public access to discovery materials." *Citizens First Nat'l Bank*, 178 F.3d at 946; *see also Public Citizen*, 858 F.2d at 788-89; *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 146 (2d Cir. 1987) (referring to the public's "presumptive right of access to discovery materials"). To the extent that this language suggests the existence of a general public right

to access the materials that litigating parties exchange in response to discovery requests, it sweeps too broadly. As we will explain, while the public has a presumptive right to access discovery materials that are filed with the court, used in a judicial proceeding, or otherwise constitute "judicial records," the same is not true of materials produced during discovery but not filed with the court. Generally speaking, the public has no constitutional, statutory (rule-based), or common-law right of access to *unfiled* discovery.

It is beyond dispute that most documents filed in court are presumptively open to the public; members of the media and the public may bring third-party challenges to protective orders that shield court records and court proceedings from public view. *See, e.g., Jessup*, 227 F.3d at 997 ("'[T]hose who seek access to [sealed court] material have a right to be heard in a manner that gives full protection to the asserted right.'" (quoting *Associated Press*, 162 F.3d at 507)); *Citizens First Nat'l Bank*, 178 F.3d at 945-46 (regarding filing of appellate appendix under seal); *Associated Press*, 162 F.3d at 507 (regarding press access to sealed court records). This right is derived from the common-law principle that courts are public institutions that operate openly—a principle codified at 28 U.S.C. § 452—and judicially imposed limitations on this right are subject to the First Amendment. *See, e.g., Globe Newspaper Co. v. Super. Ct. for Norfolk County*, 457 U.S. 596, 603-06 (1982); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."

(footnote omitted)); *see also Smith v. U.S. Dist. Ct. for S. Dist. of Ill.*, 956 F.2d 647, 650 (7th Cir. 1992) (recognizing that although this principle originally stemmed from a need to ensure access to criminal proceedings, the right of access has subsequently been expanded to civil proceedings).

While the public's right to access court records is not unlimited, *see Nixon*, 435 U.S. at 598; *Press-Enterprise Co. v. Super. Ct. of Cal., Riverside County*, 464 U.S. 501, 510 (1984), and Rule 26(c) allows a court to shield certain documents from the public when there is good cause to do so, *Citizens First Nat'l Bank*, 178 F.3d at 945 (public interest in observing judicial process can be overridden if "the property and privacy interests of the litigants . . . predominate in the particular case"), the general right of public access to judicial records is enough to give members of the public standing to attack a protective order that seals this information from public inspection. *See Jessup*, 227 F.3d at 997-98; *Grove Fresh*, 24 F.3d at 897-98; *Associated Press*, 162 F.3d at 506-09.

This case is different. Here, Kalven is seeking access to discovery materials that have never been filed with the court and have never influenced the outcome of a judicial proceeding. The Supreme Court has held that the public's right of access is limited to traditionally publicly available sources of information, and "discovered, but not yet admitted, information" is not "a traditionally public source of information." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984); *accord Grove Fresh*, 24 F.3d at 897-98 ("[U]ntil admitted into the record, material uncovered

during pretrial discovery is ordinarily not within the scope of press access."). At common law, pretrial proceedings were closed to the public, *see Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 389 (1979), and the federal discovery rules have not changed this common-law tradition. As the Court noted in *Seattle Times*, "[d]iscovery rarely takes place in public," 467 U.S. at 33 n.19, and the system created by Rule 26 contemplates that the exchange of information in discovery will occur with minimal judicial involvement. *See* FED. R. CIV. P. 26(a)(1)(A), (2), (3) (requiring parties to disclose certain material automatically, regardless of whether other litigants have requested it); *id.* 26(c)(1) (party seeking a protective order must certify that it has "in good faith conferred or attempted to confer with other affected parties in an effort to resolved the dispute without court action"); *see also* N.D. ILL. L.R. 37.2 (providing that courts "shall hereafter refuse to hear any and all motions for discovery and production of documents under Rules 26 through 37 of the Federal Rules of Civil Procedure, unless the motion includes a statement (1) that after consultation in person or by telephone and good faith attempts to resolve differences they are unable to reach an accord, or (2) counsel's attempts to engage in such consultation were unsuccessful due to no fault of counsel's").

There are good reasons to treat the public's right to access filed and unfiled discovery materials differently. For starters, "pretrial discovery, unlike the trial itself, is usually conducted in private." *Citizens First Nat'l Bank*, 178 F.3d at 944. Pretrial discovery—depositions, interrogatories, and the production of documents—"are not

public components of a civil trial," "were not open to the public at common law," and "in general, are conducted in private as a matter of modern practice." *Seattle Times,* 467 U.S. at 33. That the court's discovery processes and rules are used to require litigants to produce otherwise private information to an opposing party is not enough to alter the legal rights of the general public. Discovery rules are "a matter of legislative grace," and "[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes." *Seattle Times,* 467 U.S. at 32, 34. We have said that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002).

The rights of the public kick in when material produced during discovery is filed with the court. *See Seattle Times*, 467 U.S. at 33 & n.19 (recognizing that the public has a right to access anything that is a "traditionally public source of information" and observing that "courthouse records could serve as a source of public information"). At this point, the documents have been "used in [a court] proceeding," FED. R. CIV. P. 5(d), and consequently the possibility exists that they could "influence or underpin the judicial decision" and they are therefore presumptively "open to public inspection unless they meet the definition of trade secret or other categories

of bona fide long-term confidentiality."[8] *Baxter Int'l.*, 297 F.3d at 545; *see also Citizens First Nat'l Bank*, 178 F.3d at 945.

It is true that some cases suggest that Rule 26(c) creates a substantive right of public access to discovery. *See San Jose Mercury News, Inc. v. U.S. Dist. Court for N. Dist. of Cal.*, 187 F.3d 1096, 1103 (9th Cir. 1999); *Public Citizen*, 858 F.2d at 787-90; *Agent Orange*, 821 F.2d at 145-47. These cases, however, were based on a prior version of Rule 5(d) of the *Federal Rules of Civil Procedure* that generally required *all* discovery materials to be filed with the court unless the court ordered otherwise. *See, e.g.,*

---

[8] However, the public does not acquire a right to access discovery material just because a judge might review it in camera in the course of discovery proceedings. *See SEC v. TheStreet.com*, 273 F.3d 222, 233 (2d Cir. 2001) (court review of documents for the purpose of determining whether a protective order should be entered does not "transform every document that a court reviews into a 'judicial document' presumptively open to the public"); *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001) (holding that "material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right"); *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995) ("We are not aware . . . of any common-law principle that documents submitted to a court *in camera* for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public.").

*Agent Orange*, 821 F.2d at 146 (citing a prior version of Rule 5(d)). The drafters of a 1980 amendment to Rule 5(d) considered establishing a rule that discouraged the filing of all discovery but decided not to; "such materials are sometimes of interest to those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally." FED. R. CIV. P. 5(d), advisory committee note (1980). Accordingly, some courts read the prior Rule 5(d) together with Rule 26(c) and concluded that these rules implied the existence of a public right to access discovery *even if* the discovery was not filed with the court. *E.g.*, *Agent Orange*, 821 F.2d at 145-46.

Whatever force these decisions had was destroyed by the 2000 amendment to Rule 5(d), which reversed the longstanding rule generally requiring discovery to be filed with the court. Since 2000, information exchanged in discovery "must *not* be filed" until it is "used in the proceeding" or until "the court orders filing." FED. R. CIV. P. 5(d) (emphasis added). In its present form, then, Rule 5(d) separates discovery material—regardless of whether it is subject to a Rule 26(c) protective order—into two categories: (1) that which is filed with the court (because it is used in a court proceeding or is ordered to be filed); and (2) that which remains unfiled and therefore not part of the public court record. As the Second Circuit has recognized, this amendment eliminated any implied right of public access to *unfiled* discovery emanating from the procedural rules. *See SEC v. TheStreet.com*, 273 F.3d 222, 233 n.11 (2d Cir. 2001) (observing that the

2000 amendment to Rule 5(d) "provides no presumption
of filing of all discovery materials, let alone public access
to them") (abrogating *Agent Orange*). Accordingly,
nothing in Rule 26(c)—either standing alone or when
read in conjunction with the current version of
Rule 5(d)—confers substantive rights upon third parties
seeking access to the fruits of discovery.[9]

The district court's analysis indicates that the judge
thought Rule 26(c) conferred a right on third parties to
challenge a protective order at any time and under any
circumstances; the court seized upon language from
some of our caselaw that refers to a "presumption" in
favor of public access. *E.g.*, *Citizens First Nat'l Bank*,
178 F.3d at 946 ("Most cases endorse a presumption of
public access to discovery materials . . . ."); *In re Cont'l Ill.
Sec. Litig.*, 732 F.2d 1302, 1309-10 (7th Cir. 1984). The "pre-
sumption" mentioned in these cases simply refers to
the general right of the public to access material con-

---

[9] *See* 4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL
PRACTICE & PROCEDURE § 1152, at 465 (3d ed. 2002 & Supp.
2009) ("The 2000 amendment to Rule 5(d) eliminates the
presumption of filing all discovery materials, thereby removing
the presumption in favor of allowing unlimited access to
all discovery materials. This limitation controls both the
parties' and the media's access to those materials not con-
sidered judicial documents." (footnote omitted)); 8 CHARLES
ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2042,
at 542 (2d ed. 1994 & Supp. 2009) (acknowledging that the
changes to Rule 5(d) "may weaken arguments that there is
a presumptive public right of access to such materials").

No. 07-2651

tained in court files and the limited right of litigants
under the First Amendment to "disseminate information
discovered in advance of trial," *Seattle Times*, 467 U.S. at
34. It is a mistake to conclude, as the district court did,
that Rule 26(c) creates a freestanding public right of
access to unfiled discovery. Kalven's standing thus
cannot be grounded in Rule 26(c).[10]

---

[10] In *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, the Third
Circuit held that media representatives had standing to chal-
lenge a protective order shielding an unfiled settlement agree-
ment because the order interfered with their effort to obtain
access to the agreement from the municipal defendant as a
public record under Pennsylvania's Right to Know Act. The
underlying lawsuit in *Pansy* was brought by a former
police chief against his municipal employer, and the media
representatives had filed a state-court action against the munici-
pality under the Pennsylvania Right to Know Act contending
that the settlement agreement was a public record and they
were entitled under the Act to inspect it. The state-court
action had stalled because of the federal-court protective
order; this was enough to establish an injury-in-fact. *Id.* at 784.

Unlike the media intervenors in *Pansy*, Kalven has not sought
access to the documents under the Illinois Freedom of Informa-
tion Act, 5 ILL. COMP. STAT. 140/1 *et seq.* (the "Illinois FOIA"),
presumably on the assumption that they are exempt. *See Lieber
v. Bd. of Trs. of S. Ill. Univ.*, 680 N.E.2d 374 (Ill. 1997); *Copley
Press, Inc. v. Bd. of Educ. for Peoria Sch. Dist. No. 150*, 834 N.E.2d
558 (Ill. App. Ct. 2005). Two recent cases—one from the Illinois
Supreme Court and one from the Appellate Court of Illi-
nois—may bear on the question of how the Illinois FOIA applies
(continued...)

Nor can it be grounded in the First Amendment. Kalven appears to concede this point; he does not assert a constitutional right of access to the unfiled discovery. The only First Amendment concern raised by a protective order limiting disclosure of *unfiled* discovery is the effect such an order may have on a litigant's free-expression rights, which the Supreme Court has said are limited by the context through which the information is acquired. *Seattle Times* made it clear that "[a] litigant has no First Amendment right of access to information made available only for purposes of trying his suit." 467 U.S. at 32. As such, "judicial limitations on a party's ability to disseminate information discovered in advance of trial implicate[] the First Amendment rights of the restricted party to a far lesser extent than would

---

[10] (...continued)

to the police department records at issue here. *See Stern v. Wheaton-Warrenville Cmty. Unit Sch. Dist. 200,* 910 N.E.2d 85 (Ill. 2009); *Gekas v. Williamson,* 912 N.E.2d 347 (Ill. App. Ct. 2009). These cases are difficult to reconcile with *Lieber* and *Copley Press*. We need not try to predict how the Illinois Supreme Court might resolve the conflict. Kalven never sought access to the documents under the Illinois FOIA. Even if he had, it would not make a difference. The protective order does not interfere with Kalven's ability to try to obtain the documents he seeks directly from the City under the Illinois FOIA. Unlike the order prohibiting disclosure of the settlement agreement in *Pansy,* nothing in the protective order here prohibits the City from disclosing any of its police department records to the public upon request. Accordingly, Kalven is not similarly situated as the media intervenors in *Pansy*.

restraints on dissemination of information in a different context." *Id.* at 34; *see also* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 HARV. L. REV. 427, 487 (1991) (describing the interest in accessing information produced by discovery as a side effect of—and therefore subordinate to—the judicial system's central concern of resolving disputes between litigants). Where, as here, the litigants themselves agreed to the protective order and do not seek its modification, this (limited) interest simply is not in play.

Accordingly, Kalven cannot claim standing based on a derivative First Amendment right to receive information; this doctrine requires the existence of a willing speaker. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, to its source and to its recipients both." (footnote omitted)); *accord Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (acknowledging a First Amendment right to "receive information and ideas" and that freedom of speech "necessarily protects the right to receive"). Media challenges to trial-court gag orders have been allowed where the orders interfere with the right to receive information from parties and their attorneys who wish to disseminate it. *See, e.g., In re Dow Jones & Co.*, 842 F.2d 603 (2d Cir. 1988); *CBS Inc. v. Young*, 522 F.2d 234, 237-38 (6th Cir. 1975). But a stipulated protective order involves self-imposed secrecy and is therefore not the equivalent of a gag order.

We have said in another context that a First Amend-
ment right-to-receive claim lies only where there is a
willing speaker because "[a] precondition of the right to
receive . . . is the existence of a 'willing speaker.'" *Ind.
Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007)
(quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 756). Every
circuit to have considered the question of standing in
the context of a right-to-receive claim has reached the
same conclusion: "[I]n order to maintain a 'right to lis-
ten' claim, a plaintiff must clearly establish the ex-
istence of a 'willing speaker.' In the absence of a willing
speaker, an Article III court must dismiss the action
for lack of standing." *Pa. Family Inst., Inc. v. Black*, 489
F.3d 156, 166 (3d Cir. 2007) (internal quotation marks
omitted); *accord Stephens v. County of Albemarle, Va.*, 524
F.3d 485, 490-93 (4th Cir. 2008); *Competitive Enter. Inst. v.
U.S. Dep't of Transp.*, 856 F.2d 1563 (D.C. Cir. 1988);
*Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211-12 (5th
Cir. 1982) ("Recipients of protected communication have
standing only if there is a speaker who wishes to
express himself or herself.").

Thus, to satisfy Article III on this type of claim, an
intervenor must do more than simply assert that a pro-
tective order interferes with his inchoate, derivative
"right" to receive discovery information. *See Okla. Hosp.
Ass'n*, 748 F.2d at 1424-26. Imagining the existence of a
willing speaker runs contrary to the Supreme Court's
command that injuries-in-fact must be "actual or immi-
nent, not conjectural or hypothetical." *Lujan*, 504 U.S. at
560 (internal quotation marks omitted). Where, as here,
the litigants have voluntarily bound themselves to keep
certain discovery confidential and do not themselves

seek relief from the requirements of the protective order, there is no willing speaker on which to premise a First Amendment right-to-receive claim.

In short, Kalven has no injury to a legally protected interest and therefore no standing to support intervention. Neither do the aldermen; in all material respects, they are in the same position as Kalven.

## C. Alternative Basis for Jurisdiction

As an alternative basis for jurisdiction, it might be argued that the district court's authority to modify or revoke the protective order postjudgment is premised upon its inherent power. A district court's dismissal of a lawsuit by stipulation under Rule 41(a)(1)(A)(ii) of the *Federal Rules of Civil Procedure* generally limits the power of the court to issue further orders, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), but the Supreme Court has recognized that a court can take certain postdismissal action in furtherance of its ancillary jurisdiction, a doctrine "which recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Id.* at 378. A sua sponte postjudgment modification of a protective order does not fall within the court's ancillary jurisdiction; it is not a matter "incidental to" another matter that is "properly before" the court.

*Kokkonen* held that after a lawsuit has been dismissed, the doctrine of ancillary jurisdiction—which has alterna-

No. 07-2651                                                    33

tively been called pendent jurisdiction, supplemental
jurisdiction, or ancillary-enforcement jurisdiction, 13
CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE &
PROCEDURE § 3523.2, at 212-13 (3d ed. 2008)—will em-
power the court to act only where necessary to "enable
the court to function successfully, that is, to manage its
proceedings, vindicate its authority, and effectuate its
decrees." *Kokkonen,* 511 U.S. at 380. More specifically, the
Court held in *Kokkonen* that to support an exercise of
ancillary jurisdiction postjudgment, there must be an
express reservation of jurisdiction in the judgment.

   *Kokkonen* involved the question of a federal court's
jurisdiction to enforce a settlement agreement following
dismissal. The Court said that ancillary jurisdiction to
enforce a settlement agreement would exist only "if
the parties' obligation to comply with the terms of the
settlement agreement had been made part of the order
of dismissal—either by separate provision (such as a
provision 'retaining jurisdiction' over the settlement
agreement) or by incorporating the terms of the settle-
ment agreement in the order." *Id.* at 381. In that
situation, the Court said, "a breach of the agreement
would be a violation of the order, and ancillary juris-
diction to enforce the agreement would therefore exist."
*Id.* But where the dismissal order neither incorporated
the parties' settlement agreement nor expressly
retained jurisdiction over it, the court lacked ancillary
jurisdiction to enforce it and any action for breach of
the agreement belonged in state court. *Id.*

   As applied here, these principles foreclose the possi-
bility that the district court had inherent authority to

revisit and rescind the protective order. We note again that the protective order did not operate to shield the court's own records from public view; although a court may have inherent authority to modify a protective order sealing documents maintained in the court file, *see Nixon*, 435 U.S. at 598 ("[e]very court has supervisory power over its own records and files"), that's not what's at issue here. And although Rule 60 of the *Federal Rules of Civil Procedure* might have provided a basis for a postjudgment motion for relief from the protective order by Bond or the City, that's obviously not at issue here, either.[11] There was no breach of the protective order nor fraud in connection with its entry—either of these might have supported an exercise of ancillary jurisdiction to enable the court to "vindicate its authority." *Kokkonen,* 511 U.S. at 380.

And finally, although the docket notation recording the entry of the agreed order of dismissal said the case remained "open" for the purpose of "the Court retaining jurisdiction" over Kalven's petition to intervene to "unseal public documents," this is an insufficient basis upon which to rest ancillary jurisdiction. First of all, there *were* no "sealed public documents" in the court's file that the judge might have been prevailed upon to "unseal." Second, neither the parties' stipulation to dismiss nor the agreed dismissal order incorporated a retention of jurisdiction; the docket entry alone cannot supply

---

[11] *Kokkonen* specifically distinguished Rule 60(b) motions that "reopen[ ] the dismissed suit." 511 U.S. at 378.

No. 07-2651                                                           35

ancillary jurisdiction. Once the case was dismissed with prejudice, Kalven's third-party attack on the protective order simply cannot be considered "ancillary" or "incidental" to any matter properly before the court. We have found no case suggesting that a district court may sua sponte raise and rebalance the equities that led to the entry of a protective order after the dispute that created the need for it has ended. The district court's order dissolving the protective order therefore cannot be justified as an exercise of its inherent authority.

For the foregoing reasons, we VACATE the district court's order granting Kalven's petition to intervene and lifting the protective order and REMAND with instructions to dismiss the petition for lack of standing. Because the aldermen also lack standing, we VACATE our prior order granting their motion to intervene in this appeal; that motion is now DENIED and they are DISMISSED from the appeal.

TINDER, *Circuit Judge*, concurring. I concur in the result because I believe that the district court lacked justification to lift the protective order. As the majority correctly explains, the district court erroneously applied a presumption of public access under Rule 26(c) to the

unfiled discovery documents exchanged in this case. Such a presumption is no longer tenable in light of the 2000 amendment to Rule 5(d), which provided that discovery documents should not be filed with the court until used in a judicial proceeding. Op. at 25-27. So where, as here, the parties have agreed to a confidentiality order covering unfiled discovery materials which, for good cause, was judicially approved, a district court should honor that order absent some showing of abuse or other extraordinary circumstances. To require any less of a showing would undermine the parties' reliance on protective orders, which are essential to a fair, efficient discovery process. *See SEC v. TheStreet.com*, 273 F.3d 222, 229-30 (2d Cir. 2001). The district court relied on the public's significant interest in monitoring police misconduct as the basis for lifting the protective order. In my view, this generalized public interest in allegations of police misconduct, while not insignificant, is, standing alone, not sufficiently compelling to conclude that the parties' stipulated confidentiality order lacks good cause under Rule 26(c). But Kalven presented nothing more so he clearly failed to make a sufficient showing to undo the protective order. (Nor do the aldermen evidence that they could do any better in that regard.) For that reason, I would reverse the district court's decision to lift the protective order.

So, I would arrive at the same place as the majority opinion but by going to the merits of the decision to alter the protective order rather than barring the petition for lack of standing. I don't mean to put the cart before the horse by addressing the merits of Kalven's

No. 07-2651                                                    37

claim without considering the foundational question of
standing. The majority opinion provides a thoughtful
analysis of the complex interplay between Article III
standing, permissive intervention under Rule 24(b), and
third-party challenges to protective orders. Nevertheless,
I respectfully suggest that, although it is a very close
call, Kalven had sufficient standing to bring his brink-of-
dismissal challenge to the protective order in this case.

Courts have recognized that third parties can chal-
lenge a protective order under Rule 26(c) for good
cause, even where the order covers non-judicial records
that fall outside of the public's common law right of
access. *See Public Citizen v. Ligget Group, Inc.*, 858 F.2d
775, 787-88 (1st Cir. 1988) (public interest group had
standing to demand good cause under Rule 26(c) to
maintain a protective order covering discovery materials);
*In re Alexander Grant & Co. Litigation*, 820 F.2d 352, 354-56
(11th Cir. 1987) (per curiam) (journalists had standing
to bring a Rule 26(c) challenge to a protective order even
though they had no First Amendment right of access to
the discovery documents). As we explained in *Grove
Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 898
(7th Cir. 1994), the press has standing to challenge a
protective order for abuse or impropriety. A third party
may claim that a litigant is exploiting a court's confidenti-
ality order to insulate embarrassing documents that
present no "good cause" for secrecy within the meaning
of Rule 26(c). *Id.*; *cf. Citizens First Nat'l Bank of Princeton
v. Cincinnati Ins. Co.*, 178 F.3d 943, 944-46 (7th Cir. 1999)
(concluding that a protective order allowing the parties
to designate virtually any discovery materials as con-

fidential, even those introduced into the judicial record, was overbroad).

   After a very thorough review of these and other cases, the majority explains that courts in the past have failed to carefully distinguish between the public's rights of access to judicial records and to unfiled discovery materials, and that Rule 26(c)'s "good cause" requirement does not support any "presumption" of public access to the latter. Op. at 20-21, 25-28. That is true, and because the information sought here has never been filed with the court, this matter calls for an even more stringent review of standing than the host of cases involving court-filed documents. But I respectfully suggest that it does not follow that a third-party intervenor necessarily lacks standing to bring a Rule 26(c) challenge to a protective order covering unfiled discovery documents. Although unfiled discovery does not fall within the public's presumptive right of access, the public still "has an interest in what goes on at all stages of a judicial proceeding." *Citizens First Nat'l Bank*, 178 F.3d at 945. As noted, third-party Rule 26(c) claims may prevent litigants from abusing a court-approved confidentiality order to seal whatever they want. *See Grove Fresh*, 24 F.3d at 898. Other circumstances (not present here) could arise where a third party shows such an "extraordinary circumstance or compelling need" for unfiled discovery documents that a district court should modify an order protecting those documents. *TheStreet.com*, 273 F.3d at 229. Kalven's request came so late in the life of this case and is so lacking in merit that it is tempting to simply join in the majority's well-reasoned and persuasive

standing conclusion. However, I hesitate to do so because I fear that a determination that Kalven lacks standing might be read as a categorical bar to third parties who would seek unfiled discovery materials that are subject to protective orders. While circumstances in which such requests might be granted ought to be exceedingly rare, I think Kalven presented just enough to the district court to get in the door to argue his position.

There is no way to know whether the settlement in this case was reached between the parties before or after Kalven filed his intervention request. But we do know that his petition reached the court prior to the issuance of the order of dismissal, albeit only slightly. And we do know that his assertion of status as a journalist conducting research on a matter of public interest such as police brutality is genuine. We also know that the unfiled discovery documents subject to the protective order are concerned with allegations of police misconduct. As such, I think Kalven's petition contained just enough to demonstrate his standing to file it. But the substance of his request came nowhere close to mustering enough weight to justify altering the protective order upon which the parties had relied in fulfilling their discovery obligations.